Appeal Nos. 2024-2119, 2024-2120

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

GOOGLE LLC,

*Appellant,*

v.

SONOS, INC.,

*Appellee.*

**Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2023-00118, IPR2023-00119**

**OPENING BRIEF OF APPELLANT GOOGLE LLC**

Daniel C. Tucker
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
(571) 203-2700

Cory C. Bell
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
Two Seaport Lane
Boston, MA 02210-2001
(617) 646-1641

Erika H. Arner
A. Safiya Aguilar
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

November 18, 2024

*Attorneys for Appellant Google LLC*

**Exemplary Claim of U.S. Patent No. 10,134,398**

9.  A system comprising:

one or more computers and one or more storage devices storing instructions that are operable, when executed by the one or more computers, to cause the one or more computers to perform operations comprising:

receiving, by a computing device that is in a low power mode and that is configured to exit a low power mode upon detecting an utterance of a particular, predefined hotword using an on-device hotword detector, audio data that corresponds to an utterance of a particular, predefined hotword;

*while the computing device remains in the low power mode*, and in response to receiving the audio data that corresponds to the utterance of the particular, predefined hotword, *transmitting*, by the computing device and to another computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, *an output of processing the audio data* using the on-device hotword detector;

*while the computing device remains in low power mode*, *receiving*, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, *an additional output of processing the audio data*; and

*after transmitting* the output of processing the audio data using the on-device hotword detector *and after receiving* the additional output of processing the audio data from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, *determining, by the computing device, to remain in the low power mode*.

Appx125 at 18:1-34 (emphases added).

**Exemplary Claim of U.S. Patent No. 10,593,330**

9.  A system comprising:

one or more computers; and

one or more computers and one or more storage devices storing instructions that are operable, when executed by the one or more computers, to cause the one or more computers to perform operations comprising:

receiving, by a computing device that is in a low power mode, audio data that includes an utterance of a particular, predefined hotword;

*while the computing device remains in the low power mode*, and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, *transmitting*, by the computing device, *a message*;

*while the computing device remains in the low power mode*, *receiving*, by the computing device and from an additional computing device that is in a low power mode, *an additional message*; and

based on the message and the additional message, *determining*, by the computing device, *to exit the low power mode*.

Appx141 at 17:10-30 (emphases added).

## <u>CERTIFICATE OF INTEREST</u>

**Case Number:**  2024-2119, 2024-2120

**Short Case Caption:**  Google LLC v. Sonos, Inc.

**Filing Party/Entity:**  Google LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date:  November 18, 2024          Signature:   /s/ Daniel C. Tucker

                                 Name:      Daniel C. Tucker

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Google LLC | | XXVI Holdings Inc. |
| | | Alphabet Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this **court** for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable       ☐     Additional pages attached

| | | |
|---|---|---|
| Alissa E. Green<br>Finnegan, Henderson,<br>Farabow, Garrett &<br>Dunner, LLP | Misook Kim<br>Finnegan, Henderson,<br>Farabow, Garrett &<br>Dunner, LLP | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☒     Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒     None/Not Applicable       ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

STATEMENT OF RELATED CASES ...................................................................x

STATEMENT OF JURISDICTION ....................................................................1

I.      PRELIMINARY STATEMENT ...................................................................2

II.     STATEMENT OF THE ISSUE ....................................................................4

III.    STATEMENT OF THE CASE ......................................................................5

        A.     The '398 and '330 Patents .................................................................5

               1.     Overview .................................................................................5

               2.     The independent claims require that the computing
                      device exchange messages for determining whether to
                      exit a low power mode, while the device remains in that
                      low power mode...........................................................................7

        B.     Rosenberger Prior Art and Sonos's Anticipation Grounds.................11

               1.     In Rosenberger's coordination methods, the device
                      broadcasts its weighted signal (i.e., sends its message)
                      while in the active mode, not the low power mode. .................13

               2.     Rosenberger's column 8 disclosure relies on the
                      coordination methods where the device transmits its
                      message only from the active state. .........................................18

        C.     The Board's Final Written Decision ...................................................19

IV.     SUMMARY OF THE ARGUMENT ..........................................................22

V.      ARGUMENT....................................................................................................23

        A.     Standards of Review..........................................................................23

        B.     Substantial Evidence Does Not Support the Board's Finding
               that Rosenberger Anticipates the Claims ............................................24

1. Rosenberger's control device exits the low power mode when it is "triggered," which occurs before it transmits the weighted signal...................................................................25

2. Rosenberger's column 8 does not disclose transmitting the weighted signal while the device remains in the low power mode...............................................................................28

3. Sonos's alternative rationale in its IPR Reply cannot support affirmance. ...................................................35

VI. CONCLUSION............................................................36

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008) ..........................................................23

*Ariosa Diagnostics v. Verinata Health, Inc.*,
    805 F.3d 1359 (Fed. Cir. 2015) ..........................................................23

*Blue Calypso, LLC v. Groupon, Inc.*,
    815 F.3d 1331 (Fed. Cir. 2016) ..........................................................23

*In re Chapman*,
    595 F.3d 1330 (Fed. Cir. 2010) ..........................................................23

*In re Chudik*,
    851 F.3d 1365 (Fed. Cir. 2017) ..........................................................23

*Connell v. Sears, Roebuck & Co.*,
    722 F.2d 1542 (C.C.P.A. 1983) ..........................................................24

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009) ..........................................................26

*In re Fritch*,
    972 F.2d 1260 (Fed. Cir. 1992) ..........................................................24

*In re Gates*,
    787 F. App'x 741 (Fed. Cir. 2019) ................................................24, 31

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
    780 F.3d 1376 (Fed. Cir. 2015) ..........................................................11

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*,
    381 F.3d 1142 (Fed. Cir. 2004) ..........................................................34

*Leggett & Platt, Inc. v. VUTek, Inc.*,
    537 F.3d 1349 (Fed. Cir. 2008) ..........................................................30

*NetMoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) ...................................................24, 31

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*,
    851 F.3d 1270 (Fed. Cir. 2017) ............................................................25

*Panduit Corp. v. Dennison Mfg. Co.*,
    810 F.2d 1561 (Fed. Cir. 1987) ............................................................24

*Schumer v. Lab. Computer Sys., Inc.*,
    308 F.3d 1304 (Fed. Cir. 2002) ............................................................35

*TF3 Ltd. v. Tre Milano, LLC*,
    894 F.3d 1366 (Fed. Cir. 2018) ............................................................26

*TQ Delta, LLC v. Cisco Sys., Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019) ............................................................34

### STATUTES

5 U.S.C. § 706(2) ..................................................................................23

28 U.S.C. § 1295(a)(4)(A) ......................................................................1

35 U.S.C. § 141 ......................................................................................1

35 U.S.C. § 319 ......................................................................................1

## **STATEMENT OF RELATED CASES**

Under Fed. Cir. R. 47.5(a), counsel for Appellant, Google LLC ("Google"), certifies that no other appeal from the same proceeding in the United States Patent and Trademark Office, Patent Trial and Appeal Board ("Board"), is or was previously before this Court or any other appellate court, whether under the same or a similar title.

Under Fed. Cir. R. 47.5(b), counsel for Google states that the Court's decision in these consolidated appeals may affect the following cases: *Google LLC v. Sonos, Inc.*, Case No. 3:22-cv-04552 (N.D. Cal.); and *Certain Audio Players and Components Thereof*, Inv. No. 337-TA-1329 (ITC).

## <u>STATEMENT OF JURISDICTION</u>

These are consolidated appeals under 35 U.S.C. § 141(c) from the Board's Final Written Decisions entered on May 15, 2024, in *Inter Partes* Review ("IPR") Nos. IPR2023-00118 involving U.S. Patent No. 10,134,398 ("the '398 patent") and IPR2023-00119 involving U.S. Patent No. 10,593,330 ("the '330 patent"). *See* Appx1-53; Appx54-110.

Appellant Google timely filed Notices of Appeal on July 16, 2024. Appx706-710; Appx3800-3804. This Court therefore has jurisdiction over these appeals under 35 U.S.C. §§ 141 and 319 and 28 U.S.C. § 1295(a)(4)(A).

# I.   PRELIMINARY STATEMENT

Speech-enabled devices have improved our daily lives. We can play our favorite songs by invoking our digital assistant: "Hey Google, play Piano Man." We can set timers, get the weather, and have our questions answered without lifting a finger. Because speech-enabled devices are so useful, users often have several of them in one space. And when a user invokes the digital assistant using a hotword (e.g., "Hey Google") in the vicinity of several devices, it is desirable that only one intended device responds to the user.

The '398 and '330 patents[1] involved in these consolidated appeals solve this problem in a specific way. They describe embodiments where each computing device calculates a confidence score indicating a likelihood that an utterance includes a hotword and exchanges the confidence score with the other devices. Appx119 at 5:6-10, 5:16-21, 5:32-34; Appx135 at 5:7-11, 5:17-21, 5:33-35. The computing device with the highest confidence score "sets [its] activation state as active or 'awake'" and processes the user request. Appx122 at 11:18-23; Appx138 at 11:18-23. The independent claims of both patents capture these concepts. Central

---

[1] The '330 patent is a continuation of the '398 patent and shares its written description and figures. As explained in Section III.A.2, the independent claims of both patents include similar limitations for purposes of appeal. The records for the respective proceedings are also similar for purposes of this appeal. Google's brief therefore includes citations to the '398 patent proceeding with parallel citations to the '330 patent and its proceeding.

to this appeal, the claims recite a process by which the computing device receives the utterance in a "low power mode" and remains in that "low power mode" while exchanging messages with another device operating in a low power mode. Appx124-126 at claims 1, 9, 16; Appx140-141 at claims 1, 9, 17. After the exchange, it then determines whether to remain in or exit the low power mode. Appx124-126 at claims 1, 9, 16; Appx140-141 at claims 1, 9, 17.

Sonos filed two IPR Petitions that respectively challenged the independent claims of each patent as being anticipated by Rosenberger. Appx329; Appx3427. Rosenberger discloses speech recognition devices that exchange and compare "weighted signals" using one of four "coordination methods" to determine which device is best able to successfully interact with the user. Appx903 at 10:34-41; Appx904 at 11:27-36. Unlike the claimed computing devices of the '398 and '330 patent, Rosenberger's speech recognition devices do not exchange these weighted signals while in the low power mode. Instead, Rosenberger's devices exchange weighted signals after being triggered, i.e., after being switched from the low power mode to an active mode. Appx904 at 11:27-48; Appx891; Appx892; Appx894.

In its Final Written Decisions, the Board recognized that Rosenberger discloses exchanging weighted signals while in the active mode, but it mistakenly concluded that Rosenberger also discloses a separate "embodiment" in column 8 that teaches exchanging its weighted signals in the low power mode. Appx39-40;

Appx91-94. Specifically, the Board found that Rosenberger's column 8 disclosure that its device "determin[es] that it is in a better position to handle subsequent user interaction than any other device" before "beep[ing]," changing a "status light," or playing an "audio message," discloses exchanging weighted signals in the low power mode. Appx39-42; Appx91-94. But the Board overlooked that this part of Rosenberger *never* discloses exchanging weighted signals or exiting the low power mode. Instead, it instructs the reader to "see" the "device coordination discussion below" to understand when and how the device makes its "determin[ation]." Appx902 at 8:17-32. The "device coordination discussion below" refers to Rosenberger's four "coordination methods," which uniformly explain its device sends weighted signals after being triggered, i.e., after being switched from the low power mode to the active mode. Appx904 at 11:27-48. The Board ignored this instruction which undoes its entire reading of column 8 and demonstrates that Rosenberger does not disclose exchanging weighted signals in the low power mode. The Board's finding to the contrary therefore lacks substantial evidence support, and so the Board's unpatentability determinations should be reversed.

## II.    STATEMENT OF THE ISSUE

1.    Does substantial evidence support the Board's determination that Rosenberger anticipates the independent claims of the '398 and '330 patents, where the claims require exchanging messages while remaining in a low power mode and

Rosenberger only teaches exchanging its weighted signals (which correspond to the claimed messages) in an active mode that is different from its low power mode?

## III.    STATEMENT OF THE CASE

### A.    The '398 and '330 Patents

#### 1.    Overview

The '398 and '330 patents are directed to improvements in speech-enabled systems. The patents recognize that such systems may "pick[] up all utterances made in the surrounding environment including those not directed to the system," and thus "must have some way of discerning when any given utterance is directed at the system as opposed, e.g., to being directed at an individual present in the environment." Appx117 at 1:49-56; Appx133 at 1:50-57. This problem can be solved by using a predetermined "hotword" "that is spoken to invoke the attention of the system." Appx117 at 1:56-60; Appx133 at 1:57-61. For example, a user can invoke the attention of the system by using the hotword "OK computer," followed by the spoken query or command for the system. Appx117 at 1:60-2:5; Appx133 at 1:61-2:6. Thus, the user can interact with the system using the syntax "[HOTWORD] [QUERY]," where the "QUERY" can be any "question, command, declaration, or other request" for the system. Appx117 at 1:66-2:5; Appx133 at 1:67-2:6.

A problem may arise, however, if multiple devices are trained to respond to a user's voice, in which case "many devices may be continuously listening for

hotwords." Appx118 at 3:43-56; Appx134 at 3:44-57. If this happens, "when a user speaks the hotword toward one device, if any of their other devices are nearby, it is likely that they will also trigger a voice search." Appx118 at 3:48-51; Appx134 at 3:49-52. This likely is "not the user's intention," and so the patents "address[] the problem of selecting the correct device for reacting to a hotword, and suppressing reaction to the hotword on the other devices." Appx118 at 3:51-56; Appx134 at 3:52-57.

To address this problem, the patents describe embodiments where each device detects and processes an utterance, computes a confidence score indicating the likelihood that the utterance corresponds to a hotword, and transmits the computed confidence score to the other devices. Appx119 at 5:6-10, 5:16-20, 5:32-34; Appx135 at 5:7-11, 5:17-21, 5:33-35. The devices compare the confidence scores, and "the computing device that determines its own hotword confidence score is the highest initiates speech recognition on speech data th[at] follows the hotword utterance." Appx119 at 6:19-31; Appx135 at 6:20-32.

In one embodiment, the device determines whether to remain in a sleep state or switch to an active state based on this exchange of confidence scores. For example, the device with the highest confidence score "sets [its] activation state as active or 'awake'" and initiates the speech recognition. Appx122 at 11:10-22;

6

Appx138 at 11:11-23. The other devices remain in a sleep state, as shown in Figure

1 below:



Appx114 at Fig. 1; Appx130 (as annotated at Appx496; Appx3589). As explained

below, the independent claims of both patents are directed to the embodiment where

the device determines whether to remain in or exit its sleep mode based on the

exchange of the messages, e.g., confidence scores.

> **2.     The independent claims require that the computing device exchange messages for determining whether to exit a low power mode, while the device remains in that low power mode.**

Each independent claim of both patents recites a process by which a

computing device in a "low power mode" <span style="color:red">receives audio data</span> that includes a hotword

and remains in that low power mode while exchanging messages or outputs[2] with another device that is also in a low power mode. Appx124-126 at claims 1, 9, 16; Appx140-141 at claims 1, 9, 17. Only after the message exchange does the device determine whether to remain in or exit[3] the low power mode. Specifically, each claim requires that the computing device performs three steps in "low power mode": (a) transmit a message; (b) receive a message from another device; and (c) determine whether to exit the low power mode. Appx124-126 at claims 1, 9, 16; Appx140-141 at claims 1, 9, 17. The relevant portions of the independent claims for each patent are shown in the following tables:

| '398 Patent – Appx124-126 (emphases added) | | |
|---|---|---|
| **Claim 1** | **Claim 9** | **Claim 16** |
| *receiving, by a computing device that is in a low power mode* . . ., audio data that corresponds to an utterance of the particular, predefined hotword; | *receiving, by a computing device that is in a low power mode* . . ., audio data that corresponds to an utterance of a particular, predefined hotword; | *receiving, by a computing device that is in a low power mode* . . ., audio data that corresponds to an utterance of a particular, predefined hotword; |
| *while the computing device remains in the low power mode,* . . . | *while the computing device remains in the low power mode,* . . . | *while the computing device remains in the low power mode,* . . . |

---

[2] The '398 claims recite exchanging "output[s]," while the '330 claims recite exchanging "message[s]." *See, e.g.*, Appx124 at claim 1; Appx140 at claim 1. For succinctness, the brief uses "messages" to refer to both sets of claims.

[3] The '398 patent claims recite "remain in the low power mode," and the '330 patent claims recite "exit the low power mode." *See, e.g.*, Appx124 at claim 1; Appx140 at claim 1. For succinctness, the brief often uses "exit" to refer to the respective sets of claims.

| | | |
|---|---|---|
| *transmitting*, by the computing device . . ., an output of processing the audio data using the on-device hotword detector;<br><br>*while the computing device remains in low power mode, receiving*, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data; and<br><br>after transmitting the output . . . and after receiving the additional output . . ., *determining, by the computing device, to remain in the low power mode.* | *transmitting*, by the computing device . . ., an output of processing the audio data using the on-device hotword detector;<br><br>*while the computing device remains in low power mode, receiving*, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data; and<br><br>after transmitting the output . . . and after receiving the additional output . . ., *determining, by the computing device, to remain in the low power mode*. | *transmitting*, by the computing device . . ., an output of processing the audio data using the on-device hotword detector;<br><br>*while the computing device remains in low power mode, receiving*, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data; and<br><br>after transmitting the output . . . and after receiving the additional output . . ., *determining, by the computing device, to remain in the low power mode*. |

| '330 Patent – Appx140-141 (emphases added) | | |
|---|---|---|
| **Claim 1** | **Claim 9** | **Claim 17** |
| *receiving, by a computing device that is in a low power mode*, audio data that includes an utterance of a particular, predefined hotword;<br><br>*while the computing device remains in the low* | *receiving, by a computing device that is in a low power mode*, audio data that includes an utterance of a particular, predefined hotword;<br><br>*while the computing device remains in the low* | *receiving, by a computing device that is in a low power mode*, audio data that includes an utterance of a particular, predefined hotword;<br><br>*while the computing device remains in the low* |

| | | |
|---|---|---|
| *power mode,* and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, *transmitting*, by the computing device, a message; | *power mode,* and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, *transmitting*, by the computing device, a message; | *power mode,* and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, *transmitting*, by the computing device, a message; |
| *while the computing device remains in the low power mode, receiving*, by the computing device and from an additional computing device that is in a low power mode, an additional message; and | *while the computing device remains in the low power mode, receiving*, by the computing device and from an additional computing device that is in a low power mode, an additional message; and | *while the computing device remains in the low power mode, receiving*, by the computing device and from an additional computing device that is in a low power mode, an additional message; and |
| based on the message and the additional message, *determining, by the computing device, to exit the low power mode.* | based on the message and the additional message, *determining, by the computing device, to exit the low power mode.* | based on the message and the additional message, *determining, by the computing device, to exit the low power mode.* |

The dispute between the parties before the Board, and relevant to this appeal, was not whether Rosenberger taught exchanging messages generally, but whether it taught exchanging them *while in Rosenberger's low power mode*. In addressing this dispute, the parties and the Board treated claim 9 of each patent as representative and focused their respective analyses on "[c]lause [9.2]" of claim 9 from each patent. *See* Appx37-45; Appx89-98. Clause [9.2] for each patent recites the first of the three steps outlined above, i.e., transmitting the message from the device while that device "remains in the low power mode." Appx37; Appx89. Thus, Google's appeal also

focuses on the Board's analyses of clauses [9.2] for each patent, which are reproduced below:

| Clause [9.2], '398 patent | Clause [9.2], '330 patent |
|---|---|
| *while the computing device remains in the low power mode*, and in response to receiving the audio data that corresponds to the utterance of the particular, predefined hotword, *transmitting*, by the computing device . . . , *an output* of processing the audio data using the on-device hotword detector | *while the computing device remains in the low power mode*, and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, *transmitting*, by the computing device, *a message*; |

## B. Rosenberger Prior Art and Sonos's Anticipation Grounds

For the independent claims of each patent, Sonos only advanced anticipation grounds based on Rosenberger. Appx311; Appx3409.[4] In these grounds, Sonos advanced only an express anticipation theory; it did not argue inherency, nor did it argue that one "would 'at once envisage' the claimed arrangement." *See* Appx502 (quoting *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015)); Appx3594; Appx329-360; Appx3427-3454.

Rosenberger describes an "interactive speech recognition control device and system that . . . provide totally hands-free speech control capabilities" for systems and appliances. Appx885 at Abstract. Rosenberger discusses existing systems where speech recognition devices are "constantly listening for . . . 'trigger phrases.'"

---

[4] Sonos also advanced anticipation or obviousness grounds for each patent's dependent claims. Appx311; Appx3409-3410.

Appx899 at 2:4-6. Rosenberger recognizes that such systems might deploy multiple speech recognition devices, but that having multiple devices may create what Rosenberger calls a "duplicate response problem," where "several devices simultaneously recognize the same speech command or trigger phrase" and "respond simultaneously." Appx899 at 2:41-47, 2:52-64; Appx900 at 3:30-35.

Rosenberger addresses the duplicate response problem using "real time coordination [to] ensure[] that only one device will respond to the command," even "[w]hen two or more devices are triggered." Appx885 at Abstract; *see also* Appx903 at 10:5-14. Specifically, "the control device of the invention uses one of several different *coordination methods* to achieve the design goal of avoiding duplicate responses to the same speech command while selecting a single control device best able to successfully interact with the system user." Appx903 at 10:34-41 (emphasis added). "All of [Rosenberger's coordination] methods involve the calculation and production by the control device of a numeric weighted signal (WS) that quantifies the 'quality' of a just-recognized speech command." *Id.* Rosenberger explains that "[o]nce each device in a space that recognizes a speech command has calculated its weighted signal, there are a number of methods for the devices to be coordinated so that only the single device with the highest weighted signal proceeds to interact with the user and/or process the speech command." Appx904 at 11:27-31. Rosenberger

then describes "[f]our possible methods for achieving this goal," Appx904 at 11:32-36, each of which are explained in the following subsection.

### 1. In Rosenberger's coordination methods, the device broadcasts its weighted signal (i.e., sends its message) while in the active mode, not the low power mode.

Sonos's IPR Petition argued that Rosenberger's steps of exchanging the weighted signals in its coordination methods taught the claims' steps of exchanging messages. Appx342-353; Appx3436-3447. For example, Sonos argued that Rosenberger's device transmitting the weighted signal in its coordination method corresponded to the "transmitting" step in clauses [9.2]. Appx342-349; Appx3436-3444. As Google's expert explained and as discussed below, however, Rosenberger's devices exchange weighted signals in the coordination methods only when they are in the active mode and not in the low power mode. *See* Appx3107-3108 ¶ 60; Appx3111-3128 ¶¶ 64-83; Appx4079-4080 ¶ 60; Appx4083-4100 ¶¶ 64-84.

Before discussing Rosenberger's different coordination methods, it is important to note that Rosenberger discloses only two modes: a "low power 'listening' mode" during which the control device receives a trigger phrase, and an "active mode." Appx904 at 11:37-48. Sonos agrees—at the oral hearing, its counsel stated that "Rosenberger discloses two specific modes. That's the low power listening mode and the active mode." Appx664 at 24:4-5. When pressed to answer,

"how many low power modes" Rosenberger discloses, Sonos's counsel conceded, "[t]he answer is one." Appx662-663 at 22:22-23:12. And Sonos was clear that it was mapping Rosenberger's low power listening mode "to the claimed low power mode." Appx649 at 9:21-23 ("[E]veryone in this room here today agree[s] that Rosenberger's disclosed low power listening mode amounts to the claimed low power mode."). The Board also agreed. Appx654 at 14:4-5 ("I take it there's two modes for Rosenberger. It's either listening or it's active, according to this passage."); Appx654 at 14:13-16 ("it looks like that's when it's switched from listening mode to active mode, is after it hears the trigger word."); Appx664 at 24:2-15 (identifying "two modes" when "looking for what does Rosenberger actually teach").

In Rosenberger's coordination methods, the control device only calculates and exchanges the weighted signals after it has switched from the low power "listening" mode to the active mode. Specifically, in the coordination methods, the "*triggered . . .* device calculates a weighted signal as described above" and "*then sends its weighted signal* to each of the other interactive speech recognition control devices . . . ." Appx904 at 11:42-48 (emphases added). And Rosenberger defines a "triggered" device as one that has "switched" from the low power "listening" mode to the active mode: "the microcontroller 10 of each control device is programmed . . . to be *'triggered' (i.e., switched from a "listening" mode to an*

14

*active mode*) . . . through its recognition of a spoken trigger or command phrase." Appx904 at 11:37-45 (emphasis added). Rosenberger also explains that a device that does not win the coordination "reverts to a 'listening mode,'" i.e., returns to the low power "listening" mode from the active mode it entered when it was triggered. Appx900 at 4:45-47; *see also* Appx904 at 11:59-64 (explaining that the losing "device immediately terminates processing and resumes listening for a future speech command").

Rosenberger uses flow charts to describe the "[f]our possible methods of achieving [its] goal" of device coordination:

1. a "Broadcast and Monitor" method, as illustrated in Figure 4;
2. a "Coordinating Controller—Optimistic" method, as illustrated in Figures 5A and 5B;
3. a "Coordinating Controller—Pessimistic" method, as illustrated in Figures 5A and 5B; and
4. a "Paired Neighbor Coordination" method, as illustrated in Figure 6.

Appx904 at 11:32-36. In each of these four coordination methods, the control device "[f]irst . . . waits to be 'triggered' (i.e., switched from a 'listening' mode to an active mode)," and then performs the subsequent weighted signal calculation and transmission after being triggered. Appx904 at 11:40-48. Rosenberger's flow charts confirm that in each method, the device is triggered prior to exchanging any weighted signals.

For example, in Figure 4 (below), which describes the "Broadcast and Monitor" method, the device "waits to be 'triggered' (i.e., switched from a 'listening' mode to an active mode)" at the first step of the process, shown in green below. Appx904 at 11:40-48. After it has been "triggered," i.e., switched to the active mode, the device calculates the weighted signal, broadcasts the weighted signal to the other devices, and monitors for weighted signals sent from other devices. Appx904 at 11:42-59.



Appx891 at Fig. 4 (as excerpted and annotated at Appx3365).

Similarly, Rosenberger explains that the two Coordinating Controller methods described in Figure 5A begin "when a speech command *triggers* a control device," i.e., switches it to the active mode, then "calculates a weighted signal *as described above*." Appx904 at 12:28-33 (emphasis added). As shown in Figure 5A below, the

device calculates and transmits the weighted signal only after being triggered into active mode:



Appx892 at Fig. 5A (as excerpted and annotated at Appx3365).

Finally, Rosenberger explains that in the Paired Neighbor Coordination method described in Figure 6 the device also recognizes a "Speech Trigger or Command" before it calculates and transmits the weighted signal:



Appx894 at Fig. 6 (as excerpted and annotated at Appx3365); *see also* Appx905 at 13:30-14:1.

Thus, in all four coordination methods, Rosenberger's device is "triggered" and switches from the low power "listening" mode to the active mode before calculating and sending the weighted signals for coordination.

> ### 2. Rosenberger's column 8 disclosure relies on the coordination methods where the device transmits its message only from the active state.

Before Rosenberger discusses its "coordination methods," Appx903 at 10:34-14:9, it describes various components and attributes of its device with reference to a block diagram of the device shown in Figure 1, Appx901-902 at 6:14-8:54. The Board focused on a portion of this description at column 8 when analyzing clause [9.2]. *See infra* Section III.C. The portion of column 8 on which the Board relied is produced below:

> Preferably, device D normally operates in a low power "listening" mode in which it listens for a hands-free trigger phrase (e.g., "Hello Voice Control" or "Home Automation") to be spoken by the system user. Upon receiving and recognizing a speech trigger phrase and determining that it is in a better position to handle subsequent user interaction than any other device that simultaneously recognized the same speech trigger phrase (see device coordination discussion below), or when the user depresses the "Push to Talk" button 24 on the device, or in the event the device is instructed to wake up and expect a subsequent speech command by a system controller, the device beeps, changes its status light 34 or plays a pre-recorded or synthesized audio message (e.g. "How may I help you?") through speaker 19 and/or 20 to prompt the user to say one of the speech commands from a known vocabulary or grammar stored in the speech pattern memory 14.

Appx902 at 8:17-32.

This passage indicates that Rosenberger's "device D normally operates in a low power 'listening' mode in which it listens" for a trigger phrase. Appx902 at 8:17-20. Notably, this passage does not state *when* the device exits that low power "listening" mode. Nor does it mention exchanging weighted signals at all, let alone before the device exits the low power "listening" mode. Instead, this passage explains that "[u]pon receiving and recognizing a speech *trigger* phrase and determining that it is in a better position to handle subsequent user interaction than any other device that simultaneously recognized the same speech trigger phrase (*see device coordination discussion below*) . . . the device beeps, changes its status light 34 or plays a prerecorded or synthesized audio message . . . ." Appx902 at 8:20-32 (emphases added). It therefore discusses recognizing a "trigger" phrase and then cross references to Rosenberger's discussion of its "device coordination" methods. As explained above, in those device coordination methods, the device first switches to the active mode upon receiving the trigger phrase and then calculates and transmits the weighted signal in the active mode. *See supra* Section III.

## C.  The Board's Final Written Decision

In its final written decision, the Board found that Rosenberger anticipated the independent claims of both patents. Appx53; Appx110. The Board recognized that both parties agreed "Rosenberger's 'low power-'listening mode'' is a low power mode." Appx19; Appx73. Therefore, the Board concluded that "a specific

construction of the term 'low power mode' is not necessary to reach a decision" regarding anticipation. Appx20; Appx74. It nonetheless stated that it was applying the parties' agreed construction of the term, which was "an operating mode or state in which power is conserved." Appx20; Appx74.

The Board then summarized its understanding of Rosenberger. Appx21-27; Appx75-81. It recognized that "'Rosenberger's low power listening mode' is for listening for a trigger phrase." Appx25 (quoting Appx902 at 8:17-27); Appx79 (same). But it determined, citing Rosenberger's column 8 disclosure, that "[i]t is only *after* detecting the trigger phrase and '*upon . . . determining that it is in a better position to handle subsequent user interaction than any other device* that simultaneously recognized the same speech trigger phrase' does Rosenberger's device D '*change[] its status light 34*' to indicate its new 'wake up' status as being ready for a subsequent speech command." Appx25 (quoting Appx902 at 8:20-27); Appx79 (same). It therefore concluded that Rosenberger's computing device (1) "listen[s] in 'low power' mode for a 'trigger phrase;'" (2) exchanges weighted signals to determine which device is "in a better position" to handle a subsequent query; and (3) if it is in a "better position," "then exits its low power mode and 'wakes up.'" Appx25; Appx79.

The Board next compared Rosenberger's disclosure to the independent claims. Appx27-32; Appx81-85. During the IPR proceedings, the parties treated

independent claim 9 of both patents as representative, so the Board also focused on

claim 9 and specifically clause [9.2] which requires the computing device to transmit

the message while in the low power mode. Appx32-44; Appx85-97. Here, the Board

correctly identified the dispute between the parties:

> [T]he key issue between the parties is *when* does Rosenberger exit its low power mode? Petitioner asserts Rosenberger exits its low power mode *after* the devices *exchange* weighted signal inputs and *determine* which device will respond to a user query, and thus anticipates [the independent claims]. Patent Owner asserts Rosenberger exits its low power mode upon receiving a trigger word, and thus does not anticipate these claims.

Appx39; Appx91 (similar).

The Board resolved this dispute in favor of Sonos based on Rosenberger's

column 8 disclosure. Appx39-42; Appx91-94. The Board viewed the column 8

disclosure as being a separate "embodiment[] in Rosenberger," and credited this

disclosure with teaching the limitations at issue. Appx39; Appx91. It concluded that

"[b]ecause Rosenberger discloses several different embodiments, to some extent

both parties are correct," and noted that "[Sonos] focuses on the disclosure at column

8," while "[Google] focuses on the disclosure at column 11." Appx39-41; Appx91-

94. It then determined that Rosenberger's column 8 disclosure indicates "the

determination based on the weighted signal is made while the system is still in low

power mode and *before* the system changes its status to active and is ready for a user

query." Appx40-41 (citing Appx902 at 8:17-24, 8:30-32); Appx92-94. It briefly

noted Google's opposing argument, but did not substantively address it. Appx41-42; Appx93-94. It then concluded that "Rosenberger discloses the elements and limitations of clause [9.2]." Appx42; Appx94.

The Board also determined that Rosenberger discloses the limitations of clauses [9.3] and [9.4], which recite the additional steps that also must be performed in the low power mode. Appx42-44; Appx95-97. It made these conclusions "based on the same analysis as in clause [9.2]." Appx43-44; Appx96-97. The Board also referred to its analysis of claim 9 for the remaining independent claims. Appx44-45; Appx97-98. Google appealed the Board's decisions. Appx706-708; Appx3800-3802.

## IV.    SUMMARY OF THE ARGUMENT

The Court should reverse the Board's decisions finding that the claims of the '398 and '330 patents are unpatentable. The Board's anticipation findings for the independent claims of both patents are not supported by substantial evidence because Rosenberger fails to disclose exchanging its weighted signals "while the computing device remains in the low power mode," as required by all independent claims. Instead, Rosenberger only discloses exchanging the weighted signals *after* the device has been triggered, "i.e., switched from [the low power] 'listening' mode to an active mode." The Board's erroneous conclusion to the contrary is based on its misreading of Rosenberger's column 8 disclosure. That disclosure discusses neither

exchanging weighted signals nor exiting the low power "listening" mode. Instead, it refers the reader to other portions of Rosenberger which make clear that Rosenberger's device only exchanges weighted signals after being switched from the low power "listening" mode to an active mode. The Board's anticipation finding therefore cannot be sustained.

## V.     ARGUMENT

### A.     Standards of Review

This Court reviews the Board's legal conclusions de novo and its factual findings for substantial evidence. *In re Chapman*, 595 F.3d 1330, 1336-37 (Fed. Cir. 2010); *see also* 5 U.S.C. § 706(2); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015). Anticipation is a question of fact, reviewed for substantial evidence. *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1341 (Fed. Cir. 2016).

"[A] prior art reference anticipates a claim only if it discloses all the elements 'in the same form and order as in the claim.'" *In re Chudik*, 851 F.3d 1365, 1372 (Fed. Cir. 2017) (quoting *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1345 (Fed. Cir. 2008)). "Though [the Court's] review of an anticipation finding is deferential, [it has] not hesitated to reverse the Board when substantial evidence does not support its findings." *Id.* at 1371-72.

## B.     Substantial Evidence Does Not Support the Board's Finding that Rosenberger Anticipates the Claims

The Court should reverse the Board's determination that the '398 and '330 patent claims are unpatentable because substantial evidence does not support the Board's finding that Rosenberger anticipates the independent claims.[5] To anticipate a claim, a single prior art reference must teach each limitation "arranged or combined in the same way as in the claim." *NetMoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008); *see In re Gates*, 787 F. App'x 741, 744 (Fed. Cir. 2019). "A prior art reference that 'almost' meets that standard . . . does not 'anticipate.'" *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (C.C.P.A. 1983). Rosenberger does not meet this standard because its control devices function differently than the independent claims. The claims require "transmitting" a message "while the computing device remains in the low power mode." In contrast, Rosenberger's control devices transmit the weighted signals—what the Board read onto the claimed transmitting step—only after they are triggered, i.e., switched from the low power "listening" mode to the active mode.

---

[5] Google focuses on the Board's anticipation analysis of the independent claims. If the Court agrees with Google regarding the independent claims, it should likewise reverse the anticipation and obviousness determinations for the dependent claims. *See, e.g.*, *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("[D]ependent claims are nonobvious if the independent claims from which they depend are nonobvious."); *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1576 n.36 (Fed. Cir. 1987) ("Because [independent] claim 1 is not invalid, the presence of all its limitations in [a dependent claim] preserves the latter's validity.").

The Board incorrectly concluded that Rosenberger teaches a separate "embodiment" that exits the low power "listening" mode after exchanging the weighted signals because it misread a paragraph in column 8 of Rosenberger. Appx39-41; Appx93-94. Rosenberger does not teach transmitting the weighted signals in the low power "listening" mode—in column 8 or elsewhere—and thus does not provide substantial evidence to support the Board's determination. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 851 F.3d 1270, 1274 (Fed. Cir. 2017) (reversing Board's anticipation finding as unsupported by substantial evidence because the prior art reference was missing a claim limitation).

### 1. Rosenberger's control device exits the low power mode when it is "triggered," which occurs before it transmits the weighted signal.

The Board mapped Rosenberger's weighted signal transmission to the claimed transmitting steps of clauses [9.2].[6] Appx37-42; Appx89-94. It also mapped Rosenberger's low power "listening" mode to the claimed low power mode. Appx19; Appx24-25; Appx38-41; Appx73; Appx78-79; Appx93-94. It is undisputed that this low power "listening" mode is Rosenberger's only low power mode. Appx902 at 8:17-20; *see also* Appx904 at 11:40-42; Appx900 at 4:45-47; *see*

---

[6] As discussed above, the Board relied on its analysis of the transmitting step in clauses [9.2] when analyzing the subsequent steps of clauses [9.3] and [9.4], and it treated claim 9 of both patents as exemplary. Appx42-44; Appx95-97. Therefore, this analysis focuses on clauses [9.2] although the argument applies to clauses [9.3] and [9.4] and to all independent claims.

*supra* Section III.B.1 (citing Appx654 at 14:4-5, 14:13-16; Appx662-663 at 22:22-23:12; Appx649 at 9:21-23; Appx664 at 24:2-15). Rosenberger, however, only discloses that its device transmits the weighted signal after it exits its low power "listening" mode, which is the opposite of what is claimed.

In this regard, Rosenberger expressly defines when its device exits the low power "listening" mode: when it is "triggered" by recognizing a trigger phrase. Specifically, Rosenberger states: "[f]irst, the microcontroller waits to be 'triggered.' (*i.e.*, switched from a 'listening' mode to an active mode)." Appx904 at 11:40-42 (emphasis added); *see also id.* at 11:42-44 (discussing being "triggered . . . through its recognition of a spoken trigger or command phrase"). Rosenberger's use of "i.e." "'signals an intent to define the word to which it refers.'" *TF3 Ltd. v. Tre Milano, LLC*, 894 F.3d 1366, 1372 (Fed. Cir. 2018) (quoting *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009)). While the Board noted this disclosure, Appx41; Appx93, it incorrectly concluded that "triggering a device with a 'trigger phrase' as disclosed in Rosenberger *is not synonymous with* exiting Rosenberger's low power mode." Appx43 (emphasis added); Appx96. This conclusion directly contradicts Rosenberger's definition of "triggered" to mean "switched from a 'listening' mode to an active mode." Appx904 at 11:40-44.

Rosenberger discloses transmitting the weighted signals in the context of its "different coordination methods." Appx903 at 10:34-41. But in all "[f]our possible

methods," it explains that the control device "[f]irst . . . waits to be 'triggered' (i.e., switched from a 'listening' mode to an active mode)," and then performs the subsequent weighted signal calculation and transmission after being triggered. Appx904 at 11:32-48. Specifically, as explained above, Rosenberger's figures confirm that the devices are triggered before sending weighted signals because the triggering step occurs before the transmission step in each of the four coordination methods described in Figures 4-6. *See supra* Section III.B.2. Nowhere does Rosenberger describe transmitting the weighted signals before the device is triggered and switched to the active mode.

Elsewhere, Rosenberger confirms that its devices have exited the low power "listening" mode prior to transmitting the weighted signals because it explains that the device that loses the coordination process (i.e., that does not have the highest weighted signal) "reverts to a 'listening mode.'" Appx900 at 4:41-47; *see also* Appx904 at 11:59-64 (describing "termina[ting] processing and resum[ing] listening" if another device includes a higher weighted signal), 12:19-23 (similar); Appx905 at 13:59-64 (similar). Rosenberger's device can only "revert[] to" the "listening" mode if it has previously exited that mode. This confirms that Rosenberger's device exits the low power "listening" mode prior to exchanging the weighted signals.

Despite Rosenberger's consistent disclosure, the Board focused on a single paragraph in column 8 that it found disclosed the claim limitations. Appx24-25; Appx40-41; Appx78-79; Appx93-94. But as discussed below, the Board overlooked the shortcomings of this paragraph and its interrelation to the rest of Rosenberger's disclosure which make clear that the device switches from the low power "listening" mode to the active mode when it is "triggered" and before transmitting a weighted signal.

### 2. Rosenberger's column 8 does not disclose transmitting the weighted signal while the device remains in the low power mode.

The Board's finding that Rosenberger anticipated the independent claims was based on its misreading of Rosenberger's column 8 disclosure, which is reproduced below:

> Preferably, device D normally operates in a low power "listening" mode in which it listens for a hands-free trigger phrase (e.g., "Hello Voice Control" or "Home Automation") to be spoken by the system user. Upon receiving and recognizing a speech trigger phrase and determining that it is in a better position to handle subsequent user interaction than any other device that simultaneously recognized the same speech trigger phrase (see device coordination discussion below), or when the user depresses the "Push to Talk" button 24 on the device, or in the event the device is instructed to wake up and expect a subsequent speech command by a system controller, the device beeps, changes its status light 34 or plays a pre-recorded or synthesized audio message (e.g. "How may I help you?") through speaker 19 and/or 20 to prompt the user to say one of the speech commands from a known vocabulary or grammar stored in the speech pattern memory 14.

Appx902 at 8:17-32; *see* Appx39-41; Appx91-94. Based on this disclosure, the Board determined that Rosenberger's computing device (1) "listen[s] in 'low power' mode for a 'trigger phrase;'" (2) exchanges weighted signals to determine which device is "in a better position" to handle a subsequent query; and (3) if it is in a "better position," "then exits its low power mode and 'wakes up.'" Appx24-25; Appx78-79. It then concluded that this "embodiment[]" in Rosenberger "anticipates claims 1, 9, and 16." Appx39-42; Appx91-94. Rosenberger does not support the Board's finding for two reasons.

*First*, the Board erred in concluding that column 8 discloses exchanging the weighted signals while in the low power "listening" mode. Appx40-42; Appx93-94. Column 8 does not disclose transmitting weighted signals *at all*. Instead, the Board relied on column 8's disclosure of the device "determining that it is in a better position to handle subsequent user interaction," and noted that "the determination [is made] based on the weighted signal" Appx40; Appx92; Appx94; *see also* Appx24-25; Appx78-79. But the Board ignored that the same sentence also instructs the reader to "see" the "device coordination discussion below." Appx902 at 8:20-24. That is a clear reference to Rosenberger's "[f]our possible methods" for device coordination where the device *always* exits the low power "listening" mode before exchanging the weighted signals. *See supra* Sections V.B.1, III.B.1. Column 8 does not separately discuss transmitting weighted signals outside of its reference to the

29

"device coordination discussion below." Thus Rosenberger's only discussion of exchanging weighted signals refers to methods where the exchange occurs after the device has already exited the low power "listening" mode.

The Board failed to grapple with how column 8's "see device coordination discussion below" instruction invokes Rosenberger's subsequent disclosures of its device coordination methods. Instead, the Board viewed column 8 as a separate "embodiment," and then improperly faulted Google for "rel[ying] on the erroneous assumption that the disclosure of multiple examples renders one example less anticipatory." Appx39 (citing *Leggett & Platt, Inc. v. VUTek, Inc.*, 537 F.3d 1349, 1356 (Fed. Cir. 2008)); Appx91 (same). But column 8 is not a separate example—it is part of and expressly references the device coordination methods that follow it. Indeed, column 8 and the following device coordination discussion all discuss the same "control device" (sometimes referred to as "control device D" or "device D") that is initially disclosed in Figure 1 and referred to as "the control device of the invention." *E.g.*, Appx902 at 8:17-20; Apx903 at 10:34-38; Appx904 at 11:37-40, 12:28-32. As such, the Board's citation to *Leggett* is misplaced. There, the Court noted that the prior art disclosed "multiple examples," and that the anticipatory nature of one of those examples was not undermined by the other examples. *Leggett*, 537 F.3d at 1356. That is not the case here, because the column 8 disclosure is neither a separate example nor anticipatory.

The fact that Rosenberger discloses transmitting weighted signals and separately discloses switching out of its low power "listening" mode is not enough because the claims require that the transmission happens before the switch. Rosenberger does not disclose this and thus does not disclose each limitation "arranged or combined in the same way as in the claim." *NetMoneyIN*, 545 F.3d at 1370; *In re Gates*, 787 F. App'x at 743-44 (reversing Board's anticipation finding of a prior art reference that taught switching transmission devices and a surface proximity sensor generally because it did not disclose switching transmission devices "*in response to* a change in proximity to a surface," as claimed).

*Second*, the Board erred by concluding that column 8 discloses the device exits the low power "listening" mode after determining that it is in a better position to handle subsequent user interaction. Appx40; Appx94-95; *see also* Appx24-25; Appx78-79. Column 8 does not mention switching between modes at all, let alone switching out of the low power "listening" mode. To the contrary, column 8 only discusses the "listening" mode to explain that the device D "normally operates in a low power 'listening mode' in which it listens for a hands free trigger phrase," Appx902 at 8:17-20. It never discloses that the device is still in that "listening" mode when it determines whether it is in the best position to handle user interaction; nor does it explain when the device exits the "listening" mode.

31

The Board erroneously cited to two portions of column 8 as teaching exiting the low power listening mode. Neither support the Board's conclusion. The first portion discloses that the device "beeps, changes its status light 34 or plays a prerecorded or synthesized audio message (e.g., 'How may I help you?')." Appx902 at 8:17-20; *see* Appx40; Appx92. But this only explains when feedback is provided to the user via a visual or audio indication. Disclosing when a status light is changed or when a sound is played does not clearly disclose when the device switches from the low power "listening" mode to the "active mode," particularly considering Rosenberger's otherwise clear definition that the device switches modes when it is "triggered" by a trigger phrase.

The second portion on which the Board relied uses the phrase "wake up." Appx25; Appx79. Specifically, the Board stated that Rosenberger's device (1) "listen[s] in 'low power' mode for a 'trigger phrase;'" (2) exchanges weighted signals to determine which device is "in a better position" to handle a subsequent query; and (3) if it is in a "better position," "then exits its low power mode and '*wakes up*.'" Appx25 (emphasis added); Appx79. But the "wake up" described in column 8 is caused by an instruction, and it is untethered to a speech trigger phrase and determination that the device is in a better position to handle subsequent interaction. As shown below, the column 8 disclosure contemplates three distinct preconditions, any one of which will cause the device "to prompt the user to say one

of the speech commands from a known vocabulary or grammar stored in the speech

pattern memory":

> **[1]** Upon receiving and recognizing a speech trigger phrase and determining that it is in a better position to handle subsequent user interaction than any other device that simultaneously recognized the same speech trigger phrase (see device coordination discussion below), *or* **[2]** when the user depresses the "Push to Talk" button 24 on the device, *or* **[3]** *in the event the device is instructed to wake up and expect a subsequent speech command by a system controller*, the device beeps, changes its status light 34 or plays a pre-recorded or synthesized audio message (e.g. "How may I help you?") through speaker 19 and/or 20 to prompt the user to say one of the speech commands from a known vocabulary or grammar stored in the speech pattern memory 14.

Appx902 at 8:17-32 (emphases added). Awakening the device, as described in

column 8, does not require trigger phrases and weighted signals. Thus, the disclosed

"wake up" cannot support the Board's finding that Rosenberger discloses exiting the

low power mode after exchanging the weighted signals.

Moreover, column 8 does not associate "wake up" with switching from the

low power "listening" mode, whereas Rosenberger elsewhere defines the switch in

terms of a "triggered" device. Appx904 at 11:40-44. Instead, column 8 associates

"wak[ing] up" with facilitating user interaction by "expect[ing] a subsequent speech

command." Appx902 at 8:26-32. This is consistent with Rosenberger's use of the

phrase "wake up" in column 10, which indicates that it is acceptable for a device to

"wake up" and interact with a user. Appx903 at 10:31-33. Neither the column 8 nor

column 10 disclosures equate waking up with exiting the low power "listening" mode.

The Board also cited the declaration of Sonos's technical expert, Dr. Johnson, in support of its finding that Rosenberger's column 8 discloses transmitting a message while in low power "listening" mode. Appx41 (citing Appx818-819 ¶ 121); Appx92-94 (citing Appx3911-3912 ¶ 114-115); *see also* Appx40 (citing Appx824-825 ¶ 139); Appx92 (citing Appx3917-3918 ¶ 131). Dr. Johnson's testimony also does not provide substantial evidence for the Board's findings because it is conclusory, unsubstantiated, and contradicts Rosenberger for all the same reasons as the Board's analysis. The first cited portion simply quotes parts of column 8 (Appx818 ¶ 120; *see also* Appx3911 ¶113), and then concludes that this teaches exiting the low power mode "only after the applicable 'coordination method' is performed," (Appx818-819 ¶ 121; Appx3911-3912 ¶114-115). The second cited portion similarly block quotes column 8 and concludes that only the control device with the highest weighted signal value exits the low power mode, despite Rosenberger never making such a disclosure. Appx824-825 ¶ 139; Appx3917-3918 ¶ 131. "Conclusory expert testimony does not qualify as substantial evidence." *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358-59 & n.5 (Fed. Cir. 2019) (collecting cases); *see also Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) (holding that "[g]eneral and conclusory testimony . . .

does not suffice as substantial evidence of invalidity [anticipation]"); *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315-16 (Fed. Cir. 2002) (clarifying that "testimony concerning anticipation must . . . explain in detail how each claim element is disclosed in the prior art reference" and is "insufficient if it is merely conclusory"). Accordingly, substantial evidence does not support the Board's finding that Rosenberger discloses exchanging messages while in low power mode.

### 3.    Sonos's alternative rationale in its IPR Reply cannot support affirmance.

In its Reply during the IPR, Sonos also argued that if the Board were to determine that Rosenberger did not disclose remaining in the "listening" mode throughout its coordination process, Rosenberger would still remain in a "low power mode" because certain components in Rosenberger that interact with the user and process speech commands would "not consume power" during coordination. Appx570-572; Appx3665-3666.

The Board did not adopt this position; nonetheless, it cannot provide an independent basis for affirmance for at least two other reasons. First, it contradicts Sonos's positions before the Board. As explained above, Sonos confirmed to the Board that Rosenberger only discloses one low power mode, Appx662-663 at 22:22-23:12, and that it is the low power 'listening' mode. Appx649 at 9:21-23; Appx664 at 24:4-5.

Second, Sonos's Reply position fails to meet the agreed construction, which requires "an operating mode or state in which power is conserved." Appx18; Appx20; Appx72; Appx74. As Google explained, requiring a *mode or state* where power is conserved means more than simply measuring power consumption at two different periods of time. Appx675-677 at 35:6-37:5; Appx680-681 at 40:25-41:8; *see also* Appx599-600; Appx3693-3694. Sonos's Reply position that the Board did not adopt therefore cannot provide an independent basis for affirmance.

## VI.    CONCLUSION

The Court should reverse the Board's decisions that the challenged claims are unpatentable because Rosenberger directly contradicts and therefore does not provide substantial evidence support for the Board's anticipation findings.

Date: November 18, 2024       Respectfully submitted,

/s/ *Daniel C. Tucker*

Erika H. Arner
A. Safiya Aguilar
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue NW
Washington, DC 20001-4413
(202) 408-4000

Daniel C. Tucker
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
(571) 203-2700

Cory C. Bell
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Seaport Lane
Boston, MA 02210-2001
(617) 646-1641

*Attorneys for Appellant Google LLC*

# Addendum

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SONOS, INC.,
Petitioner,

v.

GOOGLE LLC,
Patent Owner.

———————

IPR2023-00118
Patent 10,134,398 B2

———————

Before KEVIN F. TURNER, BARRY L. GROSSMAN, and
TERRENCE W. McMILLIN, *Administrative Patent Judges*.

GROSSMAN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2023-00118
Patent No. 10,134,398 B2

# I.INTRODUCTION

## A.    Background and Summary

Sonos, Inc. ("Petitioner" or "Sonos") filed a Petition for *inter partes* review of claims 1–5, 7–13, and 15–20 (collectively, the "challenged claims") of U.S. Patent No. 10,134,398 B2 (Ex. 1001, "the '398 patent"). Paper 1 ("Pet."). Google LLC ("Patent Owner" or "Google") filed a Preliminary Response to the Petition. Paper 6 ("Prelim. Resp.").

We concluded that Petitioner satisfied the burden, under 35 U.S.C. § 314(a), to show that there was a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims. Accordingly, on behalf of the Director (37 C.F.R. § 42.4(a) (2022)), and in accordance with *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1353 (2018), we instituted an *inter partes* review of all the challenged claims, on all the asserted grounds. Paper 9 ("Dec. Inst.").

Patent Owner filed a Response. Paper 10 ("PO Resp."). Petitioner filed a Reply. Paper 12 ("Reply"). Patent Owner filed a Sur-reply. Paper 13 ("Sur-reply").

An Oral Argument was held March 5, 2024. (Paper 20) ("Transcript or "Tr.").

We have jurisdiction under 35 U.S.C. § 6. We enter this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has the burden of proving unpatentability of a claim by a preponderance of the evidence. 35 U.S.C. § 316(e).

Based on the findings, analysis, and conclusions below, we determine that Petitioner has proven by a preponderance of the evidence that the challenged claims are unpatentable.

IPR2023-00118
Patent No. 10,134,398 B2

### B.   Real Parties-in-Interest

Sonos identifies itself as the sole real party-in-interest. Pet. 1. Google identifies itself as the real party-in-interest. Paper 4, 2.

### C.   Related Matters

The parties state that the '398 patent is the subject of the following ITC and district court proceedings: *Certain Audio Players and Components Thereof*, Inv. No. 337-TA-1329 (the "1329 ITC proceeding") and *Google LLC v. Sonos, Inc.*, Case No. 3:22-CV-04552 (N.D. Cal.) (the "District Court litigation"). Pet. 1–2; Paper 4, 2; *see also* Ex. 3003 ¶ 2 (the Complaint for Patent Infringement in the District Court litigation); Ex. 1017, 1 (Patent Owner's "Initial Markman Brief" in the 1329 ITC proceeding).

At the Oral Argument, Petitioner's counsel stated both the 1329 ITC proceeding and the District Court litigation have been stayed in view of this and related IPR proceedings. Tr. 6:16–22; *see also* Ex. 1015, 6:20–25, 13:4–13 (transcript of a Case Management Conference in the 1329 ITC proceeding discussing a revised trial schedule in light of the pending IPR proceedings).

Petitioner also states that U.S. Patent 10,593,330 (the "'330 patent") "is related to the '398 Patent."[1] Pet. 2, n.1. Patent Owner acknowledges that "[t]he '330 and '398 patents are related and share a common specification." Ex. 1017, 10. The '330 patent is based on a patent application that is a "continuation" of the patent application that matured into the '398 patent. *See* Ex. 1001 (in the 00119 IPR), code [63].

---

[1] The '330 patent is the subject of IPR2023-00119 (the "00119 IPR").

IPR2023-00118
Patent No. 10,134,398 B2

Petitioner states that "Google has also asserted U.S. Patents 9,812,128 and 11,024,311 against Sonos in *Certain Audio Players and Components Thereof*, Inv. No. 337-TA-1330 and *Google LLC v. Sonos, Inc.*, Case No. 3:22-CV-04553 (N.D. Cal.)" and that "[t]hese patents are related to the '398 Patent and have been challenged by Sonos in IPR2022-01594 and IPR2022-01592, respectively." Pet. 2. In each of IPR2022-01592 and IPR2022-01594, the Board issued a Final Written Decision determining in each case that all challenged claims were unpatentable. *See* IPR2022-01592, Paper 31 (PTAB Apr. 4, 2024); IPR2022-01594, Paper 30 (PTAB Mar. 15, 2024).

*D.    The '398 patent*

We make the following findings of fact concerning the '398 patent.

The '398 patent is titled "Hotword Detection on Multiple Devices." Ex. 1001, code (54). The disclosed technology "generally relates to systems and techniques for recognizing the words that a person is speaking, otherwise referred to as speech recognition." *Id.* at 1:16–18.

The disclosed technology operates in the context of "a speech-enabled home or other environment—that is, one in which a user need only speak a query or command out loud and a computer-based system will field and answer the query and/or cause the command to be performed." *Id.* at 1:22–26.

As explained in the Specification,

> [a] speech-enabled environment (e.g., home, workplace, school, etc.) can be implemented using a network of connected microphone devices distributed throughout the various rooms or areas of the environment. Through such a network of microphones, a user has the power to orally query the system from essentially anywhere in the environment without the need

IPR2023-00118
Patent No. 10,134,398 B2

> to have a computer or other device in front of him/her or even
> nearby.

*Id*. at 1:26–34.

A "hotword," as used in the context of the '398 patent, is a word or phrase, which, by agreement among the users in the environment, "is reserved as a predetermined word [or phrase] that is spoken to invoke the attention of the system." *Id*. at 1:57–60. An example of a hotword used to invoke the system's attention is the phrase "OK computer." Ex. 1001, 1:60–62. In this example, each time the phrase "OK computer" is spoken within proximity of a system microphone, the system first determines whether the reserved, predetermined hotword was spoken and, "if so, awaits an ensuing command or query." *Id*. at 1:62–66. Thus, as further explained in the '398 patent,

> utterances directed at the system take the general form
> [HOTWORD] [QUERY], where 'HOTWORD' in this example
> is 'OK computer' and 'QUERY' can be any question, command,
> declaration, or other request that can be speech recognized,
> parsed and acted on by the system, either alone or in conjunction
> with the server via the network.

*Id*. at 1:66–2:5.

The '398 patent explains that in a speech-enabled environment, "a network of connected microphone devices distributed throughout the various rooms or areas of the environment" can be implemented for a user "to orally query the system from essentially anywhere in the environment without the need to have a computer or other device in front of him/her or even nearby." *Id*. at 1:26–33. According to the '398 patent, "the system, which potentially picks up all utterances made in the surrounding environment including those not directed to the system, must have some way of discerning when any

5

IPR2023-00118
Patent No. 10,134,398 B2

given utterance is directed at the system" and "[o]ne way to accomplish this is to use a hotword." *Id.* at 1:51–60. Accordingly, the '398 patent discloses an embodiment in which

> a user device receives an utterance that is spoken by a user. The user device determines whether the utterance includes a hotword and computes a hotword confidence score that indicates a likelihood that the utterance includes the hotword. The user device transmits this score to other user devices in the near vicinity. The other user devices likely received the same utterance. The other user devices compute a hotword confidence score and transmit their scores to the user device. The user device compares the hotword confidence scores. If the user device has the highest hotword confidence score, then the user device *remains active* and prepares to process additional audio [*i.e.*, a Query]. If the user device does not have the highest hotword confidence score, then the user device does not process the additional audio.

*Id.* at 2:6–21 (emphasis added). An advantage of this system is that "[m]ultiple devices can detect a hotword and only one device will respond to the hotword." *Id.* at 3:18–22. The system "addresses the problem of selecting the correct device for reacting to a hotword, and suppressing reaction to the hotword on other devices." *Id.* at 3:54–56.

Figure 1 of the '398 patent is reproduced below.

6

IPR2023-00118
Patent No. 10,134,398 B2



FIG.1

Figure 1 "is a diagram of an example system for hotword detection."
Ex. 1001, 3:32–33. System 100 allows user 102 [bottom center of Fig. 1] to
speak utterance 104 (*e.g.*, "OK, Computer") that is detected by microphones
of computing devices 106, 108, and 110. *Id.* at 3:58–60. Computing
devices 106, 108, and 110 process utterance 104 to determine a likelihood
that utterance 104 includes a hotword and "each [computing device]
transmit[s] data to each other that indicates the likelihood that the utterance
104 includes a hotword." *Id.* at 3:60–65.

Computing devices 106, 108, and 110 then compare the data and "the
computing device that computed the highest likelihood that the
utterance 104 included a hotword initiates speech recognition on the
utterance 104" while "computing devices that did not compute the highest
likelihood that the utterance 104 includes a hotword *do not initiate speech*

7

**Appx7**

IPR2023-00118
Patent No. 10,134,398 B2

*recognition* on the speech [*i.e.*, a Query] following the utterance 104." *Id.* at 3:65–4:5 (emphasis added).

Computing devices 106, 108, and 110 include corresponding "hotworders" 124, 126, and 128 that compute a corresponding confidence score for utterance 104 from an audio input device such as a microphone using extracted audio features and "a support vector machine or a neural network." *Id.* at 5:6–31. Computing devices 106, 108, and 110 also include corresponding score comparer 136, 138, and 140 "to compare the hotword confidence scores that the computing device has received." *Id.* at 6:19–28. To make the comparison, confidence score data packets 130, 132, and 134 are transmitted from one computing device to another. *Id.* at 5:32–6:18.

Figure 2 from the '398 patent, reproduced below, is a flow diagram of an example process for hotword detection. Ex. 1001, 3:34–35.



FIG. 2

8

**Appx8**

IPR2023-00118
Patent No. 10,134,398 B2

Figure 2 is a diagram of an example process 200 for hotword detection that may be performed by a computing device such as computing device 108 shown in Figure 1. Ex. 1001, 9:37–40. Neither Figure 2 nor the related written description refers to a "low power mode" in determining which computing device will initiate "speech recognition" on the user query following a hotword determination.

The Specification also states that the disclosed computing devices can take many different configurations, but include typical computing elements such as processors, memories, and similar components for networked computing devices. *See id.* at 12:24–13:12.

### E.    *Illustrative Claim*

Among the challenged claims, claims 1, 9, and 16 are independent claims. Independent claim 1 is directed to a "computer-implemented method." Ex. 1001, 16:27. Independent claim 9 is directed to a "system." *Id.* at 18:1.[2] Independent claim 16 is directed to a "non-transitory computer-readable medium storing software comprising instructions executable by one or more computers." *Id.* at 19:37–39. As we discuss below in our consideration of independent claims 9 and 16, but for the preambles, claims 9 and 16 are substantive repetitions of independent claim 1.[3]

---

[2] Petitioner asserts that independent claim 9 "is the narrowest independent claim of the '398 Patent." Pet. 22 (citing Ex. 1002 ¶¶ 69, 145–50. We make no finding or conclusion regarding Petitioner's assertion about the scope of claim 9.

[3] Petitioner states "elements 1.1, 1.2, 1.3, and 1.4 of claim 1 map to elements 9.1, 9.2, 9.3, and 9.4 of claim 9, respectively. Pet. 51. Petitioner also states

IPR2023-00118
Patent No. 10,134,398 B2

Independent claim 1 is illustrative and is reproduced below with bracketed labels employed by Petitioner. *See* Pet. 50–51.

> [1.0] A computer-implemented method comprising:
> [1.1] receiving, by a computing device that is in a low power mode and that is configured to exit a low power mode upon detecting an utterance of a particular, predefined hotword using an on-device hotword detector, audio data that corresponds to an utterance of the particular, predefined hotword;
> [1.2] while the computing device remains in the low power mode, and in response to receiving the audio data that corresponds to the utterance of the particular, predefined hotword, transmitting, by the computing device and to another computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an output of processing the audio data using the on-device hotword detector;
> [1.3] while the computing device remains in low power mode, receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data; and
> [1.4] after transmitting the output of processing the audio data using the on-device hotword detector and after receiving the additional output of processing the audio data from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, determining, by the computing device, to remain in the low power mode.

Ex. 1001, 16:27–55 (Bracketed paragraph numbering added by Petitioner (*see* Pet. 50–51)).

---

"elements 16.0, 16.1, 16.2, 16.3, and 16.4 of claim 16 map to elements 9.0, 9.1, 9.2, 9.3, and 9.4 of claim 9, respectively." *Id.* at 53.

10

IPR2023-00118
Patent No. 10,134,398 B2

### F. Prior Art and Asserted Grounds

Petitioner asserts that the challenged claims are unpatentable on the

following grounds:

| Claims Challenged | 35 U.S.C. §[4] | Basis |
|---|---|---|
| 1–3, 7–11, 15–18 | 102(a) | Rosenberger[5] |
| 4, 5, 12, 13, 19, 20 | 103 | Rosenberger, Basye[6] |

Petitioner also relies on the declaration testimony of Dr. Michael T.

Johnson. *See* Ex. 1002.[7]

Patent Owner relies on the Declaration testimony of Stuart Lipoff.

*See* Ex. 2012; Ex. 2013.[8]

---

[4] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011), took effect on September 16, 2011. The changes to 35 U.S.C. §§ 102 and 103 in the AIA do not apply to any patent application filed before March 16, 2013. Because the application for the patent at issue in this proceeding has an effective filing date after March 16, 2013, we refer to the AIA version of the statute.

[5] U.S. Patent No. 8,340,975 B1, Dec. 25, 2012, Ex. 1003 ("Rosenberger").

[6] U.S. Patent Application Publ. No. 2014/0163697 A1, June 12, 2014, Ex. 1013 ("Basye").

[7] Dr. Johnson earned undergraduate degrees in Computer Science Engineering and in Electrical Engineering, a Master's degree in Electrical Engineering, and a Ph.D. degree "with a doctoral dissertation focused on speech processing and automatic speech recognition." Ex. 1002 ¶ 6. Dr. Johnson currently is "the Department Chair and a Full Professor in the Department of Electrical and Computer Engineering at the University of Kentucky." *Id.* ¶ 5.

[8] Mr. Lipoff earned undergraduate degrees in Electrical Engineering and Engineering Physics. Ex. 2012 ¶ 8. Mr. Lipoff further earned a Master of Science in Electrical Engineering and a Master of Business Administration. *Id.* Mr. Lipoff states he has been "heavily engaged in the study, analysis, evaluation, design, and implementation of products and technology associated with consumer electronics and electronic appliances." *Id.* ¶ 16.

IPR2023-00118
Patent No. 10,134,398 B2

## II. ANALYSIS

### A.    *Legal Standards*

"To anticipate a claim, a prior art reference must disclose each and every element of the claim, either explicitly or inherently." *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 910 (Fed. Cir. 2022) (citing *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006). "While those elements must be arranged or combined in the same way as in the claim, the reference need not disclose the elements in the very same terms used by the patent." *Id.* (citing *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) ("[T]he reference need not satisfy an *ipsissimis verbis* test." (citing *In re Bond*, 910 F.2d 831, 832–33 (Fed. Cir. 1990))). "The question of what a reference teaches and whether it describes every element of a claim is a question for the finder of fact." *Id.* (citing *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1221 (Fed. Cir. 2003)). As further explained in *Net MoneyIN,*

> unless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102.

*Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). *Id.*; *see also Verdegaal Bros. v. Union Oil Co.*, 814 F.2d 628, 631 (Fed. Cir. 1987) ("A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior

---

A particular focus of his professional activities has been "improving the man-machine interface including voice, speech, and speaker recognition for man-machine interactions." *Id.*

12

IPR2023-00118
Patent No. 10,134,398 B2

art reference."). "The identical invention must be shown in as complete detail as is contained in the . . . claim." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989).

Whether the challenged claims would have been obvious over the cited references also is at issue in this proceeding. Section 103 forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when available, evidence such as commercial success, long felt but unsolved needs, and failure of others.[9] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *see KSR*, 550 U.S. at 407 ("While the sequence of these questions might be reordered in any particular case, the [Graham] factors continue to define the inquiry that controls."). The Court in Graham explained that these factual inquiries promote "uniformity and definiteness," for "[w]hat is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context." 383 U.S. at 18.

---

[9] Patent Owner does not direct us to any persuasive objective evidence of non-obviousness.

13

IPR2023-00118
Patent No. 10,134,398 B2

The Supreme Court made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. To support this conclusion, however, it is not enough to show merely that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires that a person of ordinary skill at the time of the invention "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any reason *why* a person of skill in the art would have made the combination. *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017).

Moreover, in determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed. Cir. 1985) ("It is elementary that the claimed invention must be considered as a whole in deciding the question of obviousness."); *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983) ("[T]he question under 35 U.S.C. § 103 is not whether

14

the differences *themselves* would have been obvious. Consideration of differences, like each of the findings set forth in *Graham*, is but an aid in reaching the ultimate determination of whether the claimed invention as a whole would have been obvious.").

As a factfinder, we also must be aware "of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR*, 550 U.S. at 421.

Applying these general principles, we consider the evidence and arguments of the parties.

### B.    Level of Ordinary Skill in the Art

The level of skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). "This reference point prevents . . . factfinders from using their own insight or, worse yet, hindsight, to gauge obviousness." *Id.*

"The *Graham* analysis includes a factual determination of the level of ordinary skill in the art. Without that information, a . . . court cannot properly assess obviousness because the critical question is whether a claimed invention would have been obvious at the time it was made to one with ordinary skill in the art." *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *see also Ruiz v. A.B. Chance*, 234 F.3d 654, 666 (Fed. Cir. 2000) ("The determination of the level of skill in the art is an integral part of the *Graham* analysis.").

Factors pertinent to a determination of the level of ordinary skill in the art include: (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity

IPR2023-00118
Patent No. 10,134,398 B2

with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field. *Best Med. Int'l, Inc. v. Elekta Inc.*, 46 F.4th 1346, 1353 (Fed. Cir. 2022) (citing *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007) (quoting *Env't Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed. Cir. 1983). These factors are not exhaustive but merely are a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo*, 501 F.3d at 1256. In determining a level of ordinary skill, we also may look to the prior art, which may reflect an appropriate skill level. *Okajima*, 261 F.3d at 1355.

Petitioner asserts that a person of ordinary skill in the art would have had "the equivalent of a four-year degree from an accredited institution (typically denoted as a B.S. degree) in electrical or computer engineering, or a related field, and approximately 2–4 years of experience in the field of voice and/or audio processing, or an equivalent level of skill, knowledge, and experience." Pet. 22 (citing Ex. 1002 ¶¶ 60–63).

Dr. Johnson's Declaration testimony states he considered some of the factors listed above. Ex. 1002 ¶ 61. Dr. Johnson "also considered [his] own experiences working and teaching in the fields of voice and audio processing." *Id.* Dr. Johnson testifies that, in his opinion, the level of ordinary skill is as stated by Petitioner. *Id.* at 62.

Patent Owner does not assert a level of ordinary skill, nor does Patent Owner dispute or otherwise comment on Petitioner's proposed definition of the level of ordinary skill. *See* PO Resp. and Sur-reply, *generally*.

Based on the prior art, the sophistication of the disclosed technology in the '398 patent, and Dr. Johnson's testimony, we adopt Petitioner's definition of the level of ordinary skill. Accordingly, based on the evidence

16

before us, we determine a person of ordinary skill in the context of the '398 patent would have had the equivalent of a four-year degree from an accredited institution (typically denoted as a B.S. degree) in electrical or computer engineering, or a related field, and approximately 2–4 years of experience in the field of voice and/or audio processing, or an equivalent level of skill, knowledge, and experience.

### C.    Claim Construction

We construe each claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b)." 37 C.F.R. § 42.100(b). Under this standard, claim terms are generally given their ordinary and customary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc) ("We have frequently stated that the words of a claim 'are generally given their ordinary and customary meaning.'" (citations omitted)); *see also Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (quoting *Phillips*, 415 F.3d at 1313). While there is substantial judicial precedent and guidance concerning claim construction, "there is no magic formula or catechism for conducting claim construction." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1324).

The Specification, or more precisely, the written description, is the "single best guide to the meaning of a *disputed* term." *Grace Instrument*, 57 F.4th at 1008 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (emphasis added), and "is, thus, the primary basis for

IPR2023-00118
Patent No. 10,134,398 B2

construing the claims." *Id.* (citation omitted). This focus on the Specification helps to avoid what has been called "the curse of indefinite and ambiguous claims, divorced from the written description." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1311 (Fed. Cir. 2011) (Plager, Circuit Judge, concurring).

Petitioner states, "the Challenged Claims do not require construction." Pet. 22.

In its Preliminary Response, Patent Owner did not propose any claim construction, nor did Patent Owner comment on Petitioner's statement that the challenged claims do not require construction. *See* Prelim. Resp., *generally*.

Accordingly, in our Institution Decision, we determined that, "[w]e do not perceive the need to construe any claim limitation." Dec. Inst. 14.

In its Response, however, Patent Owner proposes a specific construction for the term "low power mode." PO Resp. 2–6. The term "low power mode" is used in all three independent claims (claims 1, 9, and 16). This term also is used specifically in dependent claims 2, 6, 7, 10, 14, 15, 17 and 21.

According to Patent Owner, the term "low power mode" "has a well-understood plain and ordinary meaning: 'an operating mode or state in which power is conserved.'" PO Resp. 2. Patent Owner states "[t]his construction is consistent with (1) the patent's prosecution history and the

cited art, (2) the patent's specification[10], and (3) the extrinsic evidence." PO
Resp. 2–3 (citing Ex. 2012 ¶¶ 54–58).[11]

In its Reply, Petitioner notes that "Google concedes that Rosenberger
discloses [a] *low power mode* under its interpretation." Reply 1 (citing PO
Resp. 2 ("Google also does not dispute that Rosenberger's 'low-power
'listening mode'' is a low power mode, as claimed in the '398 Patent…."")).
Petitioner, therefore, argues that "the Board can assume that Google's
proposed interpretation of low power mode is correct, which means there is
no controversy for the Board to resolve." *Id.*; *see also* Sur-reply 1
("Petitioner does not dispute Patent Owner's construction of "low power
mode").

---

[10] The claims of the '398 patent use the term "low power mode" thirty-nine
times. This term, however, does *not* appear in the written description of the
'398 patent. In its Sur-reply, Patent Owner states "the '398 patent expressly
discloses 'active' and 'inactive' states—the latter of which clearly
corresponds to an operating mode or state in which power is conserved."
Sur-reply 2 n.1. Patent Owner cites no persuasive evidence to support this
argument. *Garrido v. Holt*, 547 F. App'x 974, 979 n.3 (Fed. Cir. 2013),
(citing *In re Schulze*, 346 F.2d 600, 602 (CCPA 1965) ("Argument in the
brief does not take the place of evidence in the record.")).

  We also note that in the related 1329 ITC proceeding, the Judge stated she
would be issuing a "Markman order" for the term "low power mode"
(Ex. 1015, 6:9–13) with a determination that this term is "indefinite"
(*id.* at 9:17–20). The issue of whether the term "low power mode" is
"indefinite" under 35 U.S.C. § 112 is beyond our jurisdiction in this IPR
proceeding, which is limited to determinations under "[35 U.S.C. §§] 102 or
103 and only on the basis of prior art consisting of patents or printed
publications." *See* 35 U.S.C. § 311.

[11] Patent Owner cites the Declaration testimony of Mr. Lipoff as "Decl."
We refer to it, as we do with all evidence before us, by its exhibit number,
which is Ex. 2012.

IPR2023-00118
Patent No. 10,134,398 B2

Claims must be construed "only to the extent necessary to resolve the controversy." *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1345 (Fed. Cir. 2021) (quoting *Vivid Techs., Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *see also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (citations omitted)). We determine that a specific construction of the term "low power mode" is not necessary to reach a decision in this *inter partes* review of the challenged claims.

Both parties agree that the ordinary and customary meaning of "low power mode" is "an operating mode or state in which power is conserved," and thus, this is the construction we will use in reaching our patentability determination. As we discuss below, the dispute between the parties concerns *when* a networked device in Rosenberger *exits* the low power mode, *not whether* Rosenberger discloses a low power mode as claimed. As stated by Patent Owner, the dispositive issue in this proceeding is whether Rosenberger "teach[es] a process by which devices in a low power mode remain in that low power mode while exchanging messages with other devices for the purpose of determining whether to exit the low power mode." PO Resp. 2.

We now turn to the merits of Petitioner's asserted Grounds of unpatentability.

IPR2023-00118
Patent No. 10,134,398 B2

> D.    *Ground 1 – Anticipation of Claims 1–3, 7–11, and 15–18 Based on Rosenberger*

Petitioner asserts claims 1–3, 7–11, and 15–18 are anticipated by Rosenberger.  Pet. 22–62.

First, we summarize the disclosure of Rosenberger.

> 1.    *Rosenberger (Ex. 1003)*

We make the following findings regarding Rosenberger.

Rosenberger is titled "Interactive Speech Recognition Device and System for Hands-Free Building Control."  Ex. 1003, code (54).  Rosenberger "relates to improvements in automated control systems" and, "[m]ore particularly, . . . to improvements in speech-recognizing control devices that respond to oral commands from a system user."  *Id.* at 1:8–13.

As summarized in its Abstract, Rosenberger discloses:

> A self-contained wireless interactive speech recognition control device and system that integrates with automated systems and appliances to provide totally hands-free speech control capabilities for a given space.  Preferably, each device comprises a programmable microcontroller having embedded speech recognition and audio output capabilities, a microphone, a speaker and a wireless communication system through which a plurality of devices can communicate with each other and with one or more system controllers or automated mechanisms.  The device may be enclosed in a standalone housing or within a standard electrical wall box.  Several devices may be installed in close proximity to one another to ensure hands-free coverage throughout the space.  When two or more devices are triggered simultaneously by the same speech command, real time coordination ensures that only one device will respond to the command.

Ex. 1003, code (57).

IPR2023-00118
Patent No. 10,134,398 B2

As disclosed in Rosenberger, to provide complete hands-free speech recognition coverage and comfortable user interaction from anywhere in a building using speech recognition modules of this type, it would often be necessary to install many modules in reasonable proximity to one another. *Id.* at 2:42–47. In such an arrangement, it is inevitable that a given speech command would frequently be recognized simultaneously by two or more neighboring speech recognition modules. *Id.* at 2:47–50. If multiple modules were triggered and responded simultaneously, the target automated mechanism could be instructed by each triggered device to perform the same instruction. *Id.* at 2:50–56. For example, the speech command "Lower Room Temperature Two Degrees" could be executed separately by several modules causing a thermostat to lower by multiples of the requested two degrees. *Id.* at 2:56–59. This is referred to as a "duplicate response problem." *Id.* at 2:60. One of the objectives of the system disclosed in Rosenberger is to avoid the "duplicate response problem." *Id.* at 3:30–35.

Rosenberger discloses "a totally hands-free, interactive, wireless speech recognition device and system that operate using low-power, low-data rate, wireless connections." *Id.* at 3:45–49. The disclosed system allows the user to wirelessly control the operation of automated mechanisms using speech commands, so that "[w]hen a trigger phrase is detected, the system 'wakes up' and prompts the user to say one or more commands from an expected command phrase vocabulary." *Id.* at 1:63–2:9.

Figure 3 of Rosenberger is reproduced below.

**Appx22**

IPR2023-00118
Patent No. 10,134,398 B2



**FIG. 3**

Figure 3 "illustrates a residential floor plan showing a plurality of interactive speech recognition control devices at various locations that provide totally hands-free speech control of various automated mechanisms throughout the interior space." Ex. 1003, 5:41–44. A home-automation system includes table-top control devices T1–T6, electrical wall-box mounted control devices W1–W9, and automated mechanisms such as door lock DL1, security panel A1, television TV1, thermostat Tstat1, light dimmers L1–L5, and motorized shades S1–S3, that may all be controlled "hands-free" by persons P1–P4 using only speech commands. *Id.* at 9:37–49. "Control signals may be sent directly from any speech recognition device to system controller C1, which in turn, sends appropriate control signals to the target automated mechanisms to implement the speech command" or "any speech recognition device can control the automated mechanisms directly using

standard wireless communications and automation protocols." *Id.* at 9:50–56. Any of the table top devices T1–T6 and wall-boxes mounted control devices W1–W9 "may 'hear' and recognize" a "speech trigger" to operate the automated mechanisms. *Id.* at 9:57–10:4.

Rosenberger discloses that the control device "uses one of several different coordination methods to achieve the design goal of avoiding duplicate responses to the same speech command while selecting a single control device best able to successfully interact with the system user" and "[a]ll of the methods involve the calculation and production by the control device of a numeric weighted signal (WS) that quantifies the 'quality' of a just-recognized speech command." *Id.* at 10:34–41.

As disclosed in Rosenberger,

> Preferably, device D [a control device] *normally operates in a low power 'listening mode' in which it listens for a hands-free trigger phrase* (e.g., "Hello Voice Control or "Home Automation') to be spoken by the system user. *Upon* receiving and recognizing a speech trigger phrase [Rosenberger's label for a "Hotword"] and *determining that it is in a better position to handle subsequent user interaction than any other device* that simultaneously recognized the same speech trigger phrase (see device coordination discussion below), or when the user depresses the "Push to Talk" button 24 on the device, or in the event the device is *instructed to wake up and expect a subsequent speech command by a system controller*, the device beeps, *changes its status light 34* [*see* Figs. 1, 2B] or plays a prerecorded or synthesized audio message (e.g. "How may I help you?") through speaker 19 and/or 20 to prompt the user to say one of the speech commands from a known vocabulary or grammar stored in the speech pattern memory 14. Upon recognizing a particular speech command (and optionally confirming with the user), the device produces and transmits either to a system controller or directly to the automated mechanisms (via its communications circuitry 18) a corresponding system control signal designed to

24

IPR2023-00118
Patent No. 10,134,398 B2

instruct the appropriate automated mechanisms to carry out the
subject of the speech command.

Ex. 1003, 8:17–39 (emphases added).

As disclosed, Rosenberger's "low power listening mode" is for
listening for a trigger phrase. *Id*. at 8:17–19. It is only *after* detecting the
trigger phrase and "*upon . . . determining that it is in a better position to
handle subsequent user interaction than any other device* that
simultaneously recognized the same speech trigger phrase" does
Rosenberger's device D "*change[ ] its status light 34*" to indicate its new
"wake up" status as being ready for a subsequent speech command. *Id*. at
8:20–27 (emphases added).

Thus, to summarize the disclosures cited above, Rosenberger's
computing devices (1) listen in "low power" mode for a "trigger phrase" or
"Hotword;" (2) upon detecting a trigger phrase, the devices exchange
information in the form of "weighted signals" to determine which computing
device is "in a better position" to handle a subsequent user query; and (3)
that one device in a "better position" than the other devices then exits its low
power mode and "wakes up" so it can respond to any subsequent user query.
How does the computing device accomplish these numerous and diverse
tasks? Figure 1 from Rosenberger, showing the components within each of
Rosenberger's computing devices D, provides an illustrated answer, and is
reproduced below.

25

IPR2023-00118
Patent No. 10,134,398 B2



**FIG. 1**

Figure 1 from Rosenberger "schematically illustrates an interactive speech recognition control device D that is configured in accordance with a preferred embodiment" of Rosenberger's disclosed invention. Ex. 1003, 6:40–43; *see also id.* Fig. 2A (Fig. 2A "is a perspective illustration of a contemplated table-top housing for containing the device of FIG. 1").

In order to achieve the described performance of its computing devices, Rosenberger discloses that the computing devices include "a uniquely-programmed microcontroller 10 having embedded speech recognition circuitry and software 12. *Id.* at 6:62–65. Each computing device also includes:

> a persistent internal memory 14 (e.g. non-volatile flash memory) for storing speech pattern data (phoneme expressions, etc.) and the like, a microphone 16 through which speech commands from the user are received, and a two-way, preferably wireless, communication system 18, all being supported by a housing H

26

IPR2023-00118
Patent No. 10,134,398 B2

> that can be placed anywhere in a room or installed in an electrical
> wall box.

Ex. 1003, 6:65–7:4.

> As further explained in Rosenberger,

> each control device D is *programmed* so that multiple devices
> can be placed in close proximity to one another in the same space.
> In accordance with a preferred embodiment, different devices
> recognizing the same speech command from the same person at
> the same instant *coordinate with each other* (shown in FIGS. 9,
> 10), or with an external coordinating controller CC (shown in
> FIGS. 7, 8), to ensure that only one device handles each discrete
> speech command, preferably the one able to hear the user as
> loudly and clearly as possible.

*Id*. at 10:5–14 (emphases added).

Rosenberger's control devices use one of several different
coordination methods to achieve the design goal of avoiding duplicate
responses to the same speech command while selecting a single control
device best able to successfully interact with the system user. Ex. 1003,
10:34–38. All of Rosenberger's disclosed methods involve "the calculation
and production by the control device of a numeric weighted signal (WS) that
quantifies the 'quality' of a just-recognized speech command." *Id.* at 10:38–
41.

2.    *Independent Claims 1, 9, 16*

Petitioner argues claims 1, 9, and 16 collectively. *See* Pet. 22–53.
Petitioner states that the "Petition addresses independent claim 9 first
because it is the narrowest independent claim of the '398 Patent." *Id.* at 22.
We make no finding or conclusion about the scope of claim 9 compared to
claims 1 and 16. For consistency with the Petition, however, we too will

27

IPR2023-00118
Patent No. 10,134,398 B2

begin our analysis with independent claim 9. Before doing so, we provide the chart below showing the substantial similarity of claims 1, 9, and 16.

In the chart below, we use the paragraph numbering for these claims used by Petitioner. As is evident, the only significant difference among these three claims is their preamble.

| Claim 1 | Claim 9 | Claim 16 |
|---|---|---|
| [1.0] A computer-implemented method comprising: | [9.0] A system comprising: one or more computers and one or more storage devices storing instructions that are operable, when executed by the one or more computers, to cause the one or more computers to perform operations comprising: | [16.0] A non-transitory computer-readable medium storing software comprising instructions executable by one or more computers which, upon such execution, cause the one or more computers to perform operations comprising: |
| [1.1] receiving, by a computing device that is in a low power mode and that is configured to exit a low power mode upon detecting an utterance of a particular, predefined hotword using an on-device hotword detector, audio data that corresponds to an utterance of the particular, predefined hotword; | [9.1] receiving, by a computing device that is in a low power mode and that is configured to exit a low power mode upon detecting an utterance of a particular, predefined hotword using an on-device hotword detector, audio data that corresponds to an utterance of a particular, predefined hotword; | [16.1] receiving, by a computing device that is in a low power mode and that is configured to exit a low power mode upon detecting an utterance of a particular, predefined hotword using an on-device hotword detector, audio data that corresponds to an utterance of a particular, predefined hotword; |
| [1.2] while the | [9.2] while the | [16.2] while the |

28

IPR2023-00118
Patent No. 10,134,398 B2

| | | |
|---|---|---|
| computing device remains in the low power mode, and in response to receiving the audio data that corresponds to the utterance of the particular, predefined hotword, transmitting, by the computing device and to another computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an output of processing the audio data using the on-device hotword detector; | computing device remains in the low power mode, and in response to receiving the audio data that corresponds to the utterance of the particular, predefined hotword, transmitting, by the computing device and to another computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an output of processing the audio data using the on-device hotword detector; | computing device remains in the low power mode, and in response to receiving the audio data that corresponds to the utterance of the particular, predefined hotword, transmitting, by the computing device and to another computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an output of processing the audio data using the on-device hotword detector; |
| [1.3] while the computing device remains in low power mode, receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data; and | [9.3] while the computing device remains in low power mode, receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data; and | [16.3] while the computing device remains in low power mode, receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data; and |
| [1.4] after transmitting | [9.4] after transmitting | [16.4] after |

29

IPR2023-00118
Patent No. 10,134,398 B2

| the output of processing the audio data using the on-device hotword detector and after receiving the additional output of processing the audio data from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, determining, by the computing device, to remain in the low power mode. | the output of processing the audio data using the on-device hotword detector and after receiving the additional output of processing the audio data from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, determining, by the computing device, to remain in the low power mode. | transmitting the output of processing the audio data using the on-device hotword detector and after receiving the additional output of processing the audio data from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, determining, by the computing device, to remain in the low power mode. |

Petitioner provides a clause-by-clause analysis of claim 9 mapping each element or limitation of claim 9 to what Petitioner asserts is the corresponding disclosure in Rosenberger. Pet. 22–50.

Throughout its analysis of claims 1, 9, and 16, Petitioner cites to the written description and drawings of Rosenberger and to the Declaration testimony of Dr. Johnson for evidentiary support. *See, e.g.*, *id.* at 24 (citing Ex. 1002 ¶ 74), 26 (citing Ex. 1002 ¶ 77).

In general summary, and focusing on the issues argued by the parties, independent claims 1, 9, and 16 each require three actions while the claimed "computing devices" are in a low power mode.

First, "a computing device" (a first computing device) in a low power mode receives audio data that "corresponds to an utterance" of a predefined

IPR2023-00118
Patent No. 10,134,398 B2

hotword. Ex. 1001, 16:28–33.[12]  This step, element, or limitation is contained in clauses 1.1, 9.1, and 16.1.

Second, while the first computing device remains in the low power mode, it *transmits* to "another computing device" (a second computing device), also in a low power mode, an "output" of the received audio data. *Id.* at 16:34–42.  This step, element, or limitation is contained in clauses 1.2, 9.2, and 16.2.  As disclosed in the Specification, one form of this claimed "output" may be "a hotword confidence score that indicates a likelihood that the utterance includes the hotword." *Id.* at 2:6–12.

Third, while the first computing device remains in the low power mode, it *receives* from the second computing device an "additional output." Ex. 1001, 16:43–48.  This step, element, or limitation is contained in clauses 1.3, 9.3, and 16.3.  This "additional output" from the second computing device also may be "a hotword confidence score that indicates a likelihood that the utterance includes the hotword." *Id.* at 2:6–12.

At this point in the claimed invention, the computing device, still in low power mode, determines whether to "remain in the low power mode." *Id.* at 2:15–21.  We know from the Specification that this determination is made by comparing "hotword confidence scores", with the computing device with the higher score exiting the low power mode and going into an active mode ready to receive and respond to a user query, while the other computing device remains in low power mode. Ex. 1001, 2:6–21.  We do *not* read this disclosure from the Specification into the claims.  We mention it to provide context for what the claims recite, and what they do *not* recite.

---

[12] We cite to claim 1.  As shown in the chart comparing the claims, these same steps, elements, or limitations are recited in claims 9 and 16.

31

**Appx31**

IPR2023-00118
Patent No. 10,134,398 B2

We now turn to specific clauses and arguments regarding the independent claims, beginning, as did Petitioner, with claim 9.

### a.    Claim 9

### i.  Clause [9.0]

[9.0] A system comprising: one or more computers and one or more storage devices storing instructions that are operable, when executed by the one or more computers, to cause the one or more computers to perform operations comprising:

Petitioner relies on Figures 1 and 3 (reproduced and discussed above) and the related disclosure in Rosenberger to establish that Rosenberger discloses the system in clause [9.0]. Pet. 23–27 (citing Ex. 1002 ¶¶ 72–83).

Petitioner asserts a person of ordinary skill in the relevant technology, which we have determined is a person with the equivalent of a four-year degree from an accredited institution in electrical or computer engineering, or a related field, and approximately 2-4 years of experience in the field of voice and/or audio processing (see Section II.B of this Decision), "would have understood that each "control device D" in Rosenberger amounts to a computer that comprises one or more storage devices storing instructions that are operable, when executed by the [computer], to cause the [computer] to perform operations. Id. at 24, 27 (citing Ex. 1002 ¶¶ 74, 78 (Dr. Johnson's opinion testimony supporting Petitioner's assertion); Ex. 1014, 17–18 (Patent Owner's infringement contention explaining why the accused products are "computers," as claimed in the '398 patent).

Petitioner also asserts that a person of ordinary skill in the relevant technology "would have understood that the 'uniquely-programmed microcontroller 10 having embedded speech recognition circuitry and software 12' and 'persistent internal memory 14' of each of Rosenberger's

32

'control devices' amounts to one or more storage devices storing instructions. Pet. 26 (citing Ex. 1002 ¶ 77 (Dr. Johnson's opinion testimony supporting Petitioner's assertion)).

The claims in Rosenberger also are part of Rosenberger's disclosure and Specification. 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."). Claim 1 in Rosenberger, for example, provides a summary of the elements of each of Rosenberger's "functionally identical [control] devices" (Ex. 1003, 17:12–13). These elements and their function include:

> (a) a microphone for converting spoken words, emanating from a system user located within said building space, to corresponding electrical signals;

> (b) a programmable microcontroller, operatively coupled to the microphone and comprising embedded software and circuitry . . . ;

> (c) a transmitter operatively coupled to said microcontroller for selectively transmitting said weighted signal and said system control signals into said building space;

> (d) a receiver, operatively coupled to said microcontroller, for receiving (i) weighted signals emanating from one or more other functionally identical interactive speech recognition control devices within said building space, and/or (ii) coordination signal derived from said weighted signals by an independent coordinating controller; and

> (e) audio output circuitry through which said microcontroller can transmit audible sounds to interact with and provide indications of the system status to the system user.

*Id.* at 17:17–52.

It is beyond reasonable dispute that Rosenberger's "control devices D" are computers as stated in claim 9 of the '398 patent. Indeed, Patent Owner does not take specific issue with the preamble clause, clause 9.0, and the corresponding clauses in independent claims 1 and 16.

Accordingly, based on a preponderance of the evidence before us, we determine that Rosenberger discloses the steps, elements and limitations of clause [9.0].

### ii.  Clause [9.1]

[9.1] receiving, by a computing device that is in a low power mode and that is configured to exit a low power mode upon detecting an utterance of a particular, predefined hotword using an on-device hotword detector, audio data that corresponds to an utterance of a particular, predefined hotword

Petitioner asserts that Rosenberger discloses the steps, elements, and limitations in clause [9.1]. Pet. 27–35. Throughout its analysis of this clause, Petitioner cites the Declaration testimony of Dr. Johnson for evidentiary support. *See, e.g., id.* at 28 (citing Ex. 1002 ¶¶ 84–102). Petitioner also cites Rosenberger's claim 1 for further evidence of how Rosenberger operates. Pet. 29 (citing Ex. 1003, 17:10–27).

One feature recited in clause [9.1] is an "on-device hotword detector" that detects the utterance of a particular, predefined hotword. Ex. 1001, 18:6–11.

Patent Owner argues the '398 Patent "distinguishes hotword detection from speech recognition, and describes the use of a distinct on-device hotword detector, *i.e.*, 'hotworder' to detect a hotword in incoming audio data." PO Resp. 35 (citing Ex. 2012 ¶¶ 89–90); Sur-reply 14 ("Patent Owner cited claims 5, 13, and 20 as evidence that hotword detection and

IPR2023-00118
Patent No. 10,134,398 B2

speech recognition are distinct."). We note, however, that contrary to Patent Owner's assertion, the '398 patent states it "performs *speech recognition techniques to determine whether the hotword was spoken* and, if so, awaits an ensuing command or query." Ex. 1001, 1:64–66 (emphasis added). As explained further in the '398 patent,

> In an example environment, the hotword used to invoke the system's attention are the words "OK computer." Consequently, each time the words "OK computer" are spoken, it is picked up by a microphone, conveyed to *the system, which performs speech recognition techniques to determine whether the hotword was spoken* and, if so, awaits an ensuing command or query. Accordingly, utterances directed at the system take the general form [HOTWORD] [QUERY], where "HOTWORD" in this example is "OK computer" and "QUERY" can be any question, command, declaration, or other request that can be speech recognized, parsed and acted on by the system, either alone or in conjunction with the server via the network.

*Id.* 1:60–2:5 (emphasis added). Here, the hotword is a two-word phrase. The systems listen for this exact phrase, and, if spoken, is ready to listen to, apply speech recognition to, and act on a subsequent user query.

Rosenberger does the same thing in the same way with its "trigger phrase."

Rosenberger's trigger phrase is a "hotword." Dr. Johnson testifies that:

> Rosenberger explains that, in preferred embodiments, each "control device" operates in a "low power 'listening' mode in which it listens for a hands-free trigger phrase (e.g., 'Hello Voice Control' or 'Home Automation') to be spoken by the system user" and then only one given "control device" exits that "low power" mode to interact with the user and process voice commands after employing one of the disclosed "coordination methods" and determining that the given "control device" is in "a better position to handle subsequent user interaction than any other device that simultaneously recognized the same speech trigger phrase …."

35

Ex. 1002 ¶ 48 (citing Ex. 1003, 8:15–32).

Petitioner asserts Rosenberger discloses an "on-device" hotword or "trigger" detector. Pet. 28. Dr. Johnson also testifies that a person of ordinary skill "would have understood that a control device's 'microcontroller 10 having embedded speech recognition circuitry and software 12' individually, or collectively with the 'persistent internal memory 14,' comprises *an on-device hotword detector* or, in the words of Rosenberger, a "speech recognizer." Ex. 1002 ¶ 91. We agree with Petitioner.

Figure 1 of Rosenberger schematically illustrates the numerous internal components of interactive speech recognition control device D. Ex. 1003, 6:40–45. Device D is capable of communicating wirelessly using radio frequency (RF) communication with other similarly configured devices. *Id.* Consistent with Dr. Johnson's testimony, Rosenberger discloses that microcontroller 10 has "embedded speech recognition circuitry and software 12, a persistent internal memory 14 (e.g., non-volatile flash memory) for storing speech pattern data (phoneme expressions, etc.)." *Id.* at 6:64–67. Rosenberger also states "[s]uitable embedded speech recognition circuitry and software 12 is commercially available from a variety of manufacturers." *Id.* at 7:5–6. The components and software within the device are "on-device" elements.

Patent Owner does not take any specific issue with respect to any other element of clause [9.1]. Patent Owner's basic argument as to why Rosenberger does not anticipate independent claims 1, 9, and 16 is that "Rosenberger does not teach a process by which devices in a low power mode *remain in that low power mode* while exchanging messages with other

IPR2023-00118
Patent No. 10,134,398 B2

devices for the purpose of determining whether to remain in the low power mode." PO Resp. 2 (emphasis added). We discuss this in the following sections.

Patent Owner's basic argument, however, assumes at least two or more "computing devices" that exchange messages with other computing devices for the purpose of determining which device will exit the lower power mode and respond to a user query, while the other device or devices remain in the low power mode. PO Resp. 2. If there is only one computing device in the system, there is no exchange of data or an "output" with other computing devices in the system to determine which device will exit the low power mode. Thus, Patent Owner's argument does not apply to clause [9.1] because the claimed computing device is not yet exchanging and/or comparing data with any other computing device.

Accordingly, based on a preponderance of the evidence before us, we determine that Rosenberger discloses the steps, elements and limitations of clause [9.1].

### iii.  Clause [9.2]

[9.2] while the computing device remains in the low power mode, and in response to receiving the audio data that corresponds to the utterance of the particular, predefined hotword, transmitting, by the computing device and to another computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an output of processing the audio data using the on-device hotword detector

Clause [9.2] requires a first "computing device" and "another computing device." Thus, there must be at least two such devices. This clause also introduces the requirement that one computing device provides

37

IPR2023-00118
Patent No. 10,134,398 B2

"an output of processing the audio data using the on-device hotword detector."

Petitioner asserts that Rosenberger discloses the steps, elements, and limitations in clause [9.2]. Pet. 35–42.

Petitioner asserts that "Rosenberger discloses that each 'control device' is configured to calculate and produce a 'weighted signal' (WS) value in response to receiving audio data corresponding to a user's utterance containing a 'trigger phrase.'" Pet. 35 (citing Ex. 1003, 4:6–16). According to Petitioner, "Rosenberger's WS value [is] an output of processing the audio data [trigger word] using the on-device hotword [or trigger word] detector." *Id.* at 37 (citing Ex. 1002 ¶ 110).

As we have stated above, Patent Owner's basic argument as to why Rosenberger does not anticipate independent claims 1, 9, and 16 is that "Rosenberger does not teach a process by which devices in a low power mode *remain in that low power mode* while exchanging messages with other devices for the purpose of determining whether to remain in the low power mode." PO Resp. 2 (emphasis added). It is Patent Owner's position that "Rosenberger expressly discloses that its devices exit the low power 'listening mode' when they are 'triggered by a speech command,' *prior to exchanging messages* and selecting which device will respond to the user." *Id.* (emphasis added). As further explained by Patent Owner,

> each independent claim [in the '398 patent] recites a process by which a device that receives audio data including an utterance of a particular, predefined hotword while in a low power mode, remains in that low power mode while exchanging outputs with another device operating in a low power mode. Upon receipt of an additional output from another device, the device determines whether to remain in the low power mode.

38

IPR2023-00118
Patent No. 10,134,398 B2

*Id.* at 6. Patent Owner concludes that "[t]hus, the [claimed] device determines whether to remain in low power mode after it transmits an output [and] receives an additional output." *Id.* at 8 (citing Ex. 2012 ¶ 59). Mr. Lipoff's cited testimony supports Patent Owner's argument.

> Patent Owner asserts
>
> Rosenberger does not anticipate claim 1 [or claims 9 and 16] because Rosenberger discloses sending a 'weighted signal' (the alleged 'output') *after* the control device (the alleged 'computing device') is "triggered,' 'i.e., switched from a 'listening' mode' (the low power mode) to an active mode, *not while the device remains in the low power mode*, as recited in the '398 Patent.

PO Resp. 14 (citing Ex. 1003, 11:37–42; Ex. 2012 ¶¶ 64–68.

Thus, the key issue between the parties is *when* does Rosenberger exit its low power mode? Petitioner asserts Rosenberger exits its low power mode *after* the devices *exchange* weighted signal inputs and *determine* which device will respond to a user query, and thus anticipates claims 1, 9, and 16. Patent Owner asserts Rosenberger exits it low power mode upon receiving a trigger word, and thus does not anticipate these claims.

Because Rosenberger discloses several different embodiments, to some extent both parties are correct. *See* Reply 5 (asserting that Patent Owner's arguments "inappropriately limit Rosenberger's teachings as a whole to one specific example"); *id.* at 10–11. We agree with Petitioner, however, that at least one of the embodiments in Rosenberger discloses the claimed invention and thus anticipates claims 1, 9, and 16. Moreover, Patent Owner's argument "relies on the erroneous assumption that the disclosure of multiple examples renders one example less anticipatory." *Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1356 (Fed. Cir. 2008).

Regarding the weighted signal, Rosenberger discloses

39

**Appx39**

IPR2023-00118
Patent No. 10,134,398 B2

> the control device of the invention uses one of several different
> coordination methods to achieve the design goal of avoiding
> duplicate responses to the same speech command while selecting
> a single control device best able to successfully interact with the
> system user.  All of the methods involve the calculation and
> production by the control device of a numeric weighted signal
> (WS) that quantifies the "quality of a just-recognized speech
> command.

Ex. 1003, 10:34–41.  Rosenberger also discloses that "there are a number of
methods for the devices to be coordinated so that only the single device with
the highest weighted signal proceeds to interact with the user and/or process
the speech command." *Id.* at 11:27–31.

Petitioner focuses on the disclosure at column 8 in Rosenberger.  This
disclosure states Rosenberger's device D starts out in a "low power
'listening' mode." *Id.* at 8:17–20.  Rosenberger then explains that "[u]pon
receiving and recognizing a speech trigger phrase *and determining that it is
in a better position to handle subsequent user interaction than any other
device* that simultaneously recognized the same speech trigger phrase"
(*id.* at 8:20–24), the winning device "beeps, changes its status light 34 or
plays a prerecorded or synthesized audio message" to prompt the user to
state its query. Ex. 1003, 8:30–32.  Here, the determination based on the
weighted signal is made while the system is still in low power mode and
*before* the system changes its status to active and is ready for a user query.
*See* Ex. 1002 ¶ 139 (Dr. Johnson's Declaration testimony that "Rosenberger
discloses that, *after* the 'control devices' exchange WS values as part of such
'coordination,' only the 'control device' with the highest WS value exits the
claimed low power mode." (emphasis added)).

IPR2023-00118
Patent No. 10,134,398 B2

Dr. Johnson also explains the various alternative ways in which Rosenberger may function.

> while Rosenberger discloses that each 'control device' is generally *configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword*, Rosenberger further discloses instances in which 'control devices' receive a user's utterance that contains a trigger phrase' but do not immediately exit the *low power mode*.  Rather, the 'control devices' engage in a 'coordination' method that involves exchanging WS values, where the result of the 'coordination' method dictates what 'control device is to exit the *low power mode*.  Thus, in sum, Rosenberger discloses that (i) each 'control device' operates in the claimed *low power mode* while the applicable 'coordination method' is performed –which involves each 'control device' transmitting its own WS value to one or more other devices in the system– and (ii) only after the applicable 'coordination method' is performed, does a single 'control device' exit the claimed *low power mode* to interact with the user and/or process speech commands.

Ex. 1002 ¶ 121 (emphasis in original).  Dr. Johnson concludes by testifying that "it is my opinion that Rosenberger discloses element 9.2." *Id.* at 122.

Patent Owner focuses on the disclosure at column 11 in Rosenberger disclosing a "Broadcast and Monitor method" of determining which device has the highest weighted signal. *Id.* at 11:37–40.  Using this method, Rosenberger states "[f]irst, the microcontroller waits to be "triggered." (i.e., switched from a 'listening' mode to an active mode)". *Id.* at 11:40–42. According to Patent Owner, this passage in Rosenberger "expressly discloses when the switch between listening and active modes occurs in its system—upon being triggered and before calculating the weighted signal." PO Resp. 9 (citing Ex. 2012 ¶ 60).

IPR2023-00118
Patent No. 10,134,398 B2

Accordingly, based on a preponderance of the evidence before us, we determine that Rosenberger discloses the elements and limitations of clause [9.2].

*iv.  Clause [9.3]*

[9.3] while the computing device remains in low power mode, receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data

Clause [9.2] focused on the first computing device *transmitting* to the "other" computing device "output" of audio data.  Clause [9.3] is similar to clause [9.2] but recites that the first computing device also *receives* from the "other" computing device "output" of audio data.

Petitioner asserts Rosenberger discloses the steps, elements, and limitations of clause [9.3].  Pet. 42–46 (citing Ex. 1002 ¶¶ 123–135).

Patent Owner asserts that "Petitioner's analysis is flawed" because "as discussed with respect to [9.2], mere capability is insufficient to establish anticipation."  PO Resp. 26.  Patent Owner also asserts that "[t]here is simply no need, and Petitioner does not explain why the control device of Rosenberger would receive a weighted signal from another device unless the other devices were "simultaneously triggered," i.e., exited listening mode as disclosed."  *Id.* at 29 (citing Ex. 2012 ¶¶ 81–83.  We disagree.

As we have discussed in our discussion of clause [9.2] and of Rosenberger, Rosenberger discloses in Figures 7–10 and the related written descriptions of these figures "various system architectures in which a plurality of the control devices [four control devices are shown] of the invention either coordinate amongst themselves [Figs. 9, 10] or utilize a

42

**Appx42**

coordinating controller [Figs. 7, 8] to decide which control device will handle a given speech command when more than one control device has been simultaneously triggered." Ex. 1003, 5:64–6:3. As explained above, triggering a device with a "trigger phrase" as disclosed in Rosenberger is not synonymous with exiting Rosenberger's low power mode.

Accordingly, based on a preponderance of the evidence before us, we determine that Rosenberger discloses devices that both send and receive "output" with each other while in a low power mode, which meets the requirements of clause [9.3] based on the same analysis as in clause [9.2] above.

*v. Clause [9.4]*

[9.4] after transmitting the output of processing the audio data using the on-device hotword detector and after receiving the additional output of processing the audio data from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, determining, by the computing device, to remain in the low power mode.

Essentially, clause [9.4] states that the final step of determining which of the computing devices will remain in the low power mode, and by implication, which one computing device, the one with the highest hotword confidence score, will exit the low power mode. Petitioner asserts Rosenberger discloses the steps, elements, and limitations in clause [9.4]. Pet. 46–50 (citing Ex. 1002 ¶¶ 136–144). Petitioner cites, for example, Rosenberger's disclosure that the control devices are "coordinated so that only the single device with the highest weighted signal proceeds to interact with the user and/or process the speech command." Pet. 48 (quoting Ex. 1003, 11:27–31). All other control devices in Rosenberger remain in the

low power mode. Any other result would not eliminate the "duplicate response problem" that Rosenberger seeks to avoid, which occurs when several devices simultaneously recognize the same speech command or trigger phrase. *See* Ex. 1003, 3:30–35.

Patent Owner asserts that "Petitioner's arguments for [9.4] suffer from the same deficiencies as [9.3]." PO Resp. 30. According to Patent Owner, , Petitioner's argument "that 'only the 'control device' with the highest WS value exits the claimed *low power mode*" (Pet. 46–47 (italics in Petition)) is "incorrect." PO Resp. 30. We have determined otherwise in our discussion of clause [9.3] and of Rosenberger above.

Accordingly, based on a preponderance of the evidence before us, we determine that Rosenberger discloses the steps, elements and limitations of clause [9.4].

###### b.    Claims 1 and 16

The claim chart in Section II.D.2 of this Decision establishes the substantial similarity of claims 1, 9, and 16.

Petitioner asserts elements 1.1, 1.2, 1.3, and 1.4 of claim 1 map to elements 9.1, 9.2, 9.3, and 9.4 of claim 9, respectively. Thus, according to Petitioner, Rosenberger discloses claim 1 for the same reasons it discloses claim 9. Pet 51 (citing Ex. 1002 ¶¶ 145–147.

Petitioner also asserts elements 16.0, 16.1, 16.2, 16.3, and 16.4 of claim 16 map to elements 9.0, 9.1, 9.2, 9.3, and 9.4 of claim 9, respectively. Thus, Rosenberger discloses claim 16 for the same reasons it discloses claim 9. *Id.* at 53 (citing Ex. 1002 ¶¶ 148–150.

IPR2023-00118
Patent No. 10,134,398 B2

Patent Owner also argues each clause in claims 1 and 16 with its corresponding clause in claims 9.  *See, e.g.*, PO Resp. 11 (arguing collectively clauses [1.2], [9.2], [16.2]).

<center>*c.    Conclusion for Claims 1, 9, 16*</center>

In *inter partes* reviews, a petitioner bears the burden of proving unpatentability of the challenged claims, and the burden of persuasion never shifts to the patent owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.,* 800 F.3d 1375, 1378 (Fed. Cir. 2015).  To prevail in this proceeding, Petitioner must support its challenge by a preponderance of the evidence.  35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).  Based on our analysis above of claims 1, 9, and 16, we determine that Petitioner has met its burden of proof for these claims.  Accordingly, we determine claims 1, 9, and 16 are not patentable.

<center>*3.    Dependent claims*
*2, 3, 7, 8, 10, 11, 15, 17, and 18*</center>

Claims 2, 10, and 17 are identical and depend on independent claims 1, 9, and 16, respectively.

Claims 3, 11, and 18 are identical and depend on independent claims 1, 9, and 16, respectively.

Claims 7 and 15 are identical and depend on independent claims 1 and 9, respectively.

Claim 8 depends on independent claim 1.

Petitioner provides a clause-by-clause analysis of where each element or limitation in dependent claims 2, 3, 7, 8, 10, 11, 15, 17, and 18 is disclosed in Rosenberger, and explains why and how Rosenberger

<center>45</center>

<center>**Appx45**</center>

IPR2023-00118
Patent No. 10,134,398 B2

anticipates these claims. Pet. 53–62. Throughout its analysis, Petitioner cites the declaration testimony of Dr. Johnson for evidentiary support.

Patent Owner does not address the patentability of dependent claims 2, 3, 7, 8, 10, 11, 15, 17, or 18. *See* PO Resp.; Sur-Reply; *see also* Reply 24 ("Google does not dispute that Rosenberger anticipates the additional limitations of dependent claims 2/10/17, 3/11/18, 7/15, and 8.").

We adopt Petitioner's undisputed findings and conclusions concerning dependent claims 2, 3, 7, 8, 10, 11, 15, 17, and 18. Based on these findings and conclusions, we determine that Petitioner has met its burden of proof for these claims. Accordingly, we determine claims 2, 3, 7, 8, 10, 11, 15, 17, and 18 are not patentable.

> E.    *Ground 2 – Obviousness of Claims 4, 5, 12, 13, 19, and 20 in View of Rosenberger and Basye*

Petitioner asserts dependent claims 4, 5, 12, 13, 19, and 20 are unpatentable under § 103 asserting that these claims would have been obvious in view of Rosenberger and Basye. Pet. 63–73. We first summarize the disclosure in Basye.

> 1.    *Basye (Ex. 1013)*

We make the following findings concerning the disclosure in Basye. Basye is titled "Speech Recognition Power Management." Ex. 1013, code (54). As summarized in its Abstract, Bayse discloses:

> [p]ower consumption for a computing device may be managed by one or more keywords. For example, if an audio input obtained by the computing device includes a keyword, a network interface module and/or an application processing module of the computing device may be activated. The audio input may then be transmitted via the network interface module to a remote computing device. Such as a speech recognition server. Alternately, the computing device may be

46

> provided with a speech recognition engine configured to
> process the audio input for on-device speech recognition.

*Id.*, code (57). Basye discloses using a speech processing module to "determine a score or confidence level whose value corresponds to a likelihood that a keyword is actually present in the speech" and "[i]f the score satisfies a threshold, the speech processing module" may determine that the keyword is present in the speech but "if the score does not satisfy the threshold, the speech processing module" may determine that there is no keyword in the speech. *Id.* ¶ 27. Basye's focus, however, is on power management for the disclosed devices. As disclosed in Basye, "aspects of the present disclosure are directed to power management for speech recognition." *Id.* ¶ 10. A computing device may be provided with a "power management subsystem" that selectively activates or deactivates one or more modules of the computing device. Ex. 1013 ¶ 10. This activation may be responsive to an audio input that includes one or more pre-designated spoken words," which Basye refers to as "keywords. *Id.*

Basye also discloses:

> By selectively activating modules of the computing device, the power management subsystem may advantageously improve the energy efficiency of the computing device. The power management subsystem may further improve the energy efficiency of the computing device by selectively activating one or more of its own modules. While such implementations are particularly advantageous for computing devices that rely on battery power, all computing devices for which power management may be desirable can benefit from the principles of the present disclosure.

*Id.* ¶ 14.

IPR2023-00118
Patent No. 10,134,398 B2

### 2.    *Claims 4, 12, 19*

Claims 4, 12, and 19 are identical and depend from claims 1, 9, and 16, respectively.  Claims 4, 12, and 19 each state:

> determining a hotword confidence score that is based on the audio data that corresponds to the utterance of the particular, predefined hotword and that reflects a likelihood that the audio data includes the particular, predefined hotword; and determining that the hotword confidence score satisfies a threshold, wherein transmitting the output of processing the audio data using the on-device hotword detector is based on determining that the hotword confidence score satisfies the threshold.

*E.g.*, Ex. 1001, 17:4–15 (for claim 4).

Petitioner provides a clause-by-clause analysis of where each element or limitation in dependent claims 4, 12, and 19 is disclosed in Rosenberger or Basye.  Pet. 65–68. Petitioner also explains the motivation and reasons why it would have been obvious to combine the disclosures from these two references with a reasonable expectation of success.  *Id.* at 63–64, 68–69. Throughout its analysis, Petitioner cites the declaration testimony of Dr. Johnson for evidentiary support.

In its Response, Patent Owner does not address specifically the patentability of dependent claims 4, 12, and 19.  *See* PO Resp. 47–51. Regarding claims 4, 12, and 19, Patent Owner asserts only that claims 4, 12, and 19 "are deficient for at least the same reasons discussed for independent claims 1, 9, and 16 from which they depend." *Id.* at 47.  We did not agree with Patent Owner's arguments regarding the asserted "deficiencies" of Rosenberger against the independent claims, and determine these same arguments are equally unpersuasive against dependent claims 4, 12, and 19. Patent Owner also does not address claims 4, 12, and 19 in its Sur-reply.

We adopt Petitioner's undisputed findings and conclusions concerning dependent claims 4, 12, and 19. Based on these findings and conclusions, we determine that Petitioner has met its burden of proof for these claims. Accordingly, we determine claims 4, 12, and 19 are not patentable.

### 3.    Claims 5, 13, 20

Claims 5, 13, and 20 also are identical and also depend from claims 1, 9, and 16, respectively. Claims 5, 13, and 20 each state:

> wherein the computing device transmits the output of processing the audio data using the on-device hotword detector without performing speech recognition on the audio data that corresponds to an utterance of the particular, predefined hotword.

*E.g.*, Ex. 1001, 17:16–20 (for claim 5). The essence of this claim is that the "output" or weighted signal is transmitted without performing speech recognition on the audio data that corresponds to the predefined hotword.

Petitioner provides a clause-by-clause analysis of where each element or limitation in dependent claims 5, 13, and 20 is disclosed in Rosenberger or Basye. Pet. 69–71. Petitioner also explains the motivation and reasons why it would have been obvious to combine the disclosures from these two references with a reasonable expectation of success. *Id.* at 63–64, 71–73.

Petitioner provides three arguments as to why a person of ordinary skill in the art would have been motivated to combine Rosenberger with Basye. Pet. 63–64. Petitioner first argues that "Rosenberger and Basye are in the same field of endeavor and relate to voice-controllable computing devices." *Id.* at 63 (citing Ex. 1003, 1:8–13 ("The present invention relates… to improvements in speech-recognizing control devices that respond to oral commands from a system user to produce a desired effect or result."); Ex. 1013 ¶ 1 ("Computing devices may include speech recognition

49

capabilities…. A computing device may also be capable of processing the recognized speech for specific speech recognition applications."")); *see* Ex. 1002 ¶ 192). Next, Petitioner argues that "Rosenberger and Basye both disclose techniques for intelligently 'waking' a voice-controllable computing device using a 'trigger phase' (or 'keyword' or 'wakeword' in Basye's terminology)." Pet. 63; *see* Ex. 1002 ¶ 193. Then, Petitioner argues that "Rosenberger discloses that any 'control device' could be a 'tabletop device' that ideally is powered by one or more batteries." Pet. 64 (citing Ex. 1013, 8:55–67, 9:37–40); *see* Ex. 1002 ¶ 194. In support of these arguments, Dr. Johnson testifies that "a POSITA seeking to implement one of Rosenberger's battery-powered 'control devices' would have been motivated … to look to teachings regarding intelligent power management to improve energy efficiency, such as the teachings of Basye." Ex. 1002 ¶ 196.

Petitioner asserts a person of ordinary skill "would have been motivated to modify Rosenberger's 'control device' to generate a WS [weighted signal] value based on audio data corresponding to an utterance of a 'trigger phrase' without performing speech recognition on that audio data to conserve energy and processing resources, as explained by Basye." *Id.* at 73 (citing Ex. 1002 ¶ 229).

Patent Owner asserts:

it would not have been obvious to modify Rosenberger in accordance with the teachings of Basye to not perform speech recognition on the audio data that corresponds to an utterance of the particular, predefined hotword (Pet. 69-73), as recited, because the entire premise of Rosenberger's invention is to perform speech recognition.

PO Resp. 47 (citing Ex. 2012 ¶ 111). According to Patent Owner, a person of ordinary skill "would not have been motivated to modify Rosenberger

such that its computing device no longer performs speech recognition on the audio data corresponding to the trigger phrase (alleged 'hotword') because the proposed modification alters the speech recognition principles forming the entire premise of Rosenberger." PO Resp. 51 (citing 2012 ¶¶ 109–114).

As we have noted above, the summary of the invention disclosed in the '398 patent states "each time the words 'OK computer' [the chosen "hotword"] are spoken, it is picked up by a microphone, conveyed to the system, *which performs speech recognition techniques to determine whether the hotword was spoken and, if so, awaits an ensuing command or query.* Ex. 1001, 1:62–66. Thus, before the "the output of processing the audio data" is transmitted, the system first uses "speech recognition techniques" to determine whether the words spoken are, in fact, the adopted "hotword." The '398 patent does not define how "speech recognition techniques" differ from "speech recognition." To the extent there is a substantive difference, Petitioner relies on Basye.

As Petitioner explains, using Basye instead of Rosenberger's speech recognition, would "help reduce 'false positive' detections of a 'trigger phrase' (or 'wakeword')." Pet. 68 (citing Ex. 1002 ¶ 210). Petitioner also asserts that "Bayse explains that the use of 'thresholding' can help reduce false positives, which is a situation where a computing device incorrectly determines that speech is present or that speech includes a wakeword." *Id.* (citing Ex. 1013 ¶¶ 51, 74–75). This provides a good reason why a person of ordinary skill would want to modify, and improve, Rosenberger's performance.

IPR2023-00118
Patent No. 10,134,398 B2

Based on our analysis above of claims 5, 13, and 20, we determine that Petitioner has met its burden of proof for these claims. Accordingly, we determine claims 5, 13, and 20 are not patentable.

## III.  CONCLUSION[13]

Based on the evidence and analysis above, we determine that Petitioner has established that all challenged claims, claims 1–5, 7–13, and 15–20 are not patentable based the asserted grounds.

## IV.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, that Petitioner has shown by a preponderance of the evidence that claims 1–5, 7–13, and 15–20 are unpatentable;

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[13] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2023-00118
Patent No. 10,134,398 B2

## V.  SUMMARY TABLE

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–3, 7–11, 15–18 | 102 | Rosenberger | 1–3, 7–11, 15–18 | |
| 4, 5, 12, 13, 19, 20 | 103 | Rosenberger and Basye | 4, 5, 12, 13, 19, 20 | |
| **Overall Outcome** | | | 1–5, 7–13, 15–20 | |

For PETITIONER:

Michael P. Boyea
Jae Y. Pak
Cole B. Richter
LEE SULLIVAN SHEA & SMITH LLP
boyea@ls3ip.com
pak@ls3ip.com
richter@ls3ip.com

For PATENT OWNER:

Erika Harmon Arner
Cory C. Bell
Alissa E. Green
Misook Kim
Safiya Anguilar
FINNEGAN, HENDERSON, FARABOW,
GARRETT, & DUNNER LLP
erika.arner@finnegan.com
cory.bell@finnegan.com
alissa.green@finnegan.com
misook.kim@finnegan.com
safiya.anguilar@finnegan.com

53

Trials@uspto.gov                                           Paper 21
571-272-7822                                     Entered: May 15, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SONOS, INC.,
Petitioner,

v.

GOOGLE LLC,
Patent Owner.

———————

IPR2023-00119
Patent 10,593,330 B2

———————

Before KEVIN F. TURNER, BARRY L. GROSSMAN, and
TERRENCE W. McMILLIN, *Administrative Patent Judges*.

GROSSMAN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2023-00119
Patent No. 10,593,330 B2

# I. INTRODUCTION

## A. *Background and Summary*

Sonos, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1–7, 9–15, 17, and 18 (the "challenged claims") of U.S. Patent No. 10,593,330 B2 (Ex. 1001, "the '330 patent"). Google LLC ("Patent Owner") filed a Preliminary Response (Paper 6, "Prelim. Resp.").

We concluded that Petitioner satisfied the burden, under 35 U.S.C. § 314(a), to show that there was a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims. Accordingly, on behalf of the Director (37 C.F.R. § 42.4(a) (2022)), and in accordance with *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1353 (2018), we instituted an *inter partes* review of all the challenged claims, on all the asserted grounds. Paper 9 ("Dec. Inst.").

Patent Owner filed a Response. Paper 10 ("PO Resp."). Petitioner filed a Reply. Paper 12 ("Reply"). Patent Owner filed a Sur-reply. Paper 13 ("Sur-reply").

An Oral Argument was held March 5, 2024. (Paper 20) ("Transcript or "Tr.").

We have jurisdiction under 35 U.S.C. § 6. We enter this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has the burden of proving unpatentability of a claim by a preponderance of the evidence. 35 U.S.C. § 316(e).

Based on the findings, analysis, and conclusions below, we determine that Petitioner has proven by a preponderance of the evidence that the challenged claims are unpatentable.

IPR2023-00119
Patent No. 10,593,330 B2

## B.    Real Parties-in-Interest

Sonos identifies itself as the sole real party-in-interest. Pet. 1. Google identifies itself as the real party-in-interest. Paper 4, 2.

## C.    Related Matters

The parties state that the '330 patent is the subject of the following ITC and district court proceedings: *Certain Audio Players and Components Thereof*, Inv. No. 337-TA-1329 (the "1329 ITC proceeding") and *Google LLC v. Sonos, Inc.*, Case No. 3:22-CV-04552 (N.D. Cal.) (the "District Court litigation"). Pet. 1–2; Paper 4, 2; *see also* Ex. 3004 ¶ 2 (the Complaint for Patent Infringement in the District Court litigation); Ex. 1017, 1 (Patent Owner's "Initial Markman Brief" in the 1329 ITC proceeding).

At the Oral Argument, Petitioner's counsel stated both the 1329 ITC proceeding and the District Court litigation have been stayed in view of this and related IPR proceedings. Tr. 6:16–22; *see also* Ex. 1015, 6:20–25, 13:4–13 (transcript of a Case Management Conference in the 1329 ITC proceeding discussing a revised trial schedule in light of the pending IPR proceedings).

Petitioner also states that the '330 patent "is related to the '398 Patent."[1] Pet. 2, n.1. Patent Owner acknowledges that "[t]he '330 and '398 patents are related and share a common specification." Ex. 1017, 10.

To illustrate the close relationship between the '330 and '398 patents, in addition to their common Specification, the following chart compares

---

[1] U.S. Patent 10,134,398 is the subject of IPR2023-00118. The '330 patent is a continuation of application No. 15/346,914, which is now the '398 patent. Ex. 1001 code (63). A Final Written Decision in IPR2023-00118 is being entered on the same day as this Decision in the case before us.

IPR2023-00119
Patent No. 10,593,330 B2

claim 1 from the '330 patent with claim 1 from the '398 patent. The italicized text in the chart identifies the differences between claim 1 in each of these patents.

| CLAIM 1 – '398 PATENT IPR2023-00118 | CLAIM 1 – '330 PATENT IPR2023-00119 |
|---|---|
| A computer-implemented method comprising: | A computer-implemented method comprising: |
| receiving, by a computing device that is in a low power mode *and that is configured to exit a low power mode upon detecting an utterance of a particular, predefined hotword using an on-device hotword detector,* audio data that *corresponds to* an utterance of the particular, predefined hotword; | receiving, by a computing device that is in a low power mode, audio data that *includes* an utterance of a particular, predefined hotword; |
| while the computing device remains in the low power mode, and in response to receiving the audio data that *corresponds to* the utterance of the particular, predefined hotword, transmitting, by the computing device *and to another computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an output of processing the audio data using the on-device hotword detector;* | while the computing device remains in the low power mode, and in response to receiving the audio data that *includes* the utterance of the particular, predefined hotword, transmitting, by the computing device, *a message;* |

4

IPR2023-00119
Patent No. 10,593,330 B2

| | |
|---|---|
| while the computing device remains in low power mode, receiving, by the computing device and from *the other* computing device that is *configured to exit* a low power mode *upon detecting an utterance of the particular, predefined hotword*, an additional *output of processing the audio data*; and | while the computing device remains in the low power mode, receiving, by the computing device and from *an additional* computing device that is *in* a low power mode, an additional *message*; and |
| *after transmitting the output of processing the audio data using the on-device hotword detector and after receiving the additional output of processing the audio data from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword*, determining, by the computing device, to *remain in* the low power mode. | *based on the message and the additional message*, determining, by the computing device, to *exit* the low power mode. |

Concerning related matters, Petitioner states that "Google has also asserted U.S. Patents 9,812,128 and 11,024,311 against Sonos in *Certain Audio Players and Components Thereof*, Inv. No. 337-TA-1330 and *Google LLC v. Sonos, Inc.*, Case No. 3:22-CV-04553 (N.D. Cal.)" and that "[t]hese patents are related to the '330 Patent and have been challenged by Sonos in IPR2022-01594 and IPR2022-01592, respectively." Pet. 2. In each of IPR2022-01592 and IPR2022-01594, the Board issued a Final Written Decision determining in each case that all challenged claims were

IPR2023-00119
Patent No. 10,593,330 B2

unpatentable. *See* IPR2022-01592, Paper 31 (PTAB Apr. 4, 2024);

IPR2022-01594, Paper 30 (PTAB Mar. 15, 2024).

### D.    The '330 patent

We make the following findings of fact concerning the '330 patent.

The '330 patent is titled "Hotword Detection on Multiple Devices."

Ex. 1001, code (54). The disclosed technology "generally relates to systems

and techniques for recognizing the words that a person is speaking,

otherwise referred to as speech recognition." *Id.* at 1:17–19.

The disclosed technology operates in the context of "a speech-enabled

home or other environment—that is, one in which a user need only speak a

query or command out loud and a computer-based system will field and

answer the query and/or cause the command to be performed." *Id.* at 1:23–

27.

As explained in the Specification,

> [a] speech-enabled environment (e.g., home, workplace,
> school, etc.) can be implemented using a network of connected
> microphone devices distributed throughout the various rooms or
> areas of the environment. Through such a network of
> microphones, a user has the power to orally query the system
> from essentially anywhere in the environment without the need
> to have a computer or other device in front of him/her or even
> nearby.

*Id.* at 1:27–34.

A "hotword," as used in the context of the '330 patent, is a word or

phrase, which, by agreement among the users in the environment, "is

reserved as a predetermined word [or phrase] that is spoken to invoke the

attention of the system." *Id.* at 1:57–61. An example of a hotword used to

invoke the system's attention is the phrase "OK computer." Ex. 1001, 1:61–

6

IPR2023-00119
Patent No. 10,593,330 B2

63.  In this example, each time the phrase "OK computer" is spoken within proximity of a system microphone, the system first determines whether the reserved, predetermined hotword was spoken and, "if so, awaits an ensuing command or query." *Id.* at 1:63–67.  Thus, as further explained in the '330 patent,

> utterances directed at the system take the general form [HOTWORD] [QUERY], where 'HOTWORD' in this example is 'OK computer' and 'QUERY' can be any question, command, declaration, or other request that can be speech recognized, parsed and acted on by the system, either alone or in conjunction with the server via the network.

*Id.* at 2:1–6.

According to the '330 patent, "the system, which potentially picks up all utterances made in the surrounding environment including those not directed to the system, must have some way of discerning when any given utterance is directed at the system" and "[o]ne way to accomplish this is to use a hotword." *Id.* at 1:52–58.  Accordingly, the '330 patent discloses an embodiment in which

> a user device receives an utterance that is spoken by a user. The user device determines whether the utterance includes a hotword and computes a hotword confidence score that indicates a likelihood that the utterance includes the hotword. The user device transmits this score to other user devices in the near vicinity. The other user devices likely received the same utterance. The other user devices compute a hotword confidence score and transmit their scores to the user device. The user device compares the hotword confidence scores. If the user device has the highest hotword confidence score, then the user device *remains* active and prepares to process additional audio.  If the user device does not have the highest hotword confidence score, then the user device does not process the additional audio.

7

IPR2023-00119
Patent No. 10,593,330 B2

Ex. 1001, 2:8–22 (emphasis added).  An advantage of this system is that "[m]ultiple devices can detect a hotword and only one device will respond to the hotword."  *Id.* at 3:21–23.  The system "addresses the problem of selecting the correct device for reacting to a hotword, and suppressing reaction to the hotword on other devices."  *Id.* at 3:55–57.

Figure 1 of the '330 patent is reproduced below.



FIG.1

Figure 1 "is a diagram of an example system for hotword detection." Ex. 1001, 3:33–34.  System 100 allows user 102 to speak utterance 104 that is detected by microphones of computing devices 106, 108, and 110. Ex. 1001, 3:59–61.  Computing devices 106, 108, and 110 process utterance 104 to determine a likelihood that utterance 104 includes a hotword and "each transmit[s] data to each other that indicates the likelihood that the utterance 104 includes a hotword."  *Id.* at 3:61–66.

8

IPR2023-00119
Patent No. 10,593,330 B2

Computing devices 106, 108, and 110 then compare the data and "the computing device that computed the highest likelihood that the utterance 104 included a hotword initiates speech recognition on the utterance 104" while "computing devices that did not compute the highest likelihood that the utterance 104 includes a hotword *do not initiate speech recognition* on the speech [*i.e.*, a Query] following the utterance 104." *Id.* at 3:66–4:6 (emphasis added).

Computing devices 106, 108, and 110 include corresponding "hotworders" 124, 126, and 128 that compute a corresponding confidence score for utterance 104 from an audio input device such as a microphone using extracted audio features and "a support vector machine or a neural network." *Id.* at 5:7–33. Computing devices 106, 108, and 110 also include corresponding score comparer 136, 138, and 140 "to compare the hotword confidence scores that the computing device has received." *Id.* at 6:20–29. To make the comparison, confidence score data packets 130, 132, and 134 are transmitted from one computing device to another. *Id.* at 5:33–6:19.

Figure 2 from the '330 patent, reproduced below, is a flow diagram of an example process for hotword detection. Ex. 1001, 3:35–36.

IPR2023-00119
Patent No. 10,593,330 B2



FIG. 2

Figure 2 is a diagram of an example process 200 for hotword detection that may be performed by a computing device such as computing device 108 shown in Figure 1. Ex. 1001, 9:38–41. Neither Figure 2 nor the related written description refers to a "low power mode" in determining which computing device will initiate "speech recognition" on the user query following a hotword determination.

The Specification also states that the disclosed computing devices can take many different configurations, but include typical computing elements

10

IPR2023-00119
Patent No. 10,593,330 B2

such as processors, memories, and similar components for networked computing devices. *See id.* at 12:24–13:12.

### E.    Illustrative Claim

Petitioner challenges claims 1–7, 9–15, 17, and 18. Claims 1, 9, and 17 are independent claims. Independent claim 1 is directed to a "computer-implemented method." Ex. 1001, 16:25. Independent claim 9 is directed to a "system." *Id.* at 17:10. Independent claim 17 is directed to a "non-transitory computer-readable medium storing software comprising instructions executable by one or more computers." *Id.* at 18:24–26. As we discuss below in our consideration of independent claims 9 and 17, but for the preambles, claims 9 and 17 are substantive repetitions of independent claim 1.

Independent claim 1 is illustrative and is reproduced below with bracketed labels employed by Petitioner to facilitate analysis and discussion. *See* Pet. 47.

> [1.0] A computer-implemented method comprising:
> [1.1] receiving, by a computing device that is in a low power mode, audio data that includes an utterance of a particular, predefined hotword;
> [1.2] while the computing device remains in the low power mode, and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, transmitting, by the computing device, a message;
> [1.3] while the computing device remains in the low power mode, receiving, by the computing device and from an additional computing device that is in a low power mode, an additional message; and
> [1.4] based on the message and the additional message, determining, by the computing device, to exit the low power mode.

Ex. 1001, 16:25–40.

IPR2023-00119
Patent No. 10,593,330 B2

### F.    Prior Art and Asserted Grounds

Petitioner asserts that the challenged claims are unpatentable on the following grounds:

| Claims Challenged | 35 U.S.C. §[2] | Basis |
|---|---|---|
| 1–3, 5, 7, 9–11, 13, 15, 17, 18 | 102(a) | Rosenberger[3] |
| 4, 6, 12, 14 | 103 | Rosenberger, Basye[4] |

Petitioner also relies on the declaration testimony of Dr. Michael T. Johnson. *See* Ex. 1002.[5]

Patent Owner relies on the Declaration testimony of Stuart Lipoff. *See* Ex. 2012, Ex. 2013).[6]

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011), took effect on September 16, 2011. The changes to 35 U.S.C. §§ 102 and 103 in the AIA do not apply to any patent application filed before March 16, 2013. Because the application for the patent at issue in this proceeding has an effective filing date after March 16, 2013, we refer to the AIA version of the statute.

[3] U.S. Patent No. 8,340,975 B1, Dec. 25, 2012, Ex. 1003 ("Rosenberger").

[4] U.S. Patent Application Publ. No. 2014/01636978 A1, June 12, 2014, Ex. 1013 ("Basye").

[5] Dr. Johnson earned undergraduate degrees in Computer Science Engineering and in Electrical Engineering, a Master's degree in Electrical Engineering, and a Ph.D. degree "with a doctoral dissertation focused on speech processing and automatic speech recognition." Ex. 1002 ¶ 6. Dr. Johnson currently is the Department Chair and a Full Professor in the Department of Electrical and Computer Engineering at the University of Kentucky. *Id.* ¶ 5.

[6] Mr. Lipoff earned undergraduate degrees in Electrical Engineering and Engineering Physics. Ex. 2012 ¶ 8. Mr. Lipoff further earned a Master of Science in Electrical Engineering and a Master of Business Adminstration. *Id.* Mr. Lipoff states he has been "heavily engaged in the study, analysis, evaluation, design, and implementation of products and technology

12

## II. ANALYSIS

### A.    *Legal Standards*

"To anticipate a claim, a prior art reference must disclose each and every element of the claim, either explicitly or inherently." *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 910 (Fed. Cir. 2022) (citing *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006). "While those elements must be arranged or combined in the same way as in the claim, the reference need not disclose the elements in the very same terms used by the patent." *Id.* (citing *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) ("[T]he reference need not satisfy an *ipsissimis verbis* test." (citing *In re Bond*, 910 F.2d 831, 832–33 (Fed. Cir. 1990))). "The question of what a reference teaches and whether it describes every element of a claim is a question for the finder of fact." *Id.* (citing *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1221 (Fed. Cir. 2003)). As further explained in *Net MoneyIN,*

> unless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102.

*Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). *Id.*; *see also Verdegaal Bros. v. Union Oil Co.*, 814 F.2d 628, 631 (Fed. Cir. 1987) ("A claim is anticipated only if each and every element as set forth in

---

associated with consumer electronics and electronic appliances." *Id.* ¶ 16. A particular focus of his professional activities has been "improving the man-machine interface including voice, speech, and speaker recognition for man-machine interactions." *Id.*

IPR2023-00119
Patent No. 10,593,330 B2

the claim is found, either expressly or inherently described, in a single prior art reference."). "The identical invention must be shown in as complete detail as is contained in the . . . claim." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989).

Whether the challenged claims would have been obvious over the cited references also is at issue in this proceeding. Section 103 forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when available, evidence such as commercial success, long felt but unsolved needs, and failure of others.[7] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *see KSR*, 550 U.S. at 407 ("While the sequence of these questions might be reordered in any particular case, the [Graham] factors continue to define the inquiry that controls."). The Court in Graham explained that these factual inquiries promote "uniformity and definiteness," for "[w]hat is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context." 383 U.S. at 18.

---

[7] Patent Owner does not direct us to any persuasive objective evidence of non-obviousness.

14

IPR2023-00119
Patent No. 10,593,330 B2

The Supreme Court made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. To support this conclusion, however, it is not enough to show merely that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires that a person of ordinary skill at the time of the invention "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any reason *why* a person of skill in the art would have made the combination. *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017).

Moreover, in determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed. Cir. 1985) ("It is elementary that the claimed invention must be considered as a whole in deciding the question of obviousness."); *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983) ("[T]he question under 35 U.S.C. § 103 is not whether

15

IPR2023-00119
Patent No. 10,593,330 B2

the differences *themselves* would have been obvious. Consideration of differences, like each of the findings set forth in *Graham*, is but an aid in reaching the ultimate determination of whether the claimed invention as a whole would have been obvious.").

As a factfinder, we also must be aware "of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR*, 550 U.S. at 421.

Applying these general principles, we consider the evidence and arguments of the parties.

### B.    Level of Ordinary Skill in the Art

The level of skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). "This reference point prevents . . . factfinders from using their own insight or, worse yet, hindsight, to gauge obviousness." *Id.*

"The *Graham* analysis includes a factual determination of the level of ordinary skill in the art. Without that information, a . . . court cannot properly assess obviousness because the critical question is whether a claimed invention would have been obvious at the time it was made to one with ordinary skill in the art." *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *see also Ruiz v. A.B. Chance*, 234 F.3d 654, 666 (Fed. Cir. 2000) ("The determination of the level of skill in the art is an integral part of the *Graham* analysis.").

Factors pertinent to a determination of the level of ordinary skill in the art include: (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity

16

with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field. *Best Med. Int'l, Inc. v. Elekta Inc.*, 46 F.4th 1346, 1353 (Fed. Cir. 2022) (citing *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007) (quoting *Env't Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed. Cir. 1983). These factors are not exhaustive but merely are a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo*, 501 F.3d at 1256. In determining a level of ordinary skill, we also may look to the prior art, which may reflect an appropriate skill level. *Okajima*, 261 F.3d at 1355.

Petitioner asserts that a person of ordinary skill in the art would have had "the equivalent of a four-year degree from an accredited institution (typically denoted as a B.S. degree) in electrical or computer engineering, or a related field, and approximately 2–4 years of experience in the field of voice and/or audio processing, or an equivalent level of skill, knowledge, and experience." Pet. 22 (citing Ex. 1002 ¶¶ 59–62).

Dr. Johnson's Declaration testimony states he considered some of the factors listed above. Ex. 1002 ¶ 60. Dr. Johnson "also considered [his] own experiences working and teaching in the fields of voice and audio processing." *Id.* Dr. Johnson testifies that, in his opinion, the level of ordinary skill is as stated by Petitioner. *Id.* at 61.

Patent Owner does not assert a level of ordinary skill, nor does Patent Owner dispute or otherwise comment on Petitioner's proposed definition of the level of ordinary skill. *See* PO Resp. and Sur-reply, *generally*.

Based on the prior art, the sophistication of the disclosed technology in the '330 patent, and Dr. Johnson's testimony, we adopt Petitioner's definition of the level of ordinary skill. Accordingly, based on the evidence

17

before us, we determine a person of ordinary skill in the context of the '330 patent would have had the equivalent of a four-year degree from an accredited institution (typically denoted as a B.S. degree) in electrical or computer engineering, or a related field, and approximately 2–4 years of experience in the field of voice and/or audio processing, or an equivalent level of skill, knowledge, and experience.

## C.    Claim Construction

We construe each claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b)." 37 C.F.R. § 42.100(b).  Under this standard, claim terms are generally given their ordinary and customary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc) ("We have frequently stated that the words of a claim 'are generally given their ordinary and customary meaning.'" (citations omitted)); *see also Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (quoting *Phillips*, 415 F.3d at 1313).  While there is substantial judicial precedent and guidance concerning claim construction, "there is no magic formula or catechism for conducting claim construction." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1324).

The Specification, or more precisely, the written description, is the "single best guide to the meaning of a *disputed* term." *Grace Instrument*, 57 F.4th at 1008 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (emphasis added), and "is, thus, the primary basis for

18

IPR2023-00119
Patent No. 10,593,330 B2

construing the claims." *Id.* (citation omitted). This focus on the Specification helps to avoid what has been called "the curse of indefinite and ambiguous claims, divorced from the written description." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1311 (Fed. Cir. 2011) (Plager, Circuit Judge, concurring).

Petitioner states, "the Challenged Claims do not require construction." Pet. 22.

In its Preliminary Response, Patent Owner did not propose any claim construction, nor did Patent Owner comment on Petitioner's statement that the challenged claims do not require construction. *See* Prelim. Resp., *generally*.

Accordingly, in our Institution Decision, we determined that, "[w]e do not perceive the need to construe any claim limitation." Dec. Inst. 14.

In its Response, however, Patent Owner proposes a specific construction for the term "low power mode." PO Resp. 2–6. The term "low power mode" is used in all three independent claims (claims 1, 9, and 17). This term also is used specifically in challenged dependent claims 3, 7, 11, and 15.

According to Patent Owner, the term "low power mode" "has a well-understood plain and ordinary meaning: 'an operating mode or state in which power is conserved.'" PO Resp. 2–3. Patent Owner states "[t]his construction is consistent with (1) the patent's prosecution history and the

IPR2023-00119
Patent No. 10,593,330 B2

cited art, (2) the patent's specification[8], and (3) the extrinsic evidence." PO
Resp. 3 (citing Ex. 2012 ¶¶ 54–58).[9]

In its Reply, Petitioner notes that "Google concedes that Rosenberger
discloses [a] *low power mode* under its interpretation." Reply 1 (citing PO
Resp. 2 ("Google also does not dispute that Rosenberger's 'low-power
'listening mode'' is a low power mode, as claimed in the '330 Patent….")).
Petitioner, therefore, states that "the Board can assume that Google's
proposed interpretation of low power mode is correct, which means there is
no controversy for the Board to resolve." *Id.*; *see also* Sur-reply 1
("Petitioner does not dispute Patent Owner's construction of "low power
mode").

---

[8] The claims of the '330 patent use the term "low power mode" twenty
times. This term, however, does *not* appear in the written description of the
'330 patent. In its Sur-reply, Patent Owner states "the '330 patent expressly
discloses 'active' and 'inactive' states—the latter of which clearly
corresponds to an operating mode or state in which power is conserved."
Sur-reply 2 n.1. Patent Owner cites no persuasive evidence to support this
argument. "Argument in the brief does not take the place of evidence in the
record." *Garrido v. Holt*, 547 F. App'x 974, 979 n.3 (Fed. Cir. 2013),
(citing *In re Schulze*, 346 F.2d 600, 602 (CCPA 1965).

We also note that in the related 1329 ITC proceeding, the Judge stated she
would be issuing a "Markman order" for the term "low power mode"
(Ex. 1015, 6:9–13) with a determination that this term is "indefinite"
(*id.* at 9:17–20). The issue of whether the term "low power mode" is
"indefinite" under 35 U.S.C. § 112 is beyond our jurisdiction in this IPR
proceeding, which is limited to determinations under "[35 U.S.C. §§] 102 or
103 and only on the basis of prior art consisting of patents or printed
publications." *See* 35 U.S.C. § 311.

[9] Patent Owner cites the Declaration testimony of Mr. Lipoff as "Decl." We
refer to it, as we do with all evidence before us, by its exhibit number, which
is Ex. 2012.

Claims must be construed "only to the extent necessary to resolve the controversy." *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1345 (Fed. Cir. 2021) (quoting *Vivid Techs., Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *see also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (citations omitted)). We determine that a specific construction of the term "low power mode" is not necessary to reach a decision in this *inter partes* review of the challenged claims.

Both parties agree that the ordinary and customary meaning of "low power mode" is "an operating mode or state in which power is conserved," and thus, this is the construction we will use in reaching our patentability determination. As we discuss below, the dispute between the parties concerns *when* a networked device in Rosenberger *exits* the low power mode, *not whether* Rosenberger discloses a low power mode as claimed. As stated by Patent Owner, the dispositive issue in this proceeding is whether Rosenberger "teach[es] a process by which devices in a low power mode remain in that low power mode while exchanging messages with other devices for the purpose of determining whether to exit the low power mode." PO Resp. 2.

We now turn to the merits of Petitioner's asserted Grounds of unpatentability.

> D.    *Ground 1 – Anticipation of Claims*
> *1–3, 5, 7, 9–11, 13, 15, 17, and 18*
> *Based on Rosenberger*

Petitioner asserts claims 1–3, 5, 7, 9–11, 13, 15, 17, and 18 are anticipated by Rosenberger.  Pet. 22–60.

First, we summarize the disclosure of Rosenberger.

> 1.    *Rosenberger (Ex. 1003)*

We make the following findings regarding Rosenberger.

Rosenberger is titled "Interactive Speech Recognition Device and System for Hands-Free Building Control." Ex. 1003, code (54). Rosenberger "relates to improvements in automated control systems" and, "[m]ore particularly, . . . to improvements in speech-recognizing control devices that respond to oral commands from a system user." *Id.* at 1:8–13.

As summarized in its Abstract, Rosenberger discloses:

> A self-contained wireless interactive speech recognition control device and system that integrates with automated systems and appliances to provide totally hands-free speech control capabilities for a given space.  Preferably, each device comprises a programmable microcontroller having embedded speech recognition and audio output capabilities, a microphone, a speaker and a wireless communication system through which a plurality of devices can communicate with each other and with one or more system controllers or automated mechanisms.  The device may be enclosed in a standalone housing or within a standard electrical wall box.  Several devices may be installed in close proximity to one another to ensure hands-free coverage throughout the space.  When two or more devices are triggered simultaneously by the same speech command, real time coordination ensures that only one device will respond to the command.

Ex. 1003, code (57).

As disclosed in Rosenberger, to provide complete hands-free speech recognition coverage and comfortable user interaction from anywhere in a building using speech recognition modules of this type, it would often be necessary to install many modules in reasonable proximity to one another. *Id.* at 2:42–47. In such an arrangement, it is inevitable that a given speech command would frequently be recognized simultaneously by two or more neighboring speech recognition modules. *Id.* at 2:47–50. If multiple modules were triggered and responded simultaneously, the target automated mechanism could be instructed by each triggered device to perform the same instruction. *Id.* at 2:50–56. For example, the speech command "Lower Room Temperature Two Degrees" could be executed separately by several modules causing a thermostat to lower by multiples of the requested two degrees. *Id.* at 2:56–59. This is referred to as a "duplicate response problem." *Id.* at 2:60. One of the objectives of the system disclosed in Rosenberger is to avoid the "duplicate response problem." *Id.* at 3:30–35.

Rosenberger discloses "a totally hands-free, interactive, wireless speech recognition device and system that operate using low-power, low-data rate, wireless connections." *Id.* at 3:45–49. The disclosed system allows the user to wirelessly control the operation of automated mechanisms using speech commands, so that "[w]hen a trigger phrase is detected, the system 'wakes up' and prompts the user to say one or more commands from an expected command phrase vocabulary." *Id.* at 1:63–2:9.

Figure 3 of Rosenberger is reproduced below.

IPR2023-00119
Patent No. 10,593,330 B2



**FIG. 3**

Figure 3 "illustrates a residential floor plan showing a plurality of interactive speech recognition control devices at various locations that provide totally hands-free speech control of various automated mechanisms throughout the interior space." Ex. 1003, 5:41–44. A home-automation system includes table-top control devices T1–T6, electrical wall-box mounted control devices W1–W9, and automated mechanisms such as door lock DL1, security panel A1, television TV1, thermostat Tstat1, light dimmers L1–L5, and motorized shades S1–S3, that may all be controlled "hands-free" by persons P1–P4 using only speech commands. *Id.* at 9:37–49. "Control signals may be sent directly from any speech recognition device to system controller C1, which in turn, sends appropriate control signals to the target automated mechanisms to implement the speech command" or "any speech recognition device can control the automated mechanisms directly using

24

standard wireless communications and automation protocols." *Id.* at 9:50–56. Any of the table top devices T1–T6 and wall-boxes mounted control devices W1–W9 "may 'hear' and recognize" a "speech trigger" to operate the automated mechanisms. *Id.* at 9:57–10:4.

Rosenberger discloses that the control device "uses one of several different coordination methods to achieve the design goal of avoiding duplicate responses to the same speech command while selecting a single control device best able to successfully interact with the system user" and "[a]ll of the methods involve the calculation and production by the control device of a numeric weighted signal (WS) that quantifies the 'quality' of a just-recognized speech command." *Id.* at 10:34–41.

As disclosed in Rosenberger,

> Preferably, device D [a control device] *normally operates in a low power 'listening mode' in which it listens for a hands-free trigger phrase* (e.g., "Hello Voice Control or "Home Automation") to be spoken by the system user. *Upon* receiving and recognizing a speech trigger phrase [Rosenberger's label for a "Hotword"] and *determining that it is in a better position to handle subsequent user interaction than any other device* that simultaneously recognized the same speech trigger phrase (see device coordination discussion below), or when the user depresses the "Push to Talk" button 24 on the device, or in the event the device is *instructed to wake up and expect a subsequent speech command by a system controller*, the device beeps, *changes its status light 34* [*see* Figs. 1, 2B] or plays a prerecorded or synthesized audio message (e.g. "How may I help you?") through speaker 19 and/or 20 to prompt the user to say one of the speech commands from a known vocabulary or grammar stored in the speech pattern memory 14. Upon recognizing a particular speech command (and optionally confirming with the user), the device produces and transmits either to a system controller or directly to the automated mechanisms (via its communications circuitry 18) a corresponding system control signal designed to

25

IPR2023-00119
Patent No. 10,593,330 B2

> instruct the appropriate automated mechanisms to carry out the
> subject of the speech command.

Ex. 1003, 8:17–39 (emphases added).

As disclosed, Rosenberger's "low power listening mode" is for listening for a trigger phrase. *Id.* at 8:17–19. It is only *after* detecting the trigger phrase and "*upon . . . determining that it is in a better position to handle subsequent user interaction than any other device* that simultaneously recognized the same speech trigger phrase" does Rosenberger's device D "*change[ ] its status light 34*" to indicate its new "wake up" status as being ready for a subsequent speech command. *Id.* at 8:20–27 (emphases added).

Thus, to summarize the disclosures cited above, Rosenberger's computing devices (1) listen in "low power" mode for a "trigger phrase" or "Hotword;" (2) upon detecting a trigger phrase, the devices exchange information in the form of "weighted signals" to determine which computing device is "in a better position" to handle a subsequent user query; and (3) that one device in a "better position" than the other devices then exits its low power mode and "wakes up" so it can respond to any subsequent user query. How does the computing device accomplish these numerous and diverse tasks? Figure 1 from Rosenberger, showing the components within each of Rosenberger's computing devices D, provides an illustrated answer, and is reproduced below.

26

IPR2023-00119
Patent No. 10,593,330 B2



**FIG. 1**

Figure 1 from Rosenberger "schematically illustrates an interactive speech recognition control device D that is configured in accordance with a preferred embodiment" of Rosenberger's disclosed invention. Ex. 1003, 6:40–43; *see also id.* Fig. 2A (Fig.. 2A "is a perspective illustration of a contemplated table-top housing for containing the device of FIG. 1").

In order to achieve the described performance of its computing devices, Rosenberger discloses that the computing devices include "a uniquely-programmed microcontroller 10 having embedded speech recognition circuitry and software 12. *Id.* at 6:62–65. Each computing device also includes:

> a persistent internal memory 14 (e.g. non-volatile flash memory) for storing speech pattern data (phoneme expressions, etc.) and the like, a microphone 16 through which speech commands from the user are received, and a two-way, preferably wireless, communication system 18, all being supported by a housing H

27

IPR2023-00119
Patent No. 10,593,330 B2

> that can be placed anywhere in a room or installed in an electrical
> wall box.

Ex. 1003, 6:65–7:4.

> As further explained in Rosenberger,

> each control device D is *programmed* so that multiple devices
> can be placed in close proximity to one another in the same space.
> In accordance with a preferred embodiment, different devices
> recognizing the same speech command from the same person at
> the same instant *coordinate with each other* (shown in FIGS. 9,
> 10), or with an external coordinating controller CC (shown in
> FIGS. 7, 8), to ensure that only one device handles each discrete
> speech command, preferably the one able to hear the user as
> loudly and clearly as possible.

*Id.* at 10:5–14 (emphases added).

Rosenberger's control devices use one of several different
coordination methods to achieve the design goal of avoiding duplicate
responses to the same speech command while selecting a single control
device best able to successfully interact with the system user. Ex. 1003,
10:34–38. All of Rosenberger's disclosed methods involve "the calculation
and production by the control device of a numeric weighted signal (WS) that
quantifies the 'quality' of a just-recognized speech command." *Id.* at 10:38–
41.

### 2.    *Independent Claims 1, 9, 17*

Petitioner argues claims 1, 9, and 17 collectively. *See* Pet. 22–49.
Petitioner states that the "Petition addresses independent claim 9 first
because it is the narrowest independent claim of the '330 Patent." *Id.* at 22.
We make no finding or conclusion about the scope of claim 9 compared to
claims 1 and 17. For consistency with the Petition, however, we too will

28

IPR2023-00119
Patent No. 10,593,330 B2

begin our analysis with independent claim 9. Before doing so, we provide
the chart below showing the substantial similarity of claims 1, 9, and 17.

In the chart below, we use the paragraph numbering for these claims
used by Petitioner. As is evident, the only significant difference among
these three claims is their preamble.

| CLAIM 1 | CLAIM 9 | CLAIM 17 |
|---|---|---|
| [1.0] A computer-implemented method comprising: | [9.0] A system comprising: one or more computers; and one or more computers and one or more storage devices storing instructions that are operable, when executed by the one or more computers, to cause the one or more computers to perform operations comprising: | [17.0] A non-transitory computer-readable medium storing software comprising instructions executable by one or more computers which, upon such execution, cause the one or more computers to perform operations comprising: |
| [1.1] receiving, by a computing device that is in a low power mode, audio data that includes an utterance of a particular, predefined hotword; | [9.1] receiving, by a computing device that is in a low power mode, audio data that includes an utterance of a particular, predefined hotword; | [17.1] receiving, by a computing device that is in a low power mode, audio data that includes an utterance of a particular, predefined hotword; |

29

IPR2023-00119
Patent No. 10,593,330 B2

| | | |
|---|---|---|
| [1.2] while the computing device remains in the low power mode, and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, transmitting, by the computing device, a message; | [9.2] while the computing device remains in the low power mode, and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, transmitting, by the computing device, a message; | [17.2] while the computing device remains in the low power mode, and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, transmitting, by the computing device, a message; |
| [1.3] while the computing device remains in the low power mode, receiving, by the computing device and from an additional computing device that is in a low power mode, an additional message; and | [9.3] while the computing device remains in the low power mode, receiving, by the computing device and from an additional computing device that is in a low power mode, an additional message; and | [17.3] while the computing device remains in the low power mode, receiving, by the computing device and from an additional computing device that is in a low power mode, an additional message; and |
| [1.4] based on the message and the additional message, determining, by the computing device, to exit the low power mode. | [9.4] based on the message and the additional message, determining, by the computing device, to exit the low power mode. | [17.4] based on the message and the additional message, determining, by the computing device, to exit the low power mode. |

Petitioner provides a clause-by-clause analysis of claim 9 mapping each element or limitation of claim 9 to what Petitioner asserts is the corresponding disclosure in Rosenberger.  Pet. 22–46.

30

IPR2023-00119
Patent No. 10,593,330 B2

Throughout its analysis of claims 1, 9, and 17, Petitioner cites to the written description and drawings of Rosenberger and to the Declaration testimony of Dr. Johnson for evidentiary support. *See, e.g., id.* at 24 (citing Ex. 1002 ¶ 74), 26 (citing Ex. 1002 ¶ 77).

In general summary, and focusing on the issues argued by the parties, independent claims 1, 9, and 17 each require three actions while the claimed "computing devices" are in a low power mode.

First, "a computing device" (a first computing device) in a low power mode *receives* audio data that "includes an utterance" of a predefined hotword. Ex. 1001, 16:26–28.[10] This step, element, or limitation is contained in clauses 1.1, 9.1, and 17.1.

Second, while the first computing device remains in the low power mode, and in response to receiving the audio data, it *transmits* a "message." *Id.* at 16:29–33. This step, element, or limitation is contained in clauses 1.2, 9.2, and 16.2. As disclosed in the Specification, one form of this claimed "message" may be "a hotword confidence score that indicates a likelihood that the utterance includes the hotword." *Id.* at 2:6–12.

Third, while the first computing device remains in the low power mode, it *receives* from an "additional computing device" (a second computing device) an "additional message." Ex. 1001, 16:34–37. This step, element, or limitation is contained in clauses 1.3, 9.3, and 17.3. This "additional message" from the second computing device also may be "a hotword confidence score that indicates a likelihood that the utterance includes the hotword." *Id.* at 2:6–12.

---

[10] We cite to claim 1. As shown in the chart comparing the claims, these same steps, elements, or limitations are recited in claims 9 and 17.

IPR2023-00119
Patent No. 10,593,330 B2

At this point in the claimed invention, the computing devices, still in low power mode, determine, based on the "message" and the "additional message," whether to "exit the low power mode." Ex. 1001, 16:38–40. We know from the Specification that this determination is made by comparing "hotword confidence scores", with the computing device with the higher score exiting the low power mode and going into an active mode ready to receive and respond to a user query, while the other computing device remains in low power mode. Ex. 1001, 2:6–21. We do *not* read this disclosure from the Specification into the claims. We mention it to provide context for what the claims recite, and what they do *not* recite.

We now turn to specific clauses and arguments regarding the independent claims, beginning, as did Petitioner, with claim 9.

<div align="center">

*a.*     *Claim 9*

*i. Clause [9.0]*

</div>

[9.0] A system comprising: one or more computers;[11]

Petitioner relies on Figures 1 and 3 (reproduced and discussed above) and the related disclosure in Rosenberger to establish that Rosenberger discloses the system in clause [9.0]. Pet. 23–27 (citing Ex. 1002 ¶¶ 72–83).

Petitioner asserts a person of ordinary skill in the relevant technology, which we have determined is a person with the equivalent of a four-year degree from an accredited institution in electrical or computer engineering, or a related field, and approximately 2-4 years of experience in the field of

---

[11] Petitioner clearly misstates clause [9.0] in the Petition at pages 22–23 in its clause-by-clause analysis of claim 9. We have ignored this clear error and rely on the correct preamble language in the '330 patent. Dr. Johnson makes this same error in his Declaration testimony. Ex. 1002 ¶¶ 71, 72.

<div align="center">

32

**Appx85**

</div>

voice and/or audio processing (*see* Section II.B of this Decision), "would have understood that each 'control device' in Rosenberger amounts to *a computer* that comprises *one or more storage devices storing instructions that are operable, when executed by the [computer], to cause the [computer] to perform operations*." Pet. 24 (citing Ex. 1002 ¶ 74 (Dr. Johnson's opinion testimony supporting Petitioner's assertion); *id.* at 26 (citing Ex. 1002 ¶ 82); Ex. 1014, 15–18 (Patent Owner's infringement contention explaining why the accused products are "computers," as claimed in the '330 patent)).

The claims in Rosenberger also are part of Rosenberger's disclosure and Specification. 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."). Claim 1 in Rosenberger, for example, provides a summary of the elements of each of Rosenberger's "functionally identical [control] devices" (Ex. 1003, 17:12–13). These elements and their functions include:

> (a) a microphone for converting spoken words, emanating from a system user located within said building space, to corresponding electrical signals;

> (b) a programmable microcontroller, operatively coupled to the microphone and comprising embedded software and circuitry . . . ;

> (c) a transmitter operatively coupled to said microcontroller for selectively transmitting said weighted signal and said system control signals into said building space;

> (d) a receiver, operatively coupled to said microcontroller, for receiving (i) weighted signals emanating from one or more other functionally identical interactive speech recognition control devices within said building space, and/or (ii)

33

coordination signal derived from said weighted signals by an independent coordinating controller; and

(e) audio output circuitry through which said microcontroller can transmit audible sounds to interact with and provide indications of the system status to the system user.

Ex. 1003, 17:17–52; *see also* Pet. 28–29 (citing Ex. 1003, 17:10–27).

It is beyond reasonable dispute that Rosenberger's "control devices D" are computers as stated in claim 9 of the '330 patent. Indeed, Patent Owner does not take specific issue with the preamble clause, clause 9.0, and the corresponding clauses in independent claims 1 and 17.

Accordingly, based on a preponderance of the evidence before us, we determine that Rosenberger discloses the steps, elements and limitations of clause [9.0].

### ii. Clause [9.1]

[9.1] receiving, by a computing device that is in a low power mode, audio data that includes an utterance of a particular, predefined hotword;

Petitioner asserts that Rosenberger discloses the steps, elements, and limitations in clause [9.1]. Pet. 27–31. Throughout its analysis of this clause, Petitioner cites the Declaration testimony of Dr. Johnson for evidentiary support. *See, e.g., id.* (citing Ex. 1002 ¶¶ 84–97). Petitioner also cites Rosenberger's claim 1 for further evidence of how Rosenberger operates. Pet. 29 (citing Ex. 1003, 17:10–27).

Rosenberger's trigger phrase is a "hotword." Dr. Johnson testifies that:

Rosenberger explains that, in preferred embodiments, each 'control device' operates in a "low power 'listening' mode in which it listens for a hands-free trigger phrase (e.g., 'Hello Voice Control' or 'Home Automation') to be spoken by the system

IPR2023-00119
Patent No. 10,593,330 B2

> user' and *then only one given "control device" exits that 'low power' mode* to interact with the user and process voice commands after employing one of the disclosed 'coordination methods' and determining that the given 'control device' is in 'a better position to handle subsequent user interaction than any other device that simultaneously recognized the same speech trigger phrase ....'

Ex. 1002 ¶ 47 (emphasis added) (citing Ex. 1003, 8:15–32).

Patent Owner's basic argument as to why Rosenberger does not anticipate independent claims 1, 9, and 17 is that "Rosenberger does not teach a process by which devices in a low power mode *remain in that low power mode* while exchanging messages with other devices for the purpose of determining whether to remain in the low power mode." PO Resp. 2 (emphasis added).  We discuss this in the following sections.

Patent Owner's basic argument, however, assumes at least two or more "computing devices" that exchange messages with other computing devices for the purpose of determining which device will exit the lower power mode and respond to a user query, while the other device or devices remain in the low power mode.  PO Resp. 2.  If there is only one computing device in the system, there is no exchange of data or exchange of a "message" with other computing devices in the system to determine which device will exit the low power mode.  Thus, Patent Owner's basic argument does not apply to clause [9.1] because the claimed computing device is not yet exchanging and/or comparing data with any other computing device.

Accordingly, based on a preponderance of the evidence before us, we determine that Rosenberger discloses the steps, elements and limitations of clause [9.1].

IPR2023-00119
Patent No. 10,593,330 B2

### iii. Clause [9.2]

[9.2] while the computing device remains in the low power mode, and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, transmitting, by the computing device, a message;

Clause [9.2] requires that "while the computing device remains in the low power mode," it transmits "a message." This clause does not state to what or whom it transmits this message, nor does it state the type or content of the message.

Petitioner asserts that Rosenberger discloses the steps, elements, and limitations in clause [9.2]. Pet. 31–39 (citing Ex. 1002 ¶¶ 98–115).

Petitioner asserts that "Rosenberger discloses that each 'control device' is configured to[12] calculate and produce a 'weighted signal' (WS) value in response to receiving audio data corresponding to a user's utterance containing a 'trigger phrase.'" Pet. 31–34. According to Petitioner,

Rosenberger explains that each 'control device' 'sends its weighted signal to each of the other interactive speech recognition control devices connected to the same network using a broadcast or group multicast **messaging** technique' and '[i]mmediately after broadcasting its weighted signal, a triggered [control] device waits a predetermined amount of time while it monitors **weighted signal messages** that may have been simultaneously broadcasted from other like devices.

---

[12] Patent Owner argues that Petitioner argues that Rosenberger is "capable of" performing certain functions, which, according to Patent Owner "is insufficient to establish anticipation." PO Resp. 10–13. While the term "capable of" may appear in some of Petitioner's assertions, it is clear that both Petitioner and Rosenberger discuss and disclose, respectively, a system and method that operates and performs the functions disclosed.

Pet. 34 (citing Ex. 1003, 11:45–59 (emphasis in Petition)). Thus, it is Petitioner's position that this weighted signal is the "message" include in the claims.

Patent Owner argues that Rosenberger does not expressly disclose this limitation. PO Resp. 10. Patent Owner's basic argument as to why Rosenberger does not anticipate independent claims 1, 9, and 17 is that "Rosenberger does not teach a process by which devices in a low power mode *remain in that low power mode* while exchanging messages with other devices for the purpose of determining whether to remain in the low power mode." PO Resp. 2 (emphasis added). It is Patent Owner's position that "Rosenberger expressly discloses that its devices exit the low power 'listening mode' when they are 'triggered by a speech command,' *prior to exchanging messages* and selecting which device will respond to the user." *Id.* (emphasis added). As further explained by Patent Owner,

> each independent claim [in the '330 patent] recites a process by which a device that receives audio data including an utterance of a particular, predefined hotword while in a low power mode, remains in that low power mode while exchanging outputs with another device operating in a low power mode. Upon receipt of an additional output from another device, the device determines whether to remain in the low power mode.

*Id.* at 6.

> Patent Owner asserts

> Rosenberger does not anticipate claim 1 because Rosenberger discloses sending a "weighted signal" (the alleged "message") <u>after</u> the control device (the alleged "computing device") is "triggered," "i.e., switched from a 'listening' mode" (the low power mode) to an active mode, not <u>while the computing device remains in the low power mode</u> as recited in the '330 Patent claims.

37

IPR2023-00119
Patent No. 10,593,330 B2

PO Resp. 13 (underlined text is in the PO Response) (citing Ex. 1003, 11:37–42; Ex. 2012 ¶¶ 64–68.

Thus, the key issue between the parties is *when* does Rosenberger exit its low power mode?  Petitioner asserts Rosenberger exits its low power mode *after* the devices *exchange* weighted signal inputs and *after* the devices *determine* which device will respond to a user query, and thus anticipates claims 1, 9, and 17.  Patent Owner asserts Rosenberger exits it low power mode *upon receiving a trigger word*, and thus does not anticipate these claims.

Because Rosenberger discloses several different embodiments, to some extent both parties are correct.  *See* Reply 5 (asserting that Patent Owner's arguments "inappropriately limit Rosenberger's teachings as a whole to one specific example"); *id.* at 10–11.  We agree with Petitioner, however, that at least one of the embodiments in Rosenberger discloses the claimed invention and thus anticipates claims 1, 9, and 17.  Moreover, Patent Owner's argument "relies on the erroneous assumption that the disclosure of multiple examples renders one example less anticipatory." *Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1356 (Fed. Cir. 2008).

Regarding the weighted signal, Rosenberger discloses

the control device of the invention uses one of several different coordination methods to achieve the design goal of avoiding duplicate responses to the same speech command while selecting a single control device best able to successfully interact with the system user.  All of the methods involve the calculation and production by the control device of a numeric weighted signal (WS) that quantifies the "quality" of a just-recognized speech command.

38

Ex. 1003, 10:34–41. Rosenberger also discloses that "there are a number of methods for the devices to be coordinated so that only the single device with the highest weighted signal proceeds to interact with the user and/or process the speech command." *Id.* at 11:27–31.

Rosenberger discloses that its device D starts out in a "low power 'listening' mode." *Id.* at 8:17–20. Rosenberger then explains that "[u]pon receiving and recognizing a speech trigger phrase *and determining that it is in a better position to handle subsequent user interaction than any other device* that simultaneously recognized the same speech trigger phrase" (*id.* at 8:20–24), the winning device "beeps, changes its status light 34 or plays a prerecorded or synthesized audio message" to prompt the user to state its query. *Id.* at 8:30–32. This indicates that the determination based on the weighted signal is made while the system is still in low power mode and *before* the winning device "beeps, changes its status light 34 or plays a prerecorded or synthesized audio message" to prompt the user to state its query" (*id.*).

Petitioner's Declarant, Dr. Johnson, testifies that "Rosenberger discloses that, *after* the 'control devices' exchange WS values as part of such 'coordination,' only the 'control device' with the highest WS value exits the claimed low power mode." Ex. 1002 ¶ 131 (emphasis added)).

Dr. Johnson also explains the various alternative ways in which Rosenberger may function.

> while Rosenberger discloses that each 'control device' is generally configured to exit *a low power mode* based on a user's utterance that contains a 'trigger phrase,' Rosenberger further discloses instances in which 'control devices' receive a user's utterance that contains a trigger phrase' but do not immediately exit the *low power mode.* Rather, the 'control devices' engage in

39

a 'coordination' method that involves exchanging WS values, where the result of the 'coordination' method dictates what 'control device is to exit the *low power mode*. Thus, in sum, Rosenberger discloses that (i) each 'control device' operates in the claimed *low power mode* while the applicable 'coordination method' is performed –which involves each 'control device' transmitting its own WS value to one or more other devices in the system– and (ii) only after the applicable 'coordination method' is performed, does a single 'control device' exit the claimed *low power mode* to interact with the user and/or process speech commands.

Ex. 1002 ¶ 114 (emphasis in original). Dr. Johnson concludes by testifying that "it is my opinion that Rosenberger discloses element 9.2." *Id.* at 115.

Patent Owner focuses on the disclosure at column 11 in Rosenberger disclosing a "Broadcast and Monitor method" of determining which device has the highest weighted signal. PO Resp. 17 (citing Ex. 1003, 11:55–59); *see also* Ex. 1003, 11:37–40. Using this method, Rosenberger states "[f]irst, the microcontroller waits to be "triggered." (i.e., switched from a 'listening' mode to an active mode)". *Id.* at 11:40–42 (disclosing that "[f]irst, the microcontroller waits to be 'triggered.' (i.e., switched from a 'listening' mode to an active mode"). Patent Owner also relies on the testimony of Mr. Lipoff. PO Resp. 22–27 (citing Ex. 2012 ¶¶ 71–74, 76–78).

Patent Owner appears to ignore, however, the disclosure of Rosenberger at column 8, which we repeat below. As disclosed in Rosenberger,

> Preferably, device D [a control device] *normally operates in a low power 'listening mode' in which it listens for a hands-free trigger phrase* (e.g., "Hello Voice Control or "Home Automation") to be spoken by the system user. *Upon* receiving and recognizing a speech trigger phrase [Rosenberger's label for a "Hotword"] and *determining that it is in a better position to*

IPR2023-00119
Patent No. 10,593,330 B2

>*handle subsequent user interaction than any other device* that
simultaneously recognized the same speech trigger phrase (see
device coordination discussion below), or when the user
depresses the "Push to Talk" button 24 on the device, or in the
event the device is *instructed to wake up and expect a subsequent
speech command by a system controller*, the device beeps,
*changes its status light 34* [*see* Figs. 1, 2B] or plays a prerecorded
or synthesized audio message (e.g. "How may I help you?")
through speaker 19 and/or 20 to prompt the user to say one of the
speech commands from a known vocabulary or grammar stored
in the speech pattern memory 14.  Upon recognizing a particular
speech command (and optionally confirming with the user), the
device produces and transmits either to a system controller or
directly to the automated mechanisms (via its communications
circuitry 18) a corresponding system control signal designed to
instruct the appropriate automated mechanisms to carry out the
subject of the speech command.

Ex. 1003, 8:17–39 (emphases added).

As disclosed, Rosenberger's "low power listening mode" is for
listening for a trigger phrase. *Id*. at 8:17–19.  It is only *after* detecting the
trigger phrase and "*upon . . . determining that it is in a better position to
handle subsequent user interaction than any other device* that
simultaneously recognized the same speech trigger phrase" does
Rosenberger's device D "*change[ ] its status light 34*" to indicate its new
"wake up" status as being ready for a subsequent speech command.  *Id*. at
8:20–27 (emphases added).

Accordingly, giving substantial weight to this disclosure in
Rosenberger and the related testimony by Dr. Johnson, based on a
preponderance of the evidence before us, we determine that Rosenberger
discloses the elements and limitations of clause [9.2].

41

*iv. Clause [9.3]*

[9.3] while the computing device remains in the low power mode, receiving, by the computing device and from an additional computing device that is in a low power mode, an additional message;

Clause [9.2] focused on a single computing device *transmitting* a message while in a low power mode. Clause [9.3] is similar to clause [9.2] but recites that the first computing device also *receives* a message from "an additional computing device" that also is in a "low power mode."

Petitioner asserts Rosenberger discloses the steps, elements, and limitations of clause [9.3]. Pet. 39–43 (citing Ex. 1002 ¶¶ 116–127).

Patent Owner asserts that "Petitioner's analysis is flawed" because "as discussed with respect to [9.2], mere *capability* is insufficient to establish anticipation." PO Resp. 27. We have addressed this argument in footnote 12 of this Decision.

Patent Owner also asserts that "Rosenberger's device is not configured to receive an additional message while remaining in low power mode, and the hypothetical capabilities alleged by Petitioner are insufficient to establish anticipation." *Id.* at 28 (citing Ex. 2012 ¶ 81). *Id.* at 29 (citing Ex. 2012 ¶¶ 81–83. We disagree.

As we have discussed in our discussion of clause [9.2] and of Rosenberger, Rosenberger discloses in Figures 7–10 and the related written descriptions of these figures "various system architectures in which a plurality of the control devices [four control devices are shown] of the invention either coordinate amongst themselves [Figs. 9, 10] or utilize a coordinating controller [Figs. 7, 8] to decide which control device will handle a given speech command when more than one control device has

42

been simultaneously triggered." Ex. 1003, 5:64–6:3. As also explained above, triggering a device with a "trigger phrase" as disclosed in Rosenberger is not synonymous with exiting Rosenberger's low power mode.

Accordingly, based on a preponderance of the evidence before us, we determine that Rosenberger discloses devices that both send and receive "messages" with each other while in a low power mode, which meets the requirements of clause [9.3] based on the same analysis as in clause [9.2] above.

*v. Clause [9.4]*

[9.4] based on the message and the additional message, determining, by the computing device, to exit the low power mode.

Essentially, clause [9.4] states that the final step of determining which of the computing devices will remain in the low power mode, and by implication, which one computing device, the one with the highest hotword confidence score, will exit the low power mode.

Petitioner asserts Rosenberger discloses the steps, elements, and limitations in clause [9.4]. Pet. 43–46 (citing Ex. 1002 ¶¶ 128–136). Petitioner cites, for example, Rosenberger's disclosure that the control devices are "coordinated so that only the single device with the highest weighted signal proceeds to interact with the user and/or process the speech command." Pet. 44 (quoting Ex. 1003, 11:27–31). All other control devices in Rosenberger remain in the low power mode. *Id.* at 45. Any other result would not eliminate the "duplicate response problem" that Rosenberger seeks to avoid, which occurs when several devices simultaneously recognize the same speech command or trigger phrase. *See* Ex. 1003, 3:30–35.

43

Patent Owner asserts that "Petitioner's arguments for [9.4] suffer from the same deficiencies as [9.3]." PO Resp. 31. According to Patent Owner, Petitioner's argument that "only the 'control device' with the highest WS [weighted signal] value exits the claimed *low power mode*" (Pet. 43–44 (italics in Petition)) is "incorrect." *Id.* We have determined otherwise in our discussion of clause [9.3] and of Rosenberger above.

Accordingly, based on a preponderance of the evidence before us, we determine that Rosenberger discloses the steps, elements and limitations of clause [9.4].

### b.    Claims 1 and 17

The claim chart in Section II.D.2 of this Decision establishes the substantial similarity of claims 1, 9, and 17

Petitioner asserts elements 1.1, 1.2, 1.3, and 1.4 of claim 1 map to elements 9.1, 9.2, 9.3, and 9.4 of claim 9, respectively. Pet. 47. Petitioner concludes "Rosenberger discloses claim 1 for the same reasons it discloses claim 9. *Id.* (citing Ex. 1002 ¶¶ 137–139).

Petitioner also asserts elements 17.0, 17.1, 17.2, 17.3, and 17.4 of claim 17 map to elements 9.0, 9.1, 9.2, 9.3, and 9.4 of claim 9, respectively. *Id.* at 48–49. Petitioner concludes "Rosenberger discloses claim 17 for the same reasons it discloses claim 9." *Id.* (citing Ex. 1002 ¶¶ 140–142).

Patent Owner also argues each clause in claims 1 and 17 with its corresponding clause in claim 9. *See, e.g.*, PO Resp. 10 (arguing collectively clauses [1.2], [9.2], [17.2]).

### c.    Conclusion for Claims 1, 9, 17

In *inter partes* reviews, a petitioner bears the burden of proving unpatentability of the challenged claims, and the burden of persuasion never

IPR2023-00119
Patent No. 10,593,330 B2

shifts to the patent owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail in this proceeding, Petitioner must support its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). Based on our analysis above of claims 1, 9, and 17, we determine that Petitioner has met its burden of proof for these claims. Accordingly, we determine claims 1, 9, and 17 are not patentable.

### 3. *Dependent claims*
*2, 3, 5, 7, 10, 11, 13, 15, and 18*

Claims 2, 10, and 18 are identical and depend on independent claims 1, 9, and 17, respectively.

Claims 3 and 11 are identical and depend on independent claims 1 and 9, respectively.

Claims 5 and 13 are identical and depend on independent claims 1 and 9, respectively.

Claims 7 and 15 are identical and depend on independent claims 1 and 9, respectively.

Petitioner provides a clause-by-clause analysis of where each element or limitation in dependent claims 2, 3, 5, 7, 10, 11, 13, 15, and 18 is disclosed in Rosenberger, and explains why and how Rosenberger anticipates these claims. Pet. 49–60. Throughout its analysis, Petitioner cites the declaration testimony of Dr. Johnson for evidentiary support.

Patent Owner does not address the patentability of dependent claims 2, 5, 7, 10, 13, 15, and 18. *See* PO Resp. 35 (addressing only dependent claims 3 and 11); Sur-Reply; *see also* Reply 17 ("Google does not dispute

45

that Rosenberger anticipates the additional limitations of dependent claims 2/10/18, 5/13, and 7/15.").

We adopt Petitioner's undisputed findings and conclusions concerning dependent claims 2, 3, 5, 7, 10, 11, 13, 15, and 18. Based on these findings and conclusions, we determine that Petitioner has met its burden of proof for these claims. Accordingly, we determine claims 2, 3, 5, 7, 10, 11, 13, 15, and 18 are not patentable.

### a. Dependent Claims 3 and 11

Claims 3 and 11 are identical and depend on independent claims 1 and 9, respectively. Claims 3 and 11 each state:

> the computing device is configured to exit the low power mode in response to detecting an utterance of the particular, predefined hotword, and

> the additional computing device is configured to exit the low power mode in response to detecting an utterance of the particular, predefined hotword.

*E.g.*, Ex. 1001, 16:45–51 (for claim 3).

Petitioner states "Rosenberger discloses these additional elements." Pet. 53 (citing Ex. 1002 ¶¶ 154–161).

According to Petitioner, a person of ordinary skill, which we have determined is a person with the equivalent of a four-year degree from an accredited institution (typically denoted as a B.S. degree) in electrical or computer engineering, or a related field, and approximately 2–4 years of experience in the field of voice and/or audio processing, "would have understood that Rosenberger's 'trigger phrase' is synonymous with *the particular, predefined* hotword." Pet. 53 (citing Ex. 1002 ¶ 156).

According to Petitioner,

> Rosenberger discloses that, based on detecting a 'trigger phrase'
> within a voice utterance from a user, each 'control device' is
> configured to exit (e.g., wake up from) a *low power mode* in
> which the 'control device' declines to interact with the user and
> process voice commands after a 'trigger phrase.' *See, e.g.,*
> Ex. 1003, 2:6-9 ('When a **trigger phrase** is **detected**, the **system
> 'wakes up'** and prompts the user to say one or more commands
> from an expected command phrase vocabulary.').

Pet. 54 (emphasis in Petition) (citing also Ex. 1003, 8:17–32).

Patent Owner asserts two reasons why claims 3 and 11 are patentable.
First, Patent Owner asserts "Rosenberger cannot anticipate claims 3 and 11
because Rosenberger does not anticipate claims 1 and 9 from which they
respectively depend." PO Resp. 35 (citing Ex. 2012 ¶¶ 89–109).

We have determined that claims 1 and 9 are anticipated by
Rosenberger and are not patentable. Thus, we disagree with Patent Owner's
first assertion.

Second, Patent Owner asserts "Rosenberger does not expressly
disclose 'detecting an utterance of the particular, predefined hotword.'" *Id.*

According to Patent Owner, "Petitioner's reliance on the prior art in
combination with Rosenberger's disclosed invention cannot sustain its
anticipation challenge." *Id.* We disagree with Patent Owner's premise and
its conclusion. Moreover, Patent Owner does not direct us to any persuasive
evidence to support this argument. We acknowledge that Petitioner refers to
the prior art. For example, Petitioner states "[i]n line with Rosenberger's
discussion of prior art systems that utilize low-power modes and low-power
communication technology (*id.*, 1:35-2:1), *Rosenberger explains* that an
objective of the invention is to provide a 'speech recognition device and
system that operate using low-power….' *Id.*, 3:45-49." Pet. 15. Here,

IPR2023-00119
Patent No. 10,593,330 B2

Petitioner refers to the prior art and points out that Rosenberger's explanation of Rosenberger's disclosed invention is "in line with" the prior art. Petitioner is relying on Rosenberger's explanation, not the prior art, as the basis for the anticipation of the challenged claims.

*Hotword Detection/Speech recognition*

Patent Owner also provides an extensive argument regarding claims 3 and 11 asserting that "Hotword Detection Is Distinct from Speech Recognition." PO Resp. 36–47 (*see* Section heading V.D.2, PO Resp. 36).

Patent Owner argues the '330 Patent "distinguishes hotword detection from speech recognition and describes the use of a distinct *on-device*[13] hotword detector, *i.e.*, 'hotworder' to detect a hotword in incoming audio data." PO Resp. 36 (emphasis added) (citing Ex. 2012 ¶ 92); Sur-reply 14 ("Nothing in Rosenberger indicates that the control device 'detects' a trigger phrase (i.e., via hotword detection as compared to speech recognition). We note, however, that contrary to Patent Owner's assertion, the '330 patent states it "performs *speech recognition techniques to determine whether the hotword was spoken* and, if so, awaits an ensuing command or query." Ex. 1001, 1:65–67 (emphasis added). As explained further in the '330 patent,

> In an example environment, the hotword used to invoke the system's attention are the words "OK computer." Consequently,

---

[13] The '330 patent does not claim an "on-device" hotword detector. Here, Patent Owner apparently confuses the claims of the '330 patent with the claims of the related '398 patent, challenged in IPR2023-00118, which do claim an "on-device" hotworder. The written descriptions in the '330 and '398 patents do not mention an "on-device" hotworder, although Figure 1 in each patent shows the hotworder as contained within computing devices 106, 108, and 110.

48

each time the words "OK computer" are spoken, it is picked up by a microphone, conveyed to *the system, which performs speech recognition techniques to determine whether the hotword was spoken* and, if so, awaits an ensuing command or query. Accordingly, utterances directed at the system take the general form [HOTWORD] [QUERY], where "HOTWORD" in this example is "OK computer" and "QUERY" can be any question, command, declaration, or other request that can be speech recognized, parsed and acted on by the system, either alone or in conjunction with the server via the network.

*Id.* at 1:61–2:6 (emphasis added). The '330 patent does not define how "speech recognition techniques" differ from "speech recognition." Here, the hotword is a two-word phrase. The system listens for this exact spoken phrase, and, if spoken, the system is then ready to listen to, apply speech recognition to, and act on a subsequent user query. Rosenberger does the same thing in the same way with its "trigger phrase."

While we recognize the difference between listening for a spoken phrase and speech recognition, we provide substantial probative weight to the statement in the '330 patent about the substantial similarity between "hotwords" and speech recognition. Both use "speech recognition techniques." Ex. 1001, 1:63–2:6. Moreover, we have not been directed to any step, element, or limitation in the challenged claims requiring the argued distinctions between "hotwords" and speech recognition.

Based on the evidence and analysis above, we determine that Petitioner has met its burden of proof for claims 3 and 11. Accordingly, we determine claims 3 and 11 are not patentable.

IPR2023-00119
Patent No. 10,593,330 B2

>    E.    Ground 2 – Obviousness of Claims 4, 6, 12, and 14
>          in View of Rosenberger and Basye

Petitioner asserts dependent claims 4, 6, 12, and 14 are unpatentable under § 103 asserting that these claims would have been obvious in view of Rosenberger and Basye. Pet. 61–70.

We first summarize the disclosure in Basye.

>    1.    Basye (Ex. 1013)

We make the following findings concerning the disclosure in Basye. Basye is titled "Speech Recognition Power Management." Ex. 1013, code (54). As summarized in its Abstract, Bayse discloses:

> [p]ower consumption for a computing device may be managed by one or more keywords. For example, if an audio input obtained by the computing device includes a keyword, a network interface module and/or an application processing module of the computing device may be activated. The audio input may then be transmitted via the network interface module to a remote computing device. Such as a speech recognition server. Alternately, the computing device may be provided with a speech recognition engine configured to process the audio input for on-device speech recognition.

*Id.*, code (57). Basye discloses using a speech processing module to "determine a score or confidence level whose value corresponds to a likelihood that a keyword is actually present in the speech" and "[i]f the score satisfies a threshold, the speech processing module" may determine that the keyword is present in the speech but "if the score does not satisfy the threshold, the speech processing module" may determine that there is no keyword in the speech. *Id.* ¶ 27. Bayse's focus, however, is on power management for the disclosed devices. As disclosed in Bayse, "aspects of the present disclosure are directed to power management for speech

50

recognition." *Id.* ¶ 10. A computing device may be provided with a "power management subsystem" that selectively activates or deactivates one or more modules of the computing device. Ex. 1013 ¶ 10. "This activation may be responsive to an audio input that includes one or more pre-designated spoken words," which Bayse refers to as "keywords. *Id.*

Bayse also discloses:

> By selectively activating modules of the computing device, the power management subsystem may advantageously improve the energy efficiency of the computing device. The power management subsystem may further improve the energy efficiency of the computing device by selectively activating one or more of its own modules. While such implementations are particularly advantageous for computing devices that rely on battery power, all computing devices for which power management may be desirable can benefit from the principles of the present disclosure.

*Id.* ¶ 14.

## 2. *Claims 4, 12 and Claims 6, 14*

Claims 4 and 12 are identical and depend from claims 1 and 9, respectively. Claims 4 and 12 state:

> determining, by the computing device, that the audio data includes an utterance of a particular, predefined hotword without performing automated speech recognition processing on the audio data.

*E.g.*, Ex. 1001, 16:52–56 (for claim 4).

Claims 6 and 14 are identical and also depend from claims 1 and 9, respectively. Claims 6 and 14 state:

> determining, by the computing device, a hotword score that reflects a likelihood that the audio data includes an utterance of the particular, predefined hotword; and

> determining, by the computing device, that the hotword score satisfies a threshold,

> wherein transmitting the message is based on determining that the hotword score satisfies the threshold.

*Id.* at 16:62–17:2 (for claim 6).

Petitioner provides a clause-by-clause analysis of where each element or limitation in dependent claims 4 and 12 is disclosed in Rosenberger or Basye. Pet. 62–66. Petitioner also explains the motivation and reasons why it would have been obvious to combine the disclosures from these two references with a reasonable expectation of success. *Id.* at 65–66. Throughout its analysis, Petitioner cites the declaration testimony of Dr. Johnson for evidentiary support. Petitioner provides a similar analysis for claims 6 and 14. Pet. 67–70.

In its Response, Patent Owner asserts:

> Arguments relating to dependent claims 4 and 6 are deficient for at least the same reasons discussed for independent claim 1 from which they depend. Arguments relating to dependent claims 12 and 14 are also deficient for at least the same reasons discussed for independent claim 9 from which they depend.

PO Resp. 48.

We did not agree with Patent Owner's arguments regarding the asserted "deficiencies" of Rosenberger against the independent claims, and determine these same arguments are equally unpersuasive against dependent claims 4, 6, 12, and 14. Patent Owner does not otherwise substantively address claims 6 and 14 in its Response or its Sur-reply.

Regarding claims 4 and 12, Patent Owner asserts:

> It would not have been obvious to modify Rosenberger in accordance with the teachings of Basye to not perform speech recognition on the audio data that corresponds to an utterance of

the particular, predefined hotword, (Pet. 61–66), as recited, because the entire premise of Rosenberger's invention is to perform speech recognition.

PO Resp. 48 (citing Ex. 2012 ¶ 113). Patent Owner also states "Rosenberger's disclosure is replete with passages evidencing an express need and preference for speech recognition." *Id.* at 49. Petitioner then lists ten "bullet points" where Rosenberger discusses "speech recognition." *Id.* at 49–51. Patent Owner concludes that "Petitioner's proposed modification, *which removes speech recognition processing of the trigger phrase*, upends . . . the entire premise of Rosenberger." *Id.* at 52 (citing Ex. 2012 ¶¶ 111–116). We disagree.

Rosenberger's extensive reference to "speech recognition" is consistent with the technology disclosed and claimed in Rosenberger, and in the '330 patent. We note that the '330 patent uses the term "speech recognition" 81 times. In describing its "Technical Field" the '330 patent states "[t]his specification generally relates to systems and techniques for recognizing the words that a person is speaking, otherwise referred to as *speech recognition.*" Ex. 1001, 1:17–19 (emphasis added). Thus, a reference that anticipates the invention claimed in the '330 patent likely also would emphasize speech recognition.

Petitioner provides three arguments as to why a person of ordinary skill in the art would have been motivated to combine Rosenberger with Basye. Pet. 61–62.

Petitioner first argues that "Rosenberger and Basye are in the same field of endeavor and relate to voice-controllable computing devices." *Id.* at 61 (citing Ex. 1003, 1:8–13 ("The present invention relates… to improvements in speech-recognizing control devices that respond to oral

IPR2023-00119
Patent No. 10,593,330 B2

commands from a system user to produce a desired effect or result.");
Ex.1013 ¶ 1 ("Computing devices may include speech recognition
capabilities…. A computing device may also be capable of processing the
recognized speech for specific speech recognition applications.")); *see*
Ex. 1002 ¶ 182).

Second, Petitioner argues that "Rosenberger and Basye both disclose
techniques for intelligently 'waking' a voice-controllable computing device
using a 'trigger phase' (or 'keyword' or 'wakeword' in Basye's
terminology)." Pet. 61–62; *see* Ex. 1002 ¶ 183.

Third, Petitioner argues that "Rosenberger discloses that any 'control
device' could be a 'tabletop device' that ideally is powered by one or more
batteries." Pet. 62 (citing Ex. 1013, 8:55–67, 9:37–40); *see* Ex. 1002 ¶ 194.
In support of these arguments, Dr. Johnson testifies that "a POSITA seeking
to implement one of Rosenberger's battery-powered 'control devices' would
have been motivated … to look to teachings regarding intelligent power
management to improve energy efficiency, such as the teachings of Basye."
Ex. 1002 ¶ 184.

> Patent Owner asserts:
>
> it would not have been obvious to modify Rosenberger in
> accordance with the teachings of Basye to not perform speech
> recognition on the audio data that corresponds to an utterance of
> the particular, predefined hotword (Pet. 69-73), as recited,
> because the entire premise of Rosenberger's invention is to
> perform speech recognition.

PO Resp. 47 (citing Ex. 2012 ¶ 111). According to Patent Owner, a person
of ordinary skill "would not have been motivated to modify Rosenberger
such that its computing device no longer performs speech recognition on the
audio data corresponding to the trigger phrase (alleged 'hotword') because

54

the proposed modification alters the speech recognition principles forming the entire premise of Rosenberger." PO Resp. 51 (citing 2012 ¶¶ 109–114).

As we have noted above, the summary of the invention disclosed in the '330 patent states "each time the words 'OK computer' [the chosen "hotword"] are spoken, it is picked up by a microphone, conveyed to the system, *which performs speech recognition techniques to determine whether the hotword was spoken and, if so, awaits an ensuing command or query.* Ex. 1001, 1:62–66. Thus, before the "the output of processing the audio data" is transmitted, the system first uses "speech recognition techniques" to determine whether the words spoken are, in fact, the adopted "hotword." The '330 patent does not define how "speech recognition techniques" differ from "speech recognition." To the extent there is a substantive difference, Petitioner relies on Basye.

As Petitioner explains, using Basye instead of Rosenberger's speech recognition, would "help reduce 'false positive' detections of a 'trigger phrase' (or 'wakeword')." Pet. 70 (citing Ex. 1002 ¶ 214). Petitioner also asserts that "Basye explains that the use of 'thresholding' can help reduce false positives, which is a situation where a computing device incorrectly determines that speech is present or that speech includes a wakeword." *Id.* (citing Ex. 1013 ¶¶ 51, 74–75). This provides a good reason why a person of ordinary skill would want to modify, and improve, Rosenberger's performance.

Based on our analysis above of claims 4, 6, 12, and 14, we determine that Petitioner has met its burden of proof for these claims. Accordingly, we determine claims 4, 6, 12, and 14 are not patentable.

IPR2023-00119
Patent No. 10,593,330 B2

### III.  CONCLUSION[14]

Based on the evidence and analysis above, we determine that Petitioner has established that all challenged claims, claims 1–7, 9–15, 17, 18 are not patentable based the asserted grounds.

### IV.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, that Petitioner has shown by a preponderance of the evidence that claims 1–7, 9–15, 17, 18 are unpatentable;

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[14] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2023-00119
Patent No. 10,593,330 B2

## V.   SUMMARY TABLE

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5, 7, 9–11, 13, 15, 17, 18 | 102 | Rosenberger | 1–3, 5, 7, 9–11, 13, 15, 17, 18 | |
| 4, 6, 12, 14 | 103 | Rosenberger and Basye | 4, 6, 12, 14 | |
| **Overall Outcome** | | | 1–7, 9–15, 17, 18 | |

For PETITIONER:

Michael P. Boyea
Jae Y. Pak
Cole B. Richter
LEE SULLIVAN SHEA & SMITH LLP
boyea@ls3ip.com
pak@ls3ip.com
richter@ls3ip.com

For PATENT OWNER:

Erika Harmon Arner
Cory C. Bell
Alissa E. Green
Misook Kim
Safiya Anguilar
FINNEGAN, HENDERSON, FARABOW, GARRETT, & DUNNER LLP
erika.arner@finnegan.com
cory.bell@finnegan.com
alissa.green@finnegan.com
misook.kim@finnegan.com
safiya.anguilar@finnegan.com

57

(12) **United States Patent**   (10) **Patent No.:**  **US 10,134,398 B2**
Sharifi                         (45) **Date of Patent:**     **Nov. 20, 2018**

(54) **HOTWORD DETECTION ON MULTIPLE DEVICES**

(71) Applicant: **Google LLC**, Mountain View, CA (US)

(72) Inventor: **Matthew Sharifi**, Kilchberg (CH)

(73) Assignee: **Google LLC**, Mountain View, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/346,914**

(22) Filed: **Nov. 9, 2016**

(65) **Prior Publication Data**

US 2017/0084277 A1    Mar. 23, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 15/088,477, filed on Apr. 1, 2016, now Pat. No. 9,514,752, which is a (Continued)

(51) **Int. Cl.**
**G10L 21/00**      (2013.01)
**G10L 15/28**      (2013.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ **G10L 15/285** (2013.01); **G10L 15/01** (2013.01); **G10L 15/08** (2013.01); **G10L 15/22** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ......... G10L 15/22; G10L 15/30; G10L 25/78; G10L 15/08; G10L 2015/223;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,363,102 A    12/1982  Holmgren
5,659,665 A *  8/1997  Whelpley, Jr. ........... G06F 3/16
                                          704/248
(Continued)

FOREIGN PATENT DOCUMENTS

JP      S59-180599     10/1984
JP      H09-62293      3/1997
(Continued)

OTHER PUBLICATIONS

International Search Report and Written Opinion in International Application No. PCT/US2015/052860, dated Dec. 8, 2015, 12 pages.
(Continued)

*Primary Examiner* — Michael C Colucci
(74) *Attorney, Agent, or Firm* — Fish & Richardson P.C.

(57) **ABSTRACT**

Methods, systems, and apparatus, including computer programs encoded on a computer storage medium, for hotword detection on multiple devices are disclosed. In one aspect, a method includes the actions of receiving, by a first computing device, audio data that corresponds to an utterance. The actions further include determining a first value corresponding to a likelihood that the utterance includes a hotword. The actions further include receiving a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device. The actions further include comparing the first value and the second value. The actions further include based on comparing the first value to the second value, initiating speech recognition processing on the audio data.

**21 Claims, 3 Drawing Sheets**



### Related U.S. Application Data

continuation of application No. 14/675,932, filed on Apr. 1, 2015, now Pat. No. 9,318,107.

(60) Provisional application No. 62/061,830, filed on Oct. 9, 2014.

(51) **Int. Cl.**

| | |
|---|---|
| *G10L 15/08* | (2006.01) |
| *G10L 17/22* | (2013.01) |
| *G10L 15/22* | (2006.01) |
| *G10L 15/32* | (2013.01) |
| *G10L 15/01* | (2013.01) |
| *G06F 3/16* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *G10L 15/32* (2013.01); *G10L 17/22* (2013.01); *G06F 3/167* (2013.01); *G10L 2015/088* (2013.01); *G10L 2015/223* (2013.01)

(58) **Field of Classification Search**
CPC ......... G10L 25/93; G10L 15/00; G10L 15/34; G06F 1/3215; G06F 2203/0381; H04R 3/005
USPC ....... 704/254, 275, 273, 270, 257, 256, 251, 704/250, 247, 246, 244, 243, 235, 233, 704/231, 228, 224, 2; 455/414.1; 434/157; 391/71.1; 379/88.03, 88.01; 367/124

See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,897,616 A | 4/1999 | Kanevsky | |
| 6,023,676 A | 2/2000 | Erell | |
| 6,141,644 A | 10/2000 | Kuhn | |
| 6,567,775 B1 | 5/2003 | Maali | |
| 6,671,672 B1 * | 12/2003 | Heck | G10L 17/24 704/273 |
| 6,744,860 B1 * | 6/2004 | Schrage | H04M 1/271 379/207.02 |
| 6,826,159 B1 | 11/2004 | Shaffer | |
| 6,931,375 B1 | 8/2005 | Bossemeyer | |
| 6,973,426 B1 | 12/2005 | Schier | |
| 7,016,833 B2 | 3/2006 | Gable | |
| 7,222,072 B2 * | 5/2007 | Chang | G10L 17/22 704/249 |
| 7,571,014 B1 | 8/2009 | Lambourne et al. | |
| 7,720,012 B1 | 5/2010 | Borah | |
| 7,904,297 B2 * | 3/2011 | Mirkovic | G06F 17/28 704/235 |
| 8,099,288 B2 | 1/2012 | Zhang | |
| 8,200,488 B2 | 6/2012 | Kemp et al. | |
| 8,209,174 B2 | 6/2012 | Al-Telmissani | |
| 8,214,447 B2 | 7/2012 | Deslippe et al. | |
| 8,340,975 B1 * | 12/2012 | Rosenberger | G10L 15/22 704/270 |
| 8,588,949 B2 | 11/2013 | Lambourne et al. | |
| 8,670,985 B2 | 3/2014 | Lindahl et al. | |
| 8,713,119 B2 | 4/2014 | Lindahl | |
| 8,717,949 B2 | 5/2014 | Crinon | |
| 8,719,009 B2 | 5/2014 | Baldwin et al. | |
| 8,719,018 B2 | 5/2014 | Dinerstein | |
| 8,768,687 B1 * | 7/2014 | Quasthoff | G10L 15/26 379/142.14 |
| 8,775,191 B1 | 7/2014 | Sharifi et al. | |
| 8,805,890 B2 | 8/2014 | Zhang et al. | |
| 8,838,457 B2 | 9/2014 | Cerra et al. | |
| 8,938,394 B1 | 1/2015 | Faaborg et al. | |
| 8,996,372 B1 * | 3/2015 | Secker-Walker | G10L 15/34 704/231 |
| 9,142,218 B2 * | 9/2015 | Schroeter | G10L 17/20 |

| | | | |
|---|---|---|---|
| 2002/0049596 A1 * | 4/2002 | Burchard | G10L 15/22 704/270 |
| 2002/0072905 A1 * | 6/2002 | White | G10L 15/30 704/231 |
| 2002/0123890 A1 * | 9/2002 | Kopp | H04L 12/6418 704/233 |
| 2002/0193991 A1 * | 12/2002 | Bennett | G10L 15/08 704/247 |
| 2003/0200090 A1 * | 10/2003 | Kawazoe | G10L 15/00 704/251 |
| 2003/0220797 A1 | 11/2003 | Ito | |
| 2003/0231746 A1 | 12/2003 | Hunter | |
| 2004/0101112 A1 * | 5/2004 | Kuo | H04M 1/271 379/88.01 |
| 2005/0165607 A1 * | 7/2005 | Di Fabbrizio | G06F 17/2785 704/256 |
| 2006/0074656 A1 * | 4/2006 | Mathias | G10L 15/063 704/243 |
| 2006/0085188 A1 | 4/2006 | Goodwin et al. | |
| 2006/0184370 A1 * | 8/2006 | Kwak | G10L 15/1822 704/275 |
| 2007/0100620 A1 * | 5/2007 | Tavares | G10L 17/06 704/246 |
| 2007/0198262 A1 | 8/2007 | Mindlin | |
| 2009/0240488 A1 | 9/2009 | White | |
| 2009/0258333 A1 * | 10/2009 | Yu | G09B 5/04 434/157 |
| 2009/0292541 A1 * | 11/2009 | Daya | G10L 15/063 704/251 |
| 2010/0070276 A1 * | 3/2010 | Wasserblat | G10L 15/08 704/243 |
| 2010/0110834 A1 * | 5/2010 | Kim | G01S 3/8083 367/124 |
| 2011/0026722 A1 * | 2/2011 | Jing | G10L 21/0208 381/71.1 |
| 2011/0054892 A1 * | 3/2011 | Jung | G10L 15/08 704/233 |
| 2011/0060587 A1 * | 3/2011 | Phillips | G10L 15/30 704/235 |
| 2011/0066429 A1 * | 3/2011 | Shperling | G10L 25/78 704/228 |
| 2011/0184730 A1 | 7/2011 | LeBeau et al. | |
| 2011/0304648 A1 | 12/2011 | Kim et al. | |
| 2012/0084087 A1 | 4/2012 | Yang | |
| 2012/0136923 A1 | 5/2012 | Grube | |
| 2012/0232896 A1 * | 9/2012 | Taleb | G10L 25/78 704/233 |
| 2012/0245941 A1 | 9/2012 | Cheyer | |
| 2012/0265528 A1 * | 10/2012 | Gruber | G10L 15/18 704/235 |
| 2013/0060571 A1 * | 3/2013 | Soemo | G10L 15/30 704/251 |
| 2013/0124207 A1 | 5/2013 | Sarin et al. | |
| 2013/0132086 A1 * | 5/2013 | Xu | G10L 15/01 704/257 |
| 2013/0183944 A1 * | 7/2013 | Mozer | H04L 12/282 455/414.1 |
| 2013/0289996 A1 * | 10/2013 | Fry | G10L 15/32 704/257 |
| 2014/0006825 A1 | 1/2014 | Shenhav | |
| 2014/0012573 A1 * | 1/2014 | Hung | G06F 1/3215 704/233 |
| 2014/0012578 A1 | 1/2014 | Morioka | |
| 2014/0088961 A1 * | 3/2014 | Woodward | G10L 15/22 704/235 |
| 2014/0163978 A1 | 6/2014 | Basye | |
| 2014/0222430 A1 * | 8/2014 | Rao | G10L 15/04 704/254 |
| 2014/0257821 A1 * | 9/2014 | Adams | G10L 25/93 704/275 |
| 2014/0278383 A1 * | 9/2014 | Fan | G10L 25/84 704/224 |
| 2014/0278435 A1 * | 9/2014 | Ganong, III | G10L 15/22 704/275 |
| 2015/0081295 A1 | 3/2015 | Yun | |

SONOS EXHIBIT 1001

Appx112

**US 10,134,398 B2**

Page 3

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2015/0154953 A1* | 6/2015 | Bapat | G10L 15/06 |
| | | | 704/251 |
| 2015/0228274 A1 | 8/2015 | Leppanen | |
| 2015/0262577 A1* | 9/2015 | Nomura | G10L 15/22 |
| | | | 704/231 |
| 2015/0379989 A1 | 12/2015 | Balasubramanian | |
| 2016/0104483 A1 | 4/2016 | Foerster et al. | |
| 2016/0155443 A1 | 6/2016 | Khan | |
| 2016/0189715 A1 | 6/2016 | Nishikawa | |
| 2016/0217790 A1 | 7/2016 | Sharifi | |
| 2016/0260431 A1 | 9/2016 | Newendorp | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | H09-127973 | 5/1997 |
| JP | H11-52976 | 2/1999 |
| JP | H11-231896 | 8/1999 |
| JP | 2000-75954 | 3/2000 |
| JP | 2000-310999 | 11/2000 |
| JP | 2006-227634 | 8/2006 |
| JP | 2009-104020 | 5/2009 |
| JP | 2014-92777 | 5/2014 |
| JP | 2015520409 | 7/2015 |
| KR | 10-2014-0031391 | 3/2014 |
| WO | 1998040875 | 9/1998 |
| WO | 2013/006385 | 1/2013 |
| WO | 2013/163113 | 10/2013 |
| WO | 2014/008194 | 1/2014 |
| WO | 2014/130463 | 8/2014 |
| WO | 2015/025330 | 2/2015 |

OTHER PUBLICATIONS

Extended European Search Report in European Application No. 16207288.8-1914, dated Apr. 4, 2017, 8 pages.
Office Action issued in Korean Application No. 10-2016-7027999, dated Apr. 12, 2017, 9 pages (English Translation).
Jae-Seung, Choi, "Text-dependent Speaker Recognition using Characteristic Vectors in Speech Signal and Normalized Recognition Method," Journal of Korean Institute of Information Technology, 10(5), May 2012, 7 pages (English Abstract).

Auckenthaler et al. "Score Normalization for Text-independent Speaker Verification System," Digital Signal Processing, vol. 10, 2000, 13 pages.
International Preliminary Report on Patentability in International Application No. PCT/US2015/052860, dated Apr. 11, 2017, 9 pages.
International Preliminary Report on Patentability in International application No. PCT/US2015/030569, dated Jan. 24, 2017, 8 pages.
Office Action in Korean Application No. 10-2016-7021778, dated Dec. 13, 2016, 4 pages.
Extended European Search Report issued in Application No. 16195834.3-1910, dated Nov. 23, 2016, 9 pages.
Office Action in Japanese Application No. 2016-551250, dated Apr. 10, 2017, 6 pages (English Translation).
Notice of Allowance in Korean Application No. 10-2016-7021778, dated Apr. 25, 2017, (English Translation) 3 pages.
Notice of Allowance in U.S. Appl. No. 15/201,972, dated Jun. 1, 2017, 10 pages.
Notice of Allowance in Japanese Application No. 2016-551250, dated Aug. 7, 2017, 3 pages (English Translation).
Office Action issued in U.S. Appl. No. 15/278,269, dated Aug. 18, 2017, 23 pages.
Office Action issued in Korean Application No. 10-2016-7022701, dated Aug. 17, 2017, 4 pages (English Translation).
Korean Office Action issued in Application No. 10-2016-7027999, dated Aug. 28, 2017, 9 pages (with English Translation).
European Office Action issued in Application No. 15781811.3, dated Aug. 23, 2017, 6 pages.
International Search Report and Written Opinion issued in International Application No. PCT/US2017/045123, dated Nov. 8, 2017, 15 pages.
Korean Office Action issued in Application No. 10-2016-7033161, dated Dec. 19, 2017, 10 pages (with English Translation).
Notice of Allowance issued in U.S. Appl. No. 15/278,269, dated Jan. 12, 2018, 10 pages.
Japanese Office Action issued in Application No. 2016-250670, dated Mar. 26, 2018, 7 pages (English Translation).
Japanese Office Action issued in Application No. 2016-561322, dated Feb. 5, 2018, 6 pages (with English Translation).
European Examination Report issued in European Application No. 16207288.8-1210, dated Aug. 1, 2018, 5 pages.
Japanese Office Action issued in Japanese Application No. 2017-170185, dated on Oct. 1, 2018, 17 pages (with English Abstract).

* cited by examiner



120
Device Group
Phone
Thermostat
Device ID
Tablet
114
Device Status
Sleep
144
Hotworder
126
Score Comparer
0.6
.85
.45
138
108
Tablet
0.6
132
Phone
.85
130
118
Device Group
Tablet
Thermostat
Device ID
Phone
112
Device Status
Awake
142
Hotworder
124
Score Comparer
.85
0.6
.45
136
106
134
Thermostat
.45
Tablet
0.6
132
108
106
102
75°
110
OK, Computer
104
122
Device Group
Phone
Tablet
Device ID
Thermostat
116
Device Status
Sleep
146
110
Hotworder
128
Score Comparer
.45
.85
0.6
140
130
Phone
.85
134
Thermostat
.45
100

FIG.1



200
Receive audio data that corresponds to an utterance
210
Determine a first value corresponding to a likelihood that the utterance includes a hotword
220
Receive a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device
230
Compare the first value and the second value
240
Based on comparing the first value to the second value, initiate speech recognition processing on the audio data
250

FIG. 2



FIG. 3

1

# HOTWORD DETECTION ON MULTIPLE DEVICES

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. application Ser. No. 15/088,477, filed Apr. 1, 2016, which is a continuation of U.S. application Ser. No. 14/675,932, filed Apr. 1, 2015, which claims the benefit of U.S. Provisional Application Ser. No. 62/061,830, filed on Oct. 9, 2014, which are incorporated by reference.

## TECHNICAL FIELD

This specification generally relates to systems and techniques for recognizing the words that a person is speaking, otherwise referred to as speech recognition.

## BACKGROUND

The reality of a speech-enabled home or other environment—that is, one in which a user need only speak a query or command out loud and a computer-based system will field and answer the query and/or cause the command to be performed—is upon us. A speech-enabled environment (e.g., home, workplace, school, etc.) can be implemented using a network of connected microphone devices distributed throughout the various rooms or areas of the environment. Through such a network of microphones, a user has the power to orally query the system from essentially anywhere in the environment without the need to have a computer or other device in front of him/her or even nearby. For example, while cooking in the kitchen, a user might ask the system "how many milliliters in three cups?" and, in response, receive an answer from the system, e.g., in the form of synthesized voice output. Alternatively, a user might ask the system questions such as "when does my nearest gas station close," or, upon preparing to leave the house, "should I wear a coat today?"

Further, a user may ask a query of the system, and/or issue a command, that relates to the user's personal information. For example, a user might ask the system "when is my meeting with John?" or command the system "remind me to call John when I get back home."

## SUMMARY

For a speech-enabled system, the users' manner of interacting with the system is designed to be primarily, if not exclusively, by means of voice input. Consequently, the system, which potentially picks up all utterances made in the surrounding environment including those not directed to the system, must have some way of discerning when any given utterance is directed at the system as opposed, e.g., to being directed at an individual present in the environment. One way to accomplish this is to use a hotword, which by agreement among the users in the environment, is reserved as a predetermined word that is spoken to invoke the attention of the system. In an example environment, the hotword used to invoke the system's attention are the words "OK computer." Consequently, each time the words "OK computer" are spoken, it is picked up by a microphone, conveyed to the system, which performs speech recognition techniques to determine whether the hotword was spoken and, if so, awaits an ensuing command or query. Accordingly, utterances directed at the system take the general form

2

[HOTWORD] [QUERY], where "HOTWORD" in this example is "OK computer" and "QUERY" can be any question, command, declaration, or other request that can be speech recognized, parsed and acted on by the system, either alone or in conjunction with the server via the network.

According to one innovative aspect of the subject matter described in this specification, a user device receives an utterance that is spoken by a user. The user device determines whether the utterance includes a hotword and computes a hotword confidence score that indicates a likelihood that the utterance includes the hotword. The user device transmits this score to other user devices in the near vicinity. The other user devices likely received the same utterance. The other user devices compute a hotword confidence score and transmit their scores to the user device. The user device compares the hotword confidence scores. If the user device has the highest hotword confidence score, then the user device remains active and prepares to process additional audio. If the user device does not have the highest hotword confidence score, then the user device does not process the additional audio.

In general, another innovative aspect of the subject matter described in this specification may be embodied in methods that include the actions of receiving, by a first computing device, audio data that corresponds to an utterance; determining a first value corresponding to a likelihood that the utterance includes a hotword; receiving a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device; comparing the first value and the second value; and based on comparing the first value to the second value, initiating speech recognition processing on the audio data.

These and other embodiments can each optionally include one or more of the following features. The actions further include determining that the first value satisfies a hotword score threshold. The actions further include transmitting the first value to the second computing device. The actions further include determining an activation state of the first computing device based on comparing the first value and the second value. The action of determining an activation state of the first computing device based on comparing the first value and the second value further includes determining that the activation state is an active state. The actions further include receiving, by the first computing device, additional audio data that corresponds to an additional utterance; determining a third value corresponding to a likelihood that the additional utterance includes the hotword; receiving a fourth value corresponding to a likelihood that the utterance includes the hotword, the fourth value being determined by a third computing device; comparing the first value and the second value; and based on comparing the first value and the second value, determining that the activation state of the first computing device is an inactive state.

The action of transmitting the first value to the second computing device further includes transmitting, to a server, through a local network, or through a short range radio, the first value. The action of receiving a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device further includes receiving, from the server, through the local network, or through the short range radio, a second value that was determined by a second computing device. The actions further include identifying the second computing device; and determining that the second computing device is configured to respond to utterances that include the hotword. The action of transmitting

SONOS EXHIBIT 1001

US 10,134,398 B2

3

the first value to the second computing device further includes transmitting a first identifier for the first computing device. The action of receiving a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device further includes receiving a second identifier for the second computing device. The action of determining that the activation state is an active state further includes determining that a particular amount of time has elapsed since receiving the audio data that corresponds to the utterance. The actions further include continuing, for a particular amount of time, to transmit the first value based on determining that the activation state is an active state.

Other embodiments of this aspect include corresponding systems, apparatus, and computer programs recorded on computer storage devices, each configured to perform the operations of the methods.

Particular embodiments of the subject matter described in this specification can be implemented so as to realize one or more of the following advantages. Multiple devices can detect a hotword and only one device will respond to the hotword.

The details of one or more embodiments of the subject matter described in this specification are set forth in the accompanying drawings and the description below. Other features, aspects, and advantages of the subject matter will become apparent from the description, the drawings, and the claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagram of an example system for hotword detection.

FIG. 2 is a diagram of an example process for hotword detection.

FIG. 3 shows an example of a computing device and a mobile computing device.

Like reference numbers and designations in the various drawings indicate like elements.

DETAILED DESCRIPTION

In the not too distant future, it is possible that many devices may be continuously listening for hotwords. When a single user has multiple devices trained to respond to their voice (e.g., a phone, tablet, TV, etc), it may be desirable to suppress responding to hotwords on devices that are not likely to be the ones a user intends to address. For example, when a user speaks the hotword toward one device, if any of their other devices are nearby, it is likely that they will also trigger a voice search. In many cases, this is not the user's intention. Thus, it may be advantageous if only a single device should trigger, specifically the device the user is speaking to. The present specification addresses the problem of selecting the correct device for reacting to a hotword, and suppressing reaction to the hotword on other devices.

FIG. 1 is a diagram of an example system 100 for hotword detection. In general, system 100 illustrates a user 102 speaking an utterance 104 that is detected by microphones of computing devices 106, 108, and 110. The computing devices 106, 108, and 110 process the utterance 104 to determine a likelihood that the utterance 104 includes a hotword. The computing devices 106, 108, and 110 each transmit data to each other that indicates the likelihood that the utterance 104 includes a hotword. The computing devices 106, 108, and 110 each compare the data, and the computing device that computed the highest likelihood that

4

the utterance 104 included a hotword initiates speech recognition on the utterance 104. The computing devices that did not compute the highest likelihood that the utterance 104 includes a hotword do not initiate speech recognition on the speech following the utterance 104.

Before transmitting, to another computing device, data that indicates a likelihood that the utterance 104 corresponds to a hotword, the computing devices that are located near each other identify each other. In some implementations, the computing devices identify each other by searching the local network for other devices that are configured to respond to the hotword. For example, computing device 106 may search the local area network for other devices that are configured to respond to the hotword and identify computing device 108 and computing device 110.

In some implementations, the computing devices identify other nearby computing devices that are configured to respond to the hotword by identifying the user who is logged into each device. For example, user 102 is logged into computing devices 106, 108, and 110. The user 102 has the computing device 106 is the user's hand. The computing device 108 is sitting on the table, and the computing device 110 is located on a nearby wall. Computing device 106 detects computing devices 108 and 110 and each computing device shares information that is related to the user who is logged into the computing device, such as a user identifier. In some implementations, the computing devices may identify other near computing devices that are configured to respond to the hotword by identifying computing devices that are configured to respond when the hotword is spoken by the same user through speaker identification. For example, the user 102 configured the computing devices 106, 108, and 110 each to respond to the voice of user 102 when user 102 speaks the hotword. The computing devices share the speaker identification information by providing a user identifier for user 102 to each other computing device. In some implementations, the computing devices may identify other computing devices that are configured to respond to the hotword through short range radio. For example, the computing device 106 may transmit a signal through short range radio searching for other computing devices that are configured to respond to the hotword. The computing devices may employ one of these techniques or a combination of them to identify other computing devices that are configured to respond to the hotword.

Once the computing devices 106, 108, and 110 have identified other computing devices that are configured to respond to the hotword, the computing devices 106, 108, and 110 share and store device identifiers for the identified computing devices. The identifiers may be based on a type of device, an IP address of the device, a MAC address, a name given to the device by a user, or any similar unique identifier. For example, the device identifier 112 for computing device 106 may be "phone." The device identifier 114 for computing device 108 may be "tablet." The device identifier 116 for computing device 110 may be "thermostat." The computing devices 106, 108, and 110 store the device identifier for the other computing devices that are configured to respond to the hotword. Each computing device has a device group where the computing device stores the device identifiers. For example, computing device 106 has device group 118 that lists "tablet" and "thermostat" as the two devices that will receive the likelihood that the audio data includes the hotword as computed by the computing device 106. The computing device 108 has device group 120 that lists "phone" and "thermostat" as the two devices that will receive the likelihood that the audio data

Appx118

SONOS EXHIBIT 1001

US 10,134,398 B2

5

includes the hotword as computed by the computing device **108**. The computing device **110** has device group **122** that lists "phone" and "tablet" as the two devices that will receive the likelihood that the audio data includes the hotword as computed by the computing device **110**.

When the user **102** speaks the utterance **104**, "OK computer," each computing device that has a microphone in the vicinity of the user **102** detects and processes the utterance **104**. Each computing device detects the utterance **104** through an audio input device such as a microphone. Each microphone provides audio data to a respective audio subsystem. The respective audio subsystem buffers, filters, and digitizes the audio data. In some implementations, each computing device may also perform endpointing and speaker identification on the audio data. The audio subsystem provides the processed audio data to a hotworder. The hotworder compares the processed audio data to known hotword data and computes a confidence score that indicates the likelihood that the utterance **104** corresponds to a hotword. The hotworder may extract audio features from the processed audio data such as filterbank energies or mel-frequency cepstral coefficients. The hotworder may use classifying windows to process these audio features such as by using a support vector machine or a neural network. Based on the processing of the audio features, the hotworder **124** computes a confidence score of 0.85, hotworder **126** computes a confidence score of 0.6, and hotworder **128** computes a confidence score of 0.45. In some implementations, the confidence score may be normalized to a scale of zero to one, with a higher number indicating a greater confidence that the utterance **104** includes a hotword.

Each computing device transmits a respective confidence score data packet to the other computing devices in the device group. Each confidence score data packet includes a respective confidence score and the respective device identifier for the computing device. For example, the computing device **106** transmits the confidence score data packet **130** that includes the confidence score of 0.85 and the device identifier "phone" to computing devices in device group **118**, computing devices **108** and **110**. The computing device **108** transmits the confidence score data packet **132** that includes the confidence score of 0.6 and the device identifier "tablet" to computing devices in device group **120**, computing devices **106** and **110**. The computing device **110** transmits the confidence score data packet **134** that includes the confidence score of 0.45 and the device identifier "thermostat" to computing devices in device group **118**, computing device **106** and **108**.

In some implementations, a computing device may transmit the confidence score data packet if the confidence score satisfies a hotword score threshold. For example, if the hotword score threshold is 0.5, then the computing device **110** would not transmit the confidence score data packet **134** to the other computing devices in device group **122**. The computing devices **106** and **108** would still transmit the confidence score data packets **130** and **132** to computing devices in device groups **118** and **120**, respectively.

In some implementations, the computing device that transmit a confidence score data packet may transmit the confidence score data packet to other computing devices directly. For example, computing device **106** may transmit the confidence score data packet **130** to computing devices **108** and **110** through a short range radio. The communication protocol used between two computing devices may be universal plug and play. In some implementations, a computing device that transmits a confidence score data packet may broadcast the confidence score data packet. In this

6

instance, the confidence score data packet may be received by the computing devices in the device group and by other computing devices. In some implementations, a computing device that transmits a confidence score data packet may transmit the confidence score data packet to a server and then the server transmits the confidence score data packet to the computing devices in the data group. The server may be located within the local area network of the computing devices or accessible through the Internet. For example, the computing device **108** sends the confidence score data packet **132** and the list of computing devices in device group **120** to a server. The server transmits the confidence score data packet **132** to computing device **106** and **110**. In instances where a computing device that is transmitting the confidence score data packet to another computing device, the receiving computing device may send back a confirmation that the receiving computing device received the confidence score data packet.

Each computing device uses a score comparer to compare the hotword confidence scores that the computing device has received. For example, the computing device **106** computed a hotword confidence score of 0.85 and received hotword confidence scores of 0.6 and 0.45. In this instance, the score comparer **136** compares the three scores and identifies the score of 0.85 as the highest. For computing devices **108** and **110**, the score comparers **138** and **140** reach similar conclusions, identifying the score of 0.85, which corresponds to computing device **106**, as the highest.

The computing device that determines that its own hotword confidence score is the highest initiates speech recognition on speech data the follows the hotword utterance. For example, the user may speak "OK computer" and computing device **106** may determine that it has the highest hotword confidence score. The computing device **106** will initiate speech recognition on audio data received after the hotword. If the user speaks "call Alice," then the computing device **106** will process the utterance and execute the appropriate command. In some implementations, receiving a hotword may cause the computing devices that receive the hotword to activate from a sleep state. In this instance, the computing device with the highest hotword confidence score remains in an awake state while the other computing devices that do not have the highest hotword confidence score do not process speech data that follows the hotword utterance and enter a sleep state.

As illustrated in FIG. **1**, the score comparer **136** identified the hotword confidence score corresponding to computing device **106** to be the highest. Therefore, the device status **142** is "awake." The score comparers **138** and **140** also identified the hotword confidence score corresponding to computing device **106** to be the highest. Therefore, the device statuses **138** and **140** are "asleep." In some implementations, the activation state of the computing device may be unaffected. For example, the user **102** may be watching a movie on the computing device **108** and have the computing device **106** in the user's hand. When the user **102** speaks "OK computer," the computing device **106**, by virtue of having the highest hotword confidence score, initiates speech recognition on the audio data following the hotword. The computing device **108** does not initiate speech recognition on the audio data following the hotword, and continues to play the movie.

In some implementations, the computing device that determines that it has the highest hotword confidence score waits for a particular amount of time before beginning to perform speech recognition on speech following the hotword. Doing so allows a computing device that computed the highest hotword confidence score to begin performing

SONOS EXHIBIT 1001

US 10,134,398 B2

7

speech recognition on speech that follows the hotword without waiting for a higher hotword confidence score. To illustrate, the score comparer **136** of computing device **106** received hotword confidence scores of 0.6 and 0.45 from computing device **108** and **110**, respectively, as well as the hotword confidence score of 0.85 from the hotworder **124**. From the time that the hotworder **124** computes a hotword confidence score of the "Ok computer" audio data, the computing device **106** waits five hundred milliseconds before performing speech recognition on speech that follows the hotword. In instances where the score comparer receives a higher score, the computing device may not wait for a particular amount of time before setting the device status to "sleep." For example, the hotworder **126** of computing device **108** computes a hotword confidence score of 0.6 and receives hotword confidence scores of 0.85 and 0.45. Once the computing device **108** receives the hotword confidence score of 0.85, then the computing device **108** can set the device status **144** to "sleep." This assumes that the computing device **108** receives the hotword confidence score of 0.85 within the particular amount of time after the hotworder **126** computes the hotword confidence score of 0.6.

In some implementations, when a computing device has the highest hotword confidence score, the computing device may continue to broadcast the confidence score data packet for a particular amount of time to ensure that other computing devices receive the confidence score data packet. This strategy would be most applicable in instances where a computing device does send back a confirmation once it receives a confidence score data packet from another computing device. Therefore, if the computing device **106** transmits the confidence score data packet **130** to computing devices in data group **118** and receives a confirmation before a particular amount of time such as five hundred milliseconds, then the computing device **106** may begin to perform speech recognition on speech following the hotword. In instances where computing devices broadcast their confidence score data packets and do not expect confirmation, the computing device may continue to broadcast their hotword confidence scores for a particular amount of time, such as five hundred milliseconds, or until the computing device receives a higher hotword confidence score, whichever comes first. For example, computing device **110** computes a hotword confidence score of 0.45 and begins to broadcast the confidence score data packet **134**. After three hundred milliseconds, the computing device **110** receives confidence score data packet **130** and stops broadcasting the confidence score data packet **134** because the hotword confidence score of 0.85 from confidence score data packet **130** is higher than the hotword confidence score of forty five. As another broadcast example, computing device **106** computes a hotword confidence score of 0.45 and begins to broadcast the confidence score data packet **130**. After five hundred milliseconds, the computing device **106** stops broadcasting confidence score data packet **130** and begins to perform speech recognition on speech following the hotword. The computing device **106** may receive the confidence score data packets **132** and **134** before five hundred milliseconds has elapsed, but because the hotword confidence scores in the confidence score data packets **132** and **134** are lower than 0.85, the computing device continues to wait until after the five hundred milliseconds has elapsed.

In some implementations, the computing device may begin to perform speech recognition on speech following the hotword until the computing device receives a higher hotword confidence score. The hotworder computes a hotword confidence score and if the hotword confidence score satis-

8

fies a threshold, then the computing device performs speech recognition on speech following the hotword. The computing device may perform the speech recognition without displaying any indication of the speech recognition to the user. This may be desirable because doing so gives the user the impression that the computing device is not active while also allowing the computing device to display results based on the speech recognition to the user quicker than if the computing device had waited until the computing device confirmed that it computed the highest hotword score. As an example, the computing device **106** computes a hotword confidence score of 0.85 and begins to perform speech recognition on speech following the hotword. The computing device **106** receives confidence score data packets **132** and **134** and determines that the hotword confidence score of 0.85 is the highest. The computing device **106** continues to perform speech recognition on speech following the hotword and presents the results to the user. For computing device **108**, the hotworder **126** computes a hotword confidence score of 0.6 and computing device **108** begins to perform speech recognition on the speech following the hotword without displaying data to the user. Once the computing device **108** receives the confidence score data packet **130** that includes the hotword confidence of 0.85, the computing device stops performing speech recognition. No data is displayed to the user, and the user is likely under the impression that the computing device **108** has remained in a "sleep" state.

In some implementations, to avoid any latency after a hotword is spoken, scores could be reported from the hotworder before the end of the hotword, e.g. for a partial hotword. For example, as a user is speaking "Ok computer," a computing device could compute a partial hotword confidence score once the user has finished speaking "OK comp." The computing device can then share the partial hotword confidence score with other computing devices. The computing device with the highest partial hotword confidence score can continue to process the user's speech.

In some implementations, a computing device may emit an audible or inaudible sound, e.g., of a particular frequency or frequency pattern, when the computing device determines that a hotword confidence score satisfies a threshold. The sound would signal to other computing devices that the computing device will continue to process the audio data following the hotword. Other computing devices would receive this sound and cease processing of the audio data. For example, a user speaks "Ok computer." One of the computing devices computes a hotword confidence score that is greater than or equal to a threshold. Once the computing device determines that the hotword confidence score is greater than or equal two a threshold, the computing device emits a sound of eighteen kilohertz. The other computing devices in the vicinity of the user may also be computing a hotword confidence score and may be in the middle of computing a hotword confidence score when the other computing devices receive the sound. When the other computing devices receive the sound, the other computing devices cease processing of the user's speech. In some implementations, the computing device may encode the hotword confidence score in the audible or inaudible sound. For example, if the hotword confidence score is 0.5, then the computing device may generate an audible or inaudible sound that includes a frequency pattern that encodes the score of 0.5.

In some implementations, the computing devices may use different audio metrics to select a computing device to continue processing the user's speech. For example, the

SONOS EXHIBIT 1001

Appx120

US 10,134,398 B2

9

computing devices may use loudness to determine which computing device will continue to process the user's speech. The computing device that detects the loudest speech may continue to process the user's speech. As another example, the computing device that is currently in use or has an active display may notify the other computing devices that it will continue to processes the user's speech upon detecting a hotword.

In some implementations, each computing device that is in the vicinity of the user while the user is speaking receives the audio data and sends the audio data to a server to improve speech recognition. Each computing device can receive the audio data that corresponds to the user's speech. While only one computing device will appear to the user to be processing the user's speech, each computing device can transmit the audio data to a server. The server can then use the audio data that is received from each computing device to improve speech recognition because the server can compare different audio samples that correspond to the same utterance. For example, a user says "Ok computer, remind me to buy milk." Once the user finishes speaking "Ok computer," the nearby computing devices will have likely determined which computing device has the highest hotword confidence score and that computing device will process and respond "remind me to buy milk" as the user speaks those words. The other computing devices will also receive "remind me to buy milk." While the other computing device will not respond to the "remind me to buy milk" utterance, the other computing devices can send audio data corresponding to "remind me to buy milk" to a server. The other computing devices responding to "remind me to buy milk" can also send its audio data to the server. The server can process the audio data to improve speech recognition because the server has different audio samples from different computing devices that correspond to the same "remind me to buy milk" utterance.

FIG. **2** is a diagram of an example process **200** for hotword detection. The process **200** may be performed by a computing device such as the computing device **108** from FIG. **1**. The process **200** computes a value that corresponds a likelihood that an utterance includes a hotword and compares the value to other values computed by other computing devices to determine whether or not to perform speech recognition on the portion of the utterance after the hotword.

The computing device receives audio data that corresponds to an utterance (**210**). A user speaks the utterance and a microphone of the computing device receives the audio data of the utterance. The computing device processes the audio data by buffering, filtering, endpointing, and digitizing the audio data. As an example, the user may utter "Ok, computer" and the microphone of the computing device will receive the audio data that corresponds to "Ok, computer." An audio subsystem of the computing device will sample, buffer, filter, and endpoint the audio data for further processing by the computing device.

The computing device determines a first value corresponding to a likelihood that the utterance includes a hotword (**220**). The computing device determines the first value, which may be referred to as a hotword confidence score, by comparing the audio data of the utterance to a group of audio samples that include the hotword or by analyzing the audio characteristics of the audio data of the utterance. The first value may be normalized to a scale from zero to one where one indicates the highest likelihood that the utterance includes a hotword. In some implementations, the computing device identifies a second computing device and determines that the second computing device is config-

10

ured to respond to utterances that include the hotword and is configured by the user to be responsive to the hotword. The user may be logged into both the computing device and the second computing device. Both the computing device and the second computing device may be configured to respond to the user's voice. The computing device and the second computing device may be connected to the same local area network. The computing device and the second computing device may both be located within a particular distance of each other, such as ten meters, as determined by GPS or signal strength. For example, the computing devices may communicate by a short range radio. The computing device may detect a strength of a signal being transmitted by the second computing device as five dBm and translate that a corresponding distance such as five meters.

The computing device receives a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device (**230**). The second computing device receives the utterance through a microphone of the second computing device. The second computing device processes the received audio data that corresponds to the utterance and determines a second value or a second hotword confidence score. The second hotword confidence score reflect the likelihood, as calculated by the second computing device, that the utterance includes a hotword. In some implementations, the computing device transmits the first value to the second computing device using one or more of the following techniques. The computing device may transmit the first value to the second computing device through a server accessible through the Internet, through a server that is located on the local area network, or directly through the local area network or a short range radio. The computing device may transmit the first value only to the second computing device or the computing device may broadcast the first value so that other computing devices may also receive the first value. The computing device may receive the second value from the second computing device using the same or different technique as the computing device transmitted the first value.

In some implementations, the computing device may compute a loudness score for the utterance or a signal to noise ratio for the utterance. The computing device may combine the loudness score, the signal to noise ratio, and the hotword confidence score to determine a new value for comparing to similar values from other computing devices. For example, the computing device may compute a hotword confidence score and a signal to noise ratio. The computing device may then combine those two scores and compare to similarly computed scores from other computing devices. In some implementations, the computing device may compute different scores and transmit each score to other computing devices for comparison. For example, the computing device may compute a loudness score for the utterance and a hotword confidence score. The computing device may then transmit those scores to other computing devices for comparison.

In some implementations, the computing device may transmit a first identifier with the first value. The identifier may be based on one or more of an address of the computing device, a name of the computing device given by the user, or a location of the computing device. For example, an identifier may be "69.123.132.43" or "phone." Similarly, the second computing device may transmit a second identifier with the second value. In some implementations, the computing device may transmit the first identifier to particular computing devices that the computing device previously

US 10,134,398 B2

11

identified as configured to respond to the hotword. For example, the computing device may have previously identified the second computing device as configured to respond to the hotword because, in addition to being able to respond to a hotword, the same user was logged into the second computing device as the computing device.

The computing device compares the first value and the second value (**240**). The computing device then initiates, based on the result of the comparison, speech recognition processing on the audio data (**250**). In some implementations, for example, the computing device initiates speech recognition when the first value is greater than or equal to the second value. If the user spoke "ok computer, call Carol," then the computing device would begin to process "call Carol" by performing speech recognition on "call Carol" because the first value is greater than or equal to second value. In some implementations, the computing device sets an activation state. In instances where the first value is greater than or equal to the second value, then the computing device sets the activation state as active or "awake." In the "awake" state, the computing device displays results from the speech recognition.

In some implementations, the computing device compares the first value and the second value and determines that the first value is less than the second value. The computing device, based on determining that the first value is less than the second value, sets the activation state as inactive or "sleep." In the "sleep" state, the computing device does not appear, to the user, to be active or processing the audio data.

In some implementations, when the computing device determines that the first value is greater than or equal to the second value, the computing device may wait for a particular amount of time before setting the activation state to active. The computing device may wait for the particular amount of time to increase the probability that the computing device will not receive a higher value from another computing device. The particular amount of time may be fixed or may vary depending on the technique that the computing devices transmit and receive values. In some implementations, when the computing device determines that the first value is greater than or equal to the second value, the computing device may continue to transmit the first value for a particular amount of time. By continuing to transmit the first value for a particular amount of time, the computing device increases the probability that the first value is received by the other computing devices. In instances where the computing device determines that the first value is less than the second value, the computing device may stop transmitting the first value.

In some implementations, the computing device may consider additional information in determining whether to execute the command following the hotword. One example of the additional information may be the portion of the utterance that follows the hotword. Typically, the audio data that follows the hotword corresponds to a command for the computing device such as "call Sally," "play Halloween Movie," or "set heat to 70 degrees." The computing device may identify a typical device that handles the type of request or that is capable of handling the request. A request to call a person would be typically handled by a phone based on pre-programmed typical usages or based on usage patterns of a user of the device. If the user typically watches movies on a tablet, then the tablet may handle a request to play a movie. If the thermostat is capable of adjusting the temperature, then the thermostat may handle temperature adjustments.

12

For the computing device to consider the portion of the utterance that follows the hotword, the computing device would have to initiate speech recognition on the audio data once it likely identifies a hotword. The computing device may categorize the command portion of the utterance and compute a frequency of commands in that category. The computing device may transmit the frequency along with the hotword confidence score to other computing devices. Each computing device may use the frequencies and the hotword confidence scores to determine whether to execute the command following the hotword.

For example, if the user utters "OK computer, play Michael Jackson," then if the computing device is a phone that the user use's twenty percent of the time to listen to music, then the computing device may transmit that information along with the hotword confidence score. A computing device such as a tablet that the user uses five percent of the time to listen to music may transmit that information along with the hotword confidence score to other computing devices. The computing devices may use a combination of the hotword confidence score and the percentage of time playing music to determine whether to execute the command.

FIG. **3** shows an example of a computing device **300** and a mobile computing device **350** that can be used to implement the techniques described here. The computing device **300** is intended to represent various forms of digital computers, such as laptops, desktops, workstations, personal digital assistants, servers, blade servers, mainframes, and other appropriate computers. The mobile computing device **350** is intended to represent various forms of mobile devices, such as personal digital assistants, cellular telephones, smart-phones, and other similar computing devices. The components shown here, their connections and relationships, and their functions, are meant to be examples only, and are not meant to be limiting.

The computing device **300** includes a processor **302**, a memory **304**, a storage device **306**, a high-speed interface **308** connecting to the memory **304** and multiple high-speed expansion ports **310**, and a low-speed interface **312** connecting to a low-speed expansion port **314** and the storage device **306**. Each of the processor **302**, the memory **304**, the storage device **306**, the high-speed interface **308**, the high-speed expansion ports **310**, and the low-speed interface **312**, are interconnected using various busses, and may be mounted on a common motherboard or in other manners as appropriate. The processor **302** can process instructions for execution within the computing device **300**, including instructions stored in the memory **304** or on the storage device **306** to display graphical information for a GUI on an external input/output device, such as a display **316** coupled to the high-speed interface **308**. In other implementations, multiple processors and/or multiple buses may be used, as appropriate, along with multiple memories and types of memory. Also, multiple computing devices may be connected, with each device providing portions of the necessary operations (e.g., as a server bank, a group of blade servers, or a multi-processor system).

The memory **304** stores information within the computing device **300**. In some implementations, the memory **304** is a volatile memory unit or units. In some implementations, the memory **304** is a non-volatile memory unit or units. The memory **304** may also be another form of computer-readable medium, such as a magnetic or optical disk.

The storage device **306** is capable of providing mass storage for the computing device **300**. In some implementations, the storage device **306** may be or contain a com-

SONOS EXHIBIT 1001

US 10,134,398 B2

13

puter-readable medium, such as a floppy disk device, a hard disk device, an optical disk device, or a tape device, a flash memory or other similar solid state memory device, or an array of devices, including devices in a storage area network or other configurations. Instructions can be stored in an information carrier. The instructions, when executed by one or more processing devices (for example, processor 302), perform one or more methods, such as those described above. The instructions can also be stored by one or more storage devices such as computer- or machine-readable mediums (for example, the memory 304, the storage device 306, or memory on the processor 302).

The high-speed interface 308 manages bandwidth-intensive operations for the computing device 300, while the low-speed interface 312 manages lower bandwidth-intensive operations. Such allocation of functions is an example only. In some implementations, the high-speed interface 308 is coupled to the memory 304, the display 316 (e.g., through a graphics processor or accelerator), and to the high-speed expansion ports 310, which may accept various expansion cards (not shown). In the implementation, the low-speed interface 312 is coupled to the storage device 306 and the low-speed expansion port 314. The low-speed expansion port 314, which may include various communication ports (e.g., USB, Bluetooth, Ethernet, wireless Ethernet) may be coupled to one or more input/output devices, such as a keyboard, a pointing device, a scanner, or a networking device such as a switch or router, e.g., through a network adapter.

The computing device 300 may be implemented in a number of different forms, as shown in the figure. For example, it may be implemented as a standard server 320, or multiple times in a group of such servers. In addition, it may be implemented in a personal computer such as a laptop computer 322. It may also be implemented as part of a rack server system 324. Alternatively, components from the computing device 300 may be combined with other components in a mobile device (not shown), such as a mobile computing device 350. Each of such devices may contain one or more of the computing device 300 and the mobile computing device 350, and an entire system may be made up of multiple computing devices communicating with each other.

The mobile computing device 350 includes a processor 352, a memory 364, an input/output device such as a display 354, a communication interface 366, and a transceiver 368, among other components. The mobile computing device 350 may also be provided with a storage device, such as a micro-drive or other device, to provide additional storage. Each of the processor 352, the memory 364, the display 354, the communication interface 366, and the transceiver 368, are interconnected using various buses, and several of the components may be mounted on a common motherboard or in other manners as appropriate.

The processor 352 can execute instructions within the mobile computing device 350, including instructions stored in the memory 364. The processor 352 may be implemented as a chipset of chips that include separate and multiple analog and digital processors. The processor 352 may provide, for example, for coordination of the other components of the mobile computing device 350, such as control of user interfaces, applications run by the mobile computing device 350, and wireless communication by the mobile computing device 350.

The processor 352 may communicate with a user through a control interface 358 and a display interface 356 coupled to the display 354. The display 354 may be, for example, a TFT (Thin-Film-Transistor Liquid Crystal Display) display

14

or an OLED (Organic Light Emitting Diode) display, or other appropriate display technology. The display interface 356 may comprise appropriate circuitry for driving the display 354 to present graphical and other information to a user. The control interface 358 may receive commands from a user and convert them for submission to the processor 352. In addition, an external interface 362 may provide communication with the processor 352, so as to enable near area communication of the mobile computing device 350 with other devices. The external interface 362 may provide, for example, for wired communication in some implementations, or for wireless communication in other implementations, and multiple interfaces may also be used.

The memory 364 stores information within the mobile computing device 350. The memory 364 can be implemented as one or more of a computer-readable medium or media, a volatile memory unit or units, or a non-volatile memory unit or units. An expansion memory 374 may also be provided and connected to the mobile computing device 350 through an expansion interface 372, which may include, for example, a SIMM (Single In Line Memory Module) card interface. The expansion memory 374 may provide extra storage space for the mobile computing device 350, or may also store applications or other information for the mobile computing device 350. Specifically, the expansion memory 374 may include instructions to carry out or supplement the processes described above, and may include secure information also. Thus, for example, the expansion memory 374 may be provide as a security module for the mobile computing device 350, and may be programmed with instructions that permit secure use of the mobile computing device 350. In addition, secure applications may be provided via the SIMM cards, along with additional information, such as placing identifying information on the SIMM card in a non-hackable manner.

The memory may include, for example, flash memory and/or NVRAM memory (non-volatile random access memory), as discussed below. In some implementations, instructions are stored in an information carrier. that the instructions, when executed by one or more processing devices (for example, processor 352), perform one or more methods, such as those described above. The instructions can also be stored by one or more storage devices, such as one or more computer- or machine-readable mediums (for example, the memory 364, the expansion memory 374, or memory on the processor 352). In some implementations, the instructions can be received in a propagated signal, for example, over the transceiver 368 or the external interface 362.

The mobile computing device 350 may communicate wirelessly through the communication interface 366, which may include digital signal processing circuitry where necessary. The communication interface 366 may provide for communications under various modes or protocols, such as GSM voice calls (Global System for Mobile communications), SMS (Short Message Service), EMS (Enhanced Messaging Service), or MMS messaging (Multimedia Messaging Service), CDMA (code division multiple access), TDMA (time division multiple access), PDC (Personal Digital Cellular), WCDMA (Wideband Code Division Multiple Access), CDMA2000, or GPRS (General Packet Radio Service), among others. Such communication may occur, for example, through the transceiver 368 using a radio-frequency. In addition, short-range communication may occur, such as using a Bluetooth, WiFi, or other such transceiver (not shown). In addition, a GPS (Global Positioning System) receiver module 370 may provide additional navigation- and

SONOS EXHIBIT 1001

15                                                                16

location-related wireless data to the mobile computing device **350**, which may be used as appropriate by applications running on the mobile computing device **350**.

The mobile computing device **350** may also communicate audibly using an audio codec **360**, which may receive spoken information from a user and convert it to usable digital information. The audio codec **360** may likewise generate audible sound for a user, such as through a speaker, e.g., in a handset of the mobile computing device **350**. Such sound may include sound from voice telephone calls, may include recorded sound (e.g., voice messages, music files, etc.) and may also include sound generated by applications operating on the mobile computing device **350**.

The mobile computing device **350** may be implemented in a number of different forms, as shown in the figure. For example, it may be implemented as a cellular telephone **380**. It may also be implemented as part of a smart-phone **382**, personal digital assistant, or other similar mobile device.

Various implementations of the systems and techniques described here can be realized in digital electronic circuitry, integrated circuitry, specially designed ASICs (application specific integrated circuits), computer hardware, firmware, software, and/or combinations thereof. These various implementations can include implementation in one or more computer programs that are executable and/or interpretable on a programmable system including at least one programmable processor, which may be special or general purpose, coupled to receive data and instructions from, and to transmit data and instructions to, a storage system, at least one input device, and at least one output device.

These computer programs (also known as programs, software, software applications or code) include machine instructions for a programmable processor, and can be implemented in a high-level procedural and/or object-oriented programming language, and/or in assembly/machine language. As used herein, the terms machine-readable medium and computer-readable medium refer to any computer program product, apparatus and/or device (e.g., magnetic discs, optical disks, memory, Programmable Logic Devices (PLDs)) used to provide machine instructions and/or data to a programmable processor, including a machine-readable medium that receives machine instructions as a machine-readable signal. The term machine-readable signal refers to any signal used to provide machine instructions and/or data to a programmable processor.

To provide for interaction with a user, the systems and techniques described here can be implemented on a computer having a display device (e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor) for displaying information to the user and a keyboard and a pointing device (e.g., a mouse or a trackball) by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback (e.g., visual feedback, auditory feedback, or tactile feedback); and input from the user can be received in any form, including acoustic, speech, or tactile input.

The systems and techniques described here can be implemented in a computing system that includes a back end component (e.g., as a data server), or that includes a middleware component (e.g., an application server), or that includes a front end component (e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the systems and techniques described here), or any combination of such back end, middleware, or front end components. The components of the system can be interconnected by any

form or medium of digital data communication (e.g., a communication network). Examples of communication networks include a local area network (LAN), a wide area network (WAN), and the Internet.

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other.

Although a few implementations have been described in detail above, other modifications are possible. For example, while a client application is described as accessing the delegate(s), in other implementations the delegate(s) may be employed by other applications implemented by one or more processors, such as an application executing on one or more servers. In addition, the logic flows depicted in the figures do not require the particular order shown, or sequential order, to achieve desirable results. In addition, other actions may be provided, or actions may be eliminated, from the described flows, and other components may be added to, or removed from, the described systems. Accordingly, other implementations are within the scope of the following claims.

What is claimed is:

**1**. A computer-implemented method comprising:

receiving, by a computing device that is in a low power mode and that is configured to exit a low power mode upon detecting an utterance of a particular, predefined hotword using an on-device hotword detector, audio data that corresponds to an utterance of the particular, predefined hotword;

while the computing device remains in the low power mode, and in response to receiving the audio data that corresponds to the utterance of the particular, predefined hotword, transmitting, by the computing device and to another computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an output of processing the audio data using the on-device hotword detector;

while the computing device remains in low power mode, receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data; and

after transmitting the output of processing the audio data using the on-device hotword detector and after receiving the additional output of processing the audio data from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, determining, by the computing device, to remain in the low power mode.

**2**. The method of claim **1**,

wherein determining to remain in the low power mode is based at least in part on receiving the additional output of processing the audio from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword.

**3**. The method of claim **1**, comprising:

determining a hotword confidence score that is based on the audio data that corresponds to the utterance of the particular, predefined hotword and that reflects a likelihood that the audio data includes the particular, predefined hotword,

SONOS EXHIBIT 1001

US 10,134,398 B2

17

wherein the output of processing the audio data using the on-device hotword detector includes the hotword confidence score.

**4**. The method of claim **1**, comprising:

determining a hotword confidence score that is based on the audio data that corresponds to the utterance of the particular, predefined hotword and that reflects a likelihood that the audio data includes the particular, predefined hotword; and

determining that the hotword confidence score satisfies a threshold,

wherein transmitting the output of processing the audio data using the on-device hotword detector is based on determining that the hotword confidence score satisfies the threshold.

**5**. The method of claim **1**, wherein the computing device transmits the output of processing the audio data using the on-device hotword detector without performing speech recognition on the audio data that corresponds to an utterance of the particular, predefined hotword.

**6**. The method of claim **1**, wherein:

the computing device transmits the output of processing the audio data using the on-device hotword detector for a particular amount of time, and

the computing device determines to remain in the low power mode after transmitting the output of processing the audio data using the on-device hotword detector for the particular amount of time.

**7**. The method of claim **1**, comprising:

determining a hotword confidence score that is based on the audio data that corresponds to an utterance of the particular, predefined hotword and that reflects a likelihood that the audio data includes the particular, predefined hotword,

wherein receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data comprises receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, a hotword confidence score that is based on the audio data that corresponds to the utterance of the particular, predefined hotword and that reflects an additional likelihood that the audio data includes the particular, predefined hotword,

wherein the method comprises comparing the hotword confidence score with the additional hotword confidence score, and

wherein determining to remain in the low power mode is based on comparing the hotword confidence score with the additional hotword confidence score.

**8**. The method of claim **1**, wherein:

the other computing device is in a vicinity of the computing device,

the computing device receives the utterance of the particular, predefined hotword through a microphone of the computing device,

the other computing device receives the utterance of the particular, predefined hotword through another microphone of the computing device, and

the additional output of processing the audio data is based on processing, by the other computing device, the utterance of the particular, predefined hotword received by the other computing device.

18

**9**. A system comprising:

one or more computers and one or more storage devices storing instructions that are operable, when executed by the one or more computers, to cause the one or more computers to perform operations comprising:

receiving, by a computing device that is in a low power mode and that is configured to exit a low power mode upon detecting an utterance of a particular, predefined hotword using an on-device hotword detector, audio data that corresponds to an utterance of a particular, predefined hotword;

while the computing device remains in the low power mode, and in response to receiving the audio data that corresponds to the utterance of the particular, predefined hotword, transmitting, by the computing device and to another computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an output of processing the audio data using the on-device hotword detector;

while the computing device remains in low power mode, receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data; and

after transmitting the output of processing the audio data using the on-device hotword detector and after receiving the additional output of processing the audio data from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, determining, by the computing device, to remain in the low power mode.

**10**. The system of claim **9**,

wherein determining to remain in the low power mode is based at least in part on receiving the additional output of processing the audio data from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword.

**11**. The system of claim **9**, wherein the operations further comprise:

determining a hotword confidence score that is based on the audio data that corresponds to the utterance of the particular, predefined hotword and that reflects a likelihood that the audio data includes the particular, predefined hotword,

wherein the output of processing the audio data using the on-device hotword detector includes the hotword confidence score.

**12**. The system of claim **9**, wherein the operations further comprise:

determining a hotword confidence score that is based on the audio data that corresponds to the utterance of the particular, predefined hotword and that reflects a likelihood that the audio data includes the particular, predefined hotword; and

determining that the hotword confidence score satisfies a threshold,

wherein transmitting the output of processing the audio data using the on-device hotword detector is based on determining that the hotword confidence score satisfies the threshold.

**13**. The system of claim **9**, wherein the computing device transmits the output of processing the audio data using the on-device hotword detector without performing speech rec-

US 10,134,398 B2

19 | 20

ognition on the audio data that corresponds to an utterance of the particular, predefined hotword.

**14**. The system of claim **9**, wherein:

the computing device transmits the output of processing the audio data using the on-device hotword detector for a particular amount of time, and

the computing device determines to remain in the low power mode after transmitting the output of processing the audio data using the on-device hotword detector for the particular amount of time.

**15**. The system of claim **9**, wherein the operations further comprise:

determining a hotword confidence score that is based on the audio data that corresponds to an utterance of the particular, predefined hotword and that reflects a likelihood that the audio data includes the particular, predefined hotword,

wherein receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data comprises receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, a hotword confidence score that is based on the audio data that corresponds to the utterance of the particular, predefined hotword and that reflects an additional likelihood that the audio data includes the particular, predefined hotword,

wherein the operations further comprise comparing the hotword confidence score with the additional hotword confidence score, and

wherein determining to remain in the low power mode is based on comparing the hotword confidence score with the additional hotword confidence score.

**16**. A non-transitory computer-readable medium storing software comprising instructions executable by one or more computers which, upon such execution, cause the one or more computers to perform operations comprising:

receiving, by a computing device that is in a low power mode and that is configured to exit a low power mode upon detecting an utterance of a particular, predefined hotword using an on-device hotword detector, audio data that corresponds to an utterance of a particular, predefined hotword;

while the computing device remains in the low power mode, and in response to receiving the audio data that corresponds to the utterance of the particular, predefined hotword, transmitting, by the computing device and to another computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an output of processing the audio data using the on-device hotword detector;

while the computing device remains in low power mode, receiving, by the computing device and from the other computing device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, an additional output of processing the audio data; and

after transmitting the output of processing the audio data using the on-device hotword detector and after receiving the additional output of processing the audio data from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword, determining, by the computing device, to remain in the low power mode.

**17**. The medium of claim **16**,

wherein determining to remain in the low power mode is based at least in part on receiving the additional output of processing the audio from the other using device that is configured to exit a low power mode upon detecting an utterance of the particular, predefined hotword.

**18**. The medium of claim **16**, wherein the operations further comprise:

determining a hotword confidence score that is based on the audio data that corresponds to the utterance of the particular, predefined hotword and that reflects a likelihood that the audio data includes the particular, predefined hotword,

wherein the output of processing the audio data using the on-device hotword detector includes the hotword confidence score.

**19**. The medium of claim **16**, wherein the operations further comprise:

determining a hotword confidence score that is based on the audio data that corresponds to the utterance of the particular, predefined hotword and that reflects a likelihood that the audio data includes the particular, predefined hotword; and

determining that the hotword confidence score satisfies a threshold,

wherein transmitting the output of processing the audio data using the on-device hotword detector is based on determining that the hotword confidence score satisfies the threshold.

**20**. The medium of claim **16**, wherein the computing device transmits the output of processing the audio data using the on-device hotword detector without performing speech recognition on the audio data that corresponds to an utterance of the particular, predefined hotword.

**21**. The medium of claim **16**, wherein:

the computing device transmits the output of processing the audio data using the on-device hotword detector for a particular amount of time, and

the computing device determines to remain in the low power mode after transmitting the output of processing the audio data using the on-device hotword detector for the particular amount of time.

* * * * *

SONOS EXHIBIT 1001



US010593330B2

(12) **United States Patent**
Sharifi

(10) **Patent No.:** US 10,593,330 B2
(45) **Date of Patent:** *Mar. 17, 2020

(54) **HOTWORD DETECTION ON MULTIPLE DEVICES**

(71) Applicant: **Google LLC**, Mountain View, CA (US)

(72) Inventor: **Matthew Sharifi**, Kilchberg (CH)

(73) Assignee: **Google LLC**, Mountain View, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/171,495**

(22) Filed: **Oct. 26, 2018**

(65) **Prior Publication Data**

US 2019/0130914 A1    May 2, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/346,914, filed on Nov. 9, 2016, now Pat. No. 10,134,398, which is a
(Continued)

(51) **Int. Cl.**
**G10L 15/28** (2013.01)
**G10L 15/22** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ **G10L 15/285** (2013.01); **G10L 15/01** (2013.01); **G10L 15/08** (2013.01); **G10L 15/22** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ......... G10L 15/22; G10L 15/30; G10L 25/78; G10L 15/08; G10L 2015/223;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,363,102 A | 12/1982 | Holmgren | |
| 5,659,665 A * | 8/1997 | Whelpley, Jr. ........... | G06F 3/16 704/248 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2000-75954 | 3/1920 |
| JP | S59-180599 | 10/1984 |

(Continued)

OTHER PUBLICATIONS

Auckenthaler et al. "Score Normalization for Text-independent Speaker Verification System," Digital Signal Processing, vol. 10, 2000, 13 pages.

(Continued)

*Primary Examiner* — Michael Colucci
(74) *Attorney, Agent, or Firm* — Honigman LLP

(57) **ABSTRACT**

Methods, systems, and apparatus, including computer programs encoded on a computer storage medium, for hotword detection on multiple devices are disclosed. In one aspect, a method includes the actions of receiving, by a first computing device, audio data that corresponds to an utterance. The actions further include determining a first value corresponding to a likelihood that the utterance includes a hotword. The actions further include receiving a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device. The actions further include comparing the first value and the second value. The actions further include based on comparing the first value to the second value, initiating speech recognition processing on the audio data.

**18 Claims, 3 Drawing Sheets**



US 10,593,330 B2

Page 2

## Related U.S. Application Data

continuation of application No. 15/088,477, filed on Apr. 1, 2016, now Pat. No. 9,514,752, which is a continuation of application No. 14/675,932, filed on Apr. 1, 2015, now Pat. No. 9,318,107.

(60) Provisional application No. 62/061,830, filed on Oct. 9, 2014.

(51) **Int. Cl.**
| | |
|---|---|
| *G10L 15/08* | (2006.01) |
| *G10L 17/22* | (2013.01) |
| *G10L 15/32* | (2013.01) |
| *G10L 15/01* | (2013.01) |
| *G06F 3/16* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *G10L 15/32* (2013.01); *G10L 17/22* (2013.01); *G06F 3/167* (2013.01); *G10L 2015/088* (2013.01); *G10L 2015/223* (2013.01)

(58) **Field of Classification Search**
CPC ......... G10L 25/93; G10L 15/00; G10L 15/34; G06F 1/3215; G06F 2203/0381; H04R 3/005
USPC ....... 704/254, 275, 273, 270, 257, 256, 251, 704/250, 247, 246, 244, 243, 235, 233, 704/231, 228, 224, 2; 455/414.1; 434/157; 391/71.1; 379/88.03, 88.01; 367/124
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,897,616 A | 4/1999 | Kanersky | |
| 6,023,676 A | 2/2000 | Erell | |
| 6,141,644 A | 10/2000 | Kuhn | |
| 6,567,775 B1 | 5/2003 | Maali | |
| 6,671,672 B1 * | 12/2003 | Heck | G10L 17/24 704/273 |
| 6,744,860 B1 * | 6/2004 | Schrage | H04M 1/271 379/207.02 |
| 6,826,159 B1 | 11/2004 | Shaffer | |
| 6,931,375 B1 | 8/2005 | Bossemeyer | |
| 6,973,426 B1 | 12/2005 | Schier | |
| 7,016,833 B2 | 3/2006 | Gable | |
| 7,222,072 B2 * | 5/2007 | Chang | G10L 17/22 704/249 |
| 7,571,014 B1 | 8/2009 | Lambourne et al. | |
| 7,720,012 B1 | 5/2010 | Borah | |
| 7,904,297 B2 * | 3/2011 | Mirkovic | G06F 17/28 704/235 |
| 8,099,288 B2 | 1/2012 | Zhang | |
| 8,200,488 B2 | 6/2012 | Kemp et al. | |
| 8,209,174 B2 | 6/2012 | Al-Telmissani | |
| 8,214,447 B2 | 7/2012 | Deslippe et al. | |
| 8,340,975 B1 * | 12/2012 | Rosenberger | G10L 15/22 704/270 |
| 8,588,949 B2 | 11/2013 | Lambourne et al. | |
| 8,670,985 B2 | 3/2014 | Lindahl et al. | |
| 8,713,119 B2 | 4/2014 | Lindahl | |
| 8,717,949 B2 | 5/2014 | Crinon | |
| 8,719,009 B2 | 5/2014 | Baldwin et al. | |
| 8,719,018 B2 | 5/2014 | Dinerstein | |
| 8,768,687 B1 * | 7/2014 | Quasthoff | G10L 15/26 379/142.14 |
| 8,775,191 B1 | 7/2014 | Sharifi et al. | |
| 8,805,890 B2 | 8/2014 | Zhang et al. | |
| 8,838,457 B2 | 9/2014 | Cerra et al. | |
| 8,938,394 B1 | 1/2015 | Faaborg et al. | |
| 8,996,372 B1 * | 3/2015 | Secker-Walker | G10L 15/34 704/231 |
| 9,142,218 B2 * | 9/2015 | Schroeter | G10L 17/20 |
| 2002/0049596 A1 * | 4/2002 | Burchard | G10L 15/22 704/270 |
| 2002/0072905 A1 * | 6/2002 | White | G10L 15/30 704/231 |
| 2002/0123890 A1 * | 9/2002 | Kopp | H04L 12/6418 704/233 |
| 2002/0193991 A1 * | 12/2002 | Bennett | G10L 15/08 704/247 |
| 2003/0200090 A1 * | 10/2003 | Kawazoe | G10L 15/00 704/251 |
| 2003/0220797 A1 | 11/2003 | Ito | |
| 2003/0231746 A1 | 12/2003 | Hunter | |
| 2004/0101112 A1 * | 5/2004 | Kuo | H04M 1/271 379/88.01 |
| 2005/0165607 A1 * | 7/2005 | Di Fabbrizio | G06F 17/2785 704/270 |
| 2006/0074656 A1 * | 4/2006 | Mathias | G10L 15/063 704/243 |
| 2006/0085188 A1 | 4/2006 | Goodwin et al. | |
| 2006/0184370 A1 * | 8/2006 | Kwak | G10L 15/1822 704/275 |
| 2007/0100620 A1 * | 5/2007 | Tavares | G10L 17/06 704/246 |
| 2007/0198262 A1 | 8/2007 | Mindlin | |
| 2009/0240488 A1 | 9/2009 | White | |
| 2009/0258333 A1 * | 10/2009 | Yu | G09B 5/04 434/157 |
| 2009/0292541 A1 * | 11/2009 | Daya | G10L 15/063 704/251 |
| 2010/0070276 A1 * | 3/2010 | Wasserblat | G10L 15/18 704/243 |
| 2010/0110834 A1 * | 5/2010 | Kim | G01S 3/8083 367/124 |
| 2011/0026722 A1 * | 2/2011 | Jing | G10L 21/0208 381/71.1 |
| 2011/0054892 A1 * | 3/2011 | Jung | G10L 15/08 704/233 |
| 2011/0060587 A1 * | 3/2011 | Phillips | G10L 15/30 704/235 |
| 2011/0066429 A1 * | 3/2011 | Shperling | G10L 25/78 704/228 |
| 2011/0184730 A1 | 7/2011 | LeBeau et al. | |
| 2011/0304648 A1 | 12/2011 | Kim et al. | |
| 2012/0084087 A1 | 4/2012 | Yang | |
| 2012/0136923 A1 | 5/2012 | Grube | |
| 2012/0232896 A1 * | 9/2012 | Taleb | G10L 25/78 704/233 |
| 2012/0245941 A1 | 9/2012 | Cheyer | |
| 2012/0265528 A1 * | 10/2012 | Gruber | G10L 15/18 704/235 |
| 2013/0060571 A1 * | 3/2013 | Soemo | G10L 15/30 704/251 |
| 2013/0124207 A1 | 5/2013 | Sarin et al. | |
| 2013/0132086 A1 * | 5/2013 | Xu | G10L 15/01 704/257 |
| 2013/0183944 A1 * | 7/2013 | Mozer | H04L 12/282 455/414.1 |
| 2013/0289996 A1 * | 10/2013 | Fry | G10L 15/32 704/257 |
| 2014/0006825 A1 | 1/2014 | Shenhav | |
| 2014/0012573 A1 * | 1/2014 | Hung | G06F 1/3215 704/233 |
| 2014/0012578 A1 | 1/2014 | Morioka | |
| 2014/0088961 A1 * | 3/2014 | Woodward | G10L 15/22 704/235 |
| 2014/0163978 A1 | 6/2014 | Basye | |
| 2014/0222430 A1 * | 8/2014 | Rao | G10L 15/04 704/254 |
| 2014/0257821 A1 * | 9/2014 | Adams | G10L 25/93 704/275 |
| 2014/0278383 A1 * | 9/2014 | Fan | G10L 25/84 704/224 |
| 2014/0278435 A1 * | 9/2014 | Ganong, III | G10L 15/22 704/275 |
| 2015/0081295 A1 | 3/2015 | Yun | |

SONOS EXHIBIT 1001

**US 10,593,330 B2**

Page 3

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2015/0154953 A1 * | 6/2015 | Bapat | .................... | G10L 15/06 |
| | | | | 704/251 |
| 2015/0228274 A1 | 8/2015 | Leppanen | | |
| 2015/0262577 A1 * | 9/2015 | Nomura | ................. | G10L 15/22 |
| | | | | 704/231 |
| 2015/0379989 A1 | 12/2015 | Balasubramanian | | |
| 2016/0104483 A1 | 4/2016 | Foerster et al. | | |
| 2016/0155443 A1 | 6/2016 | Khan | | |
| 2016/0189715 A1 | 6/2016 | Nishikawa | | |
| 2016/0217790 A1 | 7/2016 | Sharifi | | |
| 2016/0260431 A1 | 9/2016 | Newendorp | | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | H09-62293 | 3/1997 |
| JP | H09-127973 | 5/1997 |
| JP | H11-52976 | 2/1999 |
| JP | H11-231896 | 8/1999 |
| JP | 2000-310999 | 11/2000 |
| JP | 2006-227634 | 8/2006 |
| JP | 2009-104020 | 5/2009 |
| JP | 2014-92777 | 5/2014 |
| JP | 2015520409 | 7/2015 |
| KR | 10-2014-0031391 | 3/2014 |
| WO | WO1998040875 | 9/1998 |
| WO | WO2015/006385 | 1/2013 |
| WO | WO2013/163113 | 10/2013 |
| WO | WO2014/008194 | 1/2014 |
| WO | WO2014/130463 | 8/2014 |
| WO | WO2015/025330 | 2/2015 |

OTHER PUBLICATIONS

European Examination Report issued in European Application No. 16207288.8-1210, dated Aug. 1, 2018, 5 pages.
European Office Action issued in Application No. 15781811.3, dated Aug. 23, 2017, 6 pages.
Extended European Search Report in European Application No. 16207288.8-1914, dated Apr. 4, 2017, 8 pages.
Extended European Search Report issued in Application No. 16195834.3-1910, dated Nov. 23, 2016, 9 pages.

International Preliminary Report of Patentability in International application No. PCT/US2015/030569, dated Jan. 24, 2017, 8 pages.
International Preliminary Report on Patentability in International Application No. PCT/US2015/052860, dated Apr. 11, 2017, 9 pages.
International Search Report and Written Opinion in International Application No. PCT/US2015/052860, dated Dec. 8, 2015, 12 pages.
International Search Report and Written Opinion issued in International Application No. PCT/US2017/045123, dated Nov. 8, 2017, 15 pages.
Jae-Seung, Choi, "Text-dependent Speaker Recognition using Characteristic Vectors in Speech Signal and Normalized Recognition Method," Journal of Korean Institute of Information Technology, 10(5), May 2012 (English Abstract).
Japanese Office Action issued in Application No. 2016-250670, dated Mar. 26, 2018, 7 pages (English Translation).
Japanese Office Action issued in Application No. 2016-561322, dated Feb. 5, 2018, 6 pages (with English Translation).
Japanese Office Action issued in Japanese Application No. 2017-170185, dated Oct. 1, 2018, 17 pages (with English Abstract).
Korean Office Action issued in Application No. 10-2016-7027999, dated Aug. 28, 2017, 9 pages (with English Translation).
Korean Office Action issued in Application No. 10-2016-7033161, dated Dec. 19, 2017, 10 pages (with English Translation).
Notice of Allowance in Japanese Application No. 2016-551250, dated Aug. 7, 2017, 3 pages (English Translation).
Notice of Allowance in Korean Application No. 10-2016-7021778, dated Apr. 25, 2017, (no English translation yet).
Notice of Allowance in U.S. Appl. No. 15/201,972, dated Jun. 1, 2017, 10 pages.
Notice of Allowance issued in U.S. Appl. No. 15/278,269, dated Jan. 12, 2018, 10 pages.
Office Action in Japanese Application No. 2016-551250, dated Apr. 10, 2017, 6 pages (English Translation).
Office Action in Korean Application No. 10-2016-7021778, dated Dec. 13, 2016, 4 pages.
Office Action issued in Korean Application No. 10-2016-7022701, dated Aug. 17, 2017, 4 pages (English Translation).
Office Action issued in Korean Application No. 10-2016-7027999, dated Apr. 12, 2017, 9 pages (English Translation).
Office Action issued in U.S. Appl. No. 15/278,269, dated Aug. 18, 2017, 23 pages.

* cited by examiner

SONOS EXHIBIT 1001



120
Device Group
Phone
Thermostat
114
Device ID
Tablet
144
Device Status
Sleep
126
Hotworder
Score Comparer
0.6
.85
.45
138
108
Tablet
0.6
132
Phone
.85
130
106
118
Device Group
Tablet
Thermostat
112
Device ID
Phone
142
Device Status
Awake
124
Hotworder
Score Comparer
.85
0.6
.45
136
134
Thermostat
.45
Tablet
0.6
132
108
106
102
75°
110
OK, Computer
104
122
Device Group
Phone
Tablet
116
Device ID
Thermostat
146
Device Status
Sleep
110
128
Hotworder
Score Comparer
.45
.85
0.6
140
130
Phone
.85
134
Thermostat
.45
100

FIG.1



200
Receive audio data that corresponds to an utterance
210
Determine a first value corresponding to a likelihood that the utterance includes a hotword
220
Receive a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device
230
Compare the first value and the second value
240
Based on comparing the first value to the second value, initiate speech recognition processing on the audio data
250

FIG. 2



FIG. 3

    SONOS EXHIBIT 1001

US 10,593,330 B2

<div style="text-align:center">1</div>

# HOTWORD DETECTION ON MULTIPLE DEVICES

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. application Ser. No. 15/346,914, filed Nov. 9, 2016, which is a continuation of U.S. application Ser. No. 15/088,477, filed Apr. 1, 2016, which is a continuation of U.S. application Ser. No. 14/675,932, filed Apr. 1, 2015, which claims the benefit of U.S. Provisional Application No. 62/061,830, filed on Oct. 9, 2014, all of which are incorporated by reference.

## TECHNICAL FIELD

This specification generally relates to systems and techniques for recognizing the words that a person is speaking, otherwise referred to as speech recognition.

## BACKGROUND

The reality of a speech-enabled home or other environment—that is, one in which a user need only speak a query or command out loud and a computer-based system will field and answer the query and/or cause the command to be performed—is upon us. A speech-enabled environment (e.g., home, workplace, school, etc.) can be implemented using a network of connected microphone devices distributed throughout the various rooms or areas of the environment. Through such a network of microphones, a user has the power to orally query the system from essentially anywhere in the environment without the need to have a computer or other device in front of him/her or even nearby. For example, while cooking in the kitchen, a user might ask the system "how many milliliters in three cups?" and, in response, receive an answer from the system, e.g., in the form of synthesized voice output. Alternatively, a user might ask the system questions such as "when does my nearest gas station close," or, upon preparing to leave the house, "should I wear a coat today?"

Further, a user may ask a query of the system, and/or issue a command, that relates to the user's personal information. For example, a user might ask the system "when is my meeting with John?" or command the system "remind me to call John when I get back home."

## SUMMARY

For a speech-enabled system, the users' manner of interacting with the system is designed to be primarily, if not exclusively, by means of voice input. Consequently, the system, which potentially picks up all utterances made in the surrounding environment including those not directed to the system, must have some way of discerning when any given utterance is directed at the system as opposed, e.g., to being directed at an individual present in the environment. One way to accomplish this is to use a hotword, which by agreement among the users in the environment, is reserved as a predetermined word that is spoken to invoke the attention of the system. In an example environment, the hotword used to invoke the system's attention are the words "OK computer." Consequently, each time the words "OK computer" are spoken, it is picked up by a microphone, conveyed to the system, which performs speech recognition techniques to determine whether the hotword was spoken and, if so, awaits an ensuing command or query. Accord-

<div style="text-align:center">2</div>

ingly, utterances directed at the system take the general form [HOTWORD] [QUERY], where "HOTWORD" in this example is "OK computer" and "QUERY" can be any question, command, declaration, or other request that can be speech recognized, parsed and acted on by the system, either alone or in conjunction with the server via the network.

According to one innovative aspect of the subject matter described in this specification, a user device receives an utterance that is spoken by a user. The user device determines whether the utterance includes a hotword and computes a hotword confidence score that indicates a likelihood that the utterance includes the hotword. The user device transmits this score to other user devices in the near vicinity. The other user devices likely received the same utterance. The other user devices compute a hotword confidence score and transmit their scores to the user device. The user device compares the hotword confidence scores. If the user device has the highest hotword confidence score, then the user device remains active and prepares to process additional audio. If the user device does not have the highest hotword confidence score, then the user device does not process the additional audio.

In general, another innovative aspect of the subject matter described in this specification may be embodied in methods that include the actions of receiving, by a first computing device, audio data that corresponds to an utterance; determining a first value corresponding to a likelihood that the utterance includes a hotword; receiving a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device; comparing the first value and the second value; and based on comparing the first value to the second value, initiating speech recognition processing on the audio data.

These and other embodiments can each optionally include one or more of the following features. The actions further include determining that the first value satisfies a hotword score threshold. The actions further include transmitting the first value to the second computing device. The actions further include determining an activation state of the first computing device based on comparing the first value and the second value. The action of determining an activation state of the first computing device based on comparing the first value and the second value further includes determining that the activation state is an active state. The actions further include receiving, by the first computing device, additional audio data that corresponds to an additional utterance; determining a third value corresponding to a likelihood that the additional utterance includes the hotword; receiving a fourth value corresponding to a likelihood that the utterance includes the hotword, the fourth value being determined by a third computing device; comparing the first value and the second value; and based on comparing the first value and the second value, determining that the activation state of the first computing device is an inactive state.

The action of transmitting the first value to the second computing device further includes transmitting, to a server, through a local network, or through a short range radio, the first value. The action of receiving a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device further includes receiving, from the server, through the local network, or through the short range radio, a second value that was determined by a second computing device. The actions further include identifying the second computing device; and determining that the second computing device is configured to respond to utter-

SONOS EXHIBIT 1001

US 10,593,330 B2

3

ances that include the hotword. The action of transmitting the first value to the second computing device further includes transmitting a first identifier for the first computing device. The action of receiving a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device further includes receiving a second identifier for the second computing device. The action of determining that the activation state is an active state further includes determining that a particular amount of time has elapsed since receiving the audio data that corresponds to the utterance. The actions further include continuing, for a particular amount of time, to transmit the first value based on determining that the activation state is an active state.

Other embodiments of this aspect include corresponding systems, apparatus, and computer programs recorded on computer storage devices, each configured to perform the operations of the methods.

Particular embodiments of the subject matter described in this specification can be implemented so as to realize one or more of the following advantages. Multiple devices can detect a hotword and only one device will respond to the hotword.

The details of one or more embodiments of the subject matter described in this specification are set forth in the accompanying drawings and the description below. Other features, aspects, and advantages of the subject matter will become apparent from the description, the drawings, and the claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagram of an example system for hotword detection.

FIG. 2 is a diagram of an example process for hotword detection.

FIG. 3 shows an example of a computing device and a mobile computing device.

Like reference numbers and designations in the various drawings indicate like elements.

DETAILED DESCRIPTION

In the not too distant future, it is possible that many devices may be continuously listening for hotwords. When a single user has multiple devices trained to respond to their voice (e.g., a phone, tablet, TV, etc), it may be desirable to suppress responding to hotwords on devices that are not likely to be the ones a user intends to address. For example, when a user speaks the hotword toward one device, if any of their other devices are nearby, it is likely that they will also trigger a voice search. In many cases, this is not the user's intention. Thus, it may be advantageous if only a single device should trigger, specifically the device the user is speaking to. The present specification addresses the problem of selecting the correct device for reacting to a hotword, and suppressing reaction to the hotword on other devices.

FIG. 1 is a diagram of an example system 100 for hotword detection. In general, system 100 illustrates a user 102 speaking an utterance 104 that is detected by microphones of computing devices 106, 108, and 110. The computing devices 106, 108, and 110 process the utterance 104 to determine a likelihood that the utterance 104 includes a hotword. The computing devices 106, 108, and 110 each transmit data to each other that indicates the likelihood that the utterance 104 includes a hotword. The computing devices 106, 108, and 110 each compare the data, and the

4

computing device that computed the highest likelihood that the utterance 104 included a hotword initiates speech recognition on the utterance 104. The computing devices that did not compute the highest likelihood that the utterance 104 includes a hotword do not initiate speech recognition on the speech following the utterance 104.

Before transmitting, to another computing device, data that indicates a likelihood that the utterance 104 corresponds to a hotword, the computing devices that are located near each other identify each other. In some implementations, the computing devices identify each other by searching the local network for other devices that are configured to respond to the hotword. For example, computing device 106 may search the local area network for other devices that are configured to respond to the hotword and identify computing device 108 and computing device 110.

In some implementations, the computing devices identify other nearby computing devices that are configured to respond to the hotword by identifying the user who is logged into each device. For example, user 102 is logged into computing devices 106, 108, and 110. The user 102 has the computing device 106 is the user's hand. The computing device 108 is sitting on the table, and the computing device 110 is located on a nearby wall. Computing device 106 detects computing devices 108 and 110 and each computing device shares information that is related to the user who is logged into the computing device, such as a user identifier. In some implementations, the computing devices may identify other near computing devices that are configured to respond to the hotword by identifying computing devices that are configured to respond when the hotword is spoken by the same user through speaker identification. For example, the user 102 configured the computing devices 106, 108, and 110 each to respond to the voice of user 102 when user 102 speaks the hotword. The computing devices share the speaker identification information by providing a user identifier for user 102 to each other computing device. In some implementations, the computing devices may identify other computing devices that are configured to respond to the hotword through short range radio. For example, the computing device 106 may transmit a signal through short range radio searching for other computing devices that are configured to respond to the hotword. The computing devices may employ one of these techniques or a combination of them to identify other computing devices that are configured to respond to the hotword.

Once the computing devices 106, 108, and 110 have identified other computing devices that are configured to respond to the hotword, the computing devices 106, 108, and 110 share and store device identifiers for the identified computing devices. The identifiers may be based on a type of device, an IP address of the device, a MAC address, a name given to the device by a user, or any similar unique identifier. For example, the device identifier 112 for computing device 106 may be "phone." The device identifier 114 for computing device 108 may be "tablet." The device identifier 116 for computing device 110 may be "thermostat." The computing devices 106, 108, and 110 store the device identifier for the other computing devices that are configured to respond to the hotword. Each computing device has a device group where the computing device stores the device identifiers. For example, computing device 106 has device group 118 that lists "tablet" and "thermostat" as the two devices that will receive the likelihood that the audio data includes the hotword as computed by the computing device 106. The computing device 108 has device group 120 that lists "phone" and "thermostat" as the two

Appx134

SONOS EXHIBIT 1001

US 10,593,330 B2

5

devices that will receive the likelihood that the audio data includes the hotword as computed by the computing device **108**. The computing device **110** has device group **122** that lists "phone" and "tablet" as the two devices that will receive the likelihood that the audio data includes the hotword as computed by the computing device **110**.

When the user **102** speaks the utterance **104**, "OK computer," each computing device that has a microphone in the vicinity of the user **102** detects and processes the utterance **104**. Each computing device detects the utterance **104** through an audio input device such as a microphone. Each microphone provides audio data to a respective audio subsystem. The respective audio subsystem buffers, filters, and digitizes the audio data. In some implementations, each computing device may also perform endpointing and speaker identification on the audio data. The audio subsystem provides the processed audio data to a hotworder. The hotworder compares the processed audio data to known hotword data and computes a confidence score that indicates the likelihood that the utterance **104** corresponds to a hotword. The hotworder may extract audio features from the processed audio data such as filterbank energies or mel-frequency cepstral coefficients. The hotworder may use classifying windows to process these audio features such as by using a support vector machine or a neural network. Based on the processing of the audio features, the hotworder **124** computes a confidence score of 0.85, hotworder **126** computes a confidence score of 0.6, and hotworder **128** computes a confidence score of 0.45. In some implementations, the confidence score may be normalized to a scale of zero to one, with a higher number indicating a greater confidence that the utterance **104** includes a hotword.

Each computing device transmits a respective confidence score data packet to the other computing devices in the device group. Each confidence score data packet includes a respective confidence score and the respective device identifier for the computing device. For example, the computing device **106** transmits the confidence score data packet **130** that includes the confidence score of 0.85 and the device identifier "phone" to computing devices in device group **118**, computing devices **108** and **110**. The computing device **108** transmits the confidence score data packet **132** that includes the confidence score of 0.6 and the device identifier "tablet" to computing devices in device group **120**, computing devices **106** and **110**. The computing device **110** transmits the confidence score data packet **134** that includes the confidence score of 0.45 and the device identifier "thermostat" to computing devices in device group **118**, computing device **106** and **108**.

In some implementations, a computing device may transmit the confidence score data packet if the confidence score satisfies a hotword score threshold. For example, if the hotword score threshold is 0.5, then the computing device **110** would not transmit the confidence score data packet **134** to the other computing devices in device group **122**. The computing devices **106** and **108** would still transmit the confidence score data packets **130** and **132** to computing devices in device groups **118** and **120**, respectively.

In some implementations, the computing device that transmit a confidence score data packet may transmit the confidence score data packet to other computing devices directly. For example, computing device **106** may transmit the confidence score data packet **130** to computing devices **108** and **110** through a short range radio. The communication protocol used between two computing devices may be universal plug and play. In some implementations, a computing device that transmits a confidence score data packet

6

may broadcast the confidence score data packet. In this instance, the confidence score data packet may be received by the computing devices in the device group and by other computing devices. In some implementations, a computing device that transmits a confidence score data packet may transmit the confidence score data packet to a server and then the server transmits the confidence score data packet to the computing devices in the data group. The server may be located within the local area network of the computing devices or accessible through the Internet. For example, the computing device **108** sends the confidence score data packet **132** and the list of computing devices in device group **120** to a server. The server transmits the confidence score data packet **132** to computing device **106** and **110**. In instances where a computing device that is transmitting the confidence score data packet to another computing device, the receiving computing device may send back a confirmation that the receiving computing device received the confidence score data packet.

Each computing device uses a score comparer to compare the hotword confidence scores that the computing device has received. For example, the computing device **106** computed a hotword confidence score of 0.85 and received hotword confidence scores of 0.6 and 0.45. In this instance, the score comparer **136** compares the three scores and identifies the score of 0.85 as the highest. For computing devices **108** and **110**, the score comparers **138** and **140** reach similar conclusions, identifying the score of 0.85, which corresponds to computing device **106**, as the highest.

The computing device that determines that its own hotword confidence score is the highest initiates speech recognition on speech data the follows the hotword utterance. For example, the user may speak "OK computer" and computing device **106** may determine that it has the highest hotword confidence score. The computing device **106** will initiate speech recognition on audio data received after the hotword. If the user speaks "call Alice," then the computing device **106** will process the utterance and execute the appropriate command. In some implementations, receiving a hotword may cause the computing devices that receive the hotword to activate from a sleep state. In this instance, the computing device with the highest hotword confidence score remains in an awake state while the other computing devices that do not have the highest hotword confidence score do not process speech data that follows the hotword utterance and enter a sleep state.

As illustrated in FIG. **1**, the score comparer **136** identified the hotword confidence score corresponding to computing device **106** to be the highest. Therefore, the device status **142** is "awake." The score comparers **138** and **140** also identified the hotword confidence score corresponding to computing device **106** to be the highest. Therefore, the device statuses **138** and **140** are "asleep." In some implementations, the activation state of the computing device may be unaffected. For example, the user **102** may be watching a movie on the computing device **108** and have the computing device **106** in the user's hand. When the user **102** speaks "OK computer," the computing device **106**, by virtue of having the highest hotword confidence score, initiates speech recognition on the audio data following the hotword. The computing device **108** does not initiate speech recognition on the audio data following the hotword, and continues to play the movie.

In some implementations, the computing device that determines that it has the highest hotword confidence score waits for a particular amount of time before beginning to perform speech recognition on speech following the hotword. Doing so allows a computing device that computed

SONOS EXHIBIT 1001

US 10,593,330 B2

7      8

the highest hotword confidence score to begin performing speech recognition on speech that follows the hotword without waiting for a higher hotword confidence score. To illustrate, the score comparer **136** of computing device **106** received hotword confidence scores of 0.6 and 0.45 from computing device **108** and **110**, respectively, as well as the hotword confidence score of 0.85 from the hotworder **124**. From the time that the hotworder **124** computes a hotword confidence score of the "Ok computer" audio data, the computing device **106** waits five hundred milliseconds before performing speech recognition on speech that follows the hotword. In instances where the score comparer receives a higher score, the computing device may not wait for a particular amount of time before setting the device status to "sleep." For example, the hotworder **126** of computing device **108** computes a hotword confidence score of 0.6 and receives hotword confidence scores of 0.85 and 0.45. Once the computing device **108** receives the hotword confidence score of 0.85, then the computing device **108** can set the device status **144** to "sleep." This assumes that the computing device **108** receives the hotword confidence score of 0.85 within the particular amount of time after the hotworder **126** computes the hotword confidence score of 0.6.

In some implementations, when a computing device has the highest hotword confidence score, the computing device may continue to broadcast the confidence score data packet for a particular amount of time to ensure that other computing devices receive the confidence score data packet. This strategy would be most applicable in instances where a computing device does send back a confirmation once it receives a confidence score data packet from another computing device. Therefore, if the computing device **106** transmits the confidence score data packet **130** to computing devices in data group **118** and receives a confirmation before a particular amount of time such as five hundred milliseconds, then the computing device **106** may begin to perform speech recognition on speech following the hotword. In instances where computing devices broadcast their confidence score data packets and do not expect confirmation, the computing device may continue to broadcast their hotword confidence scores for a particular amount of time, such as five hundred milliseconds, or until the computing device receives a higher hotword confidence score, whichever comes first. For example, computing device **110** computes a hotword confidence score of 0.45 and begins to broadcast the confidence score data packet **134**. After three hundred milliseconds, the computing device **110** receives confidence score data packet **130** and stops broadcasting the confidence score data packet **134** because the hotword confidence score of 0.85 from confidence score data packet **130** is higher than the hotword confidence score of forty five. As another broadcast example, computing device **106** computes a hotword confidence score of 0.45 and begins to broadcast the confidence score data packet **130**. After five hundred milliseconds, the computing device **106** stops broadcasting confidence score data packet **130** and begins to perform speech recognition on speech following the hotword. The computing device **106** may receive the confidence score data packets **132** and **134** before five hundred milliseconds has elapsed, but because the hotword confidence scores in the confidence score data packets **132** and **134** are lower than 0.85, the computing device continues to wait until after the five hundred milliseconds has elapsed.

In some implementations, the computing device may begin to perform speech recognition on speech following the hotword until the computing device receives a higher hotword confidence score. The hotworder computes a hotword confidence score and if the hotword confidence score satisfies a threshold, then the computing device performs speech recognition on speech following the hotword. The computing device may perform the speech recognition without displaying any indication of the speech recognition to the user. This may be desirable because doing so gives the user the impression that the computing device is not active while also allowing the computing device to display results based on the speech recognition to the user quicker than if the computing device had waited until the computing device confirmed that it computed the highest hotword score. As an example, the computing device **106** computes a hotword confidence score of 0.85 and begins to perform speech recognition on speech following the hotword. The computing device **106** receives confidence score data packets **132** and **134** and determines that the hotword confidence score of 0.85 is the highest. The computing device **106** continues to perform speech recognition on speech following the hotword and presents the results to the user. For computing device **108**, the hotworder **126** computes a hotword confidence score of 0.6 and the computing device **108** begins to perform speech recognition on speech following the hotword without displaying data to the user. Once the computing device **108** receives the confidence score data packet **130** that includes the hotword confidence of 0.85, the computing device stops performing speech recognition. No data is displayed to the user, and the user is likely under the impression that the computing device **108** has remained in a "sleep" state.

In some implementations, to avoid any latency after a hotword is spoken, scores could be reported from the hotworder before the end of the hotword, e.g. for a partial hotword. For example, as a user is speaking "Ok computer," a computing device could compute a partial hotword confidence score once the user has finished speaking "OK comp." The computing device can then share the partial hotword confidence score with other computing devices. The computing device with the highest partial hotword confidence score can continue to process the user's speech.

In some implementations, a computing device may emit an audible or inaudible sound, e.g., of a particular frequency or frequency pattern, when the computing device determines that a hotword confidence score satisfies a threshold. The sound would signal to other computing devices that the computing device will continue to process the audio data following the hotword. Other computing devices would receive this sound and cease processing of the audio data. For example, a user speaks "Ok computer." One of the computing devices computes a hotword confidence score that is greater than or equal to a threshold. Once the computing device determines that the hotword confidence score is greater than or equal two a threshold, the computing device emits a sound of eighteen kilohertz. The other computing devices in the vicinity of the user may also be computing a hotword confidence score and may be in the middle of computing a hotword confidence score when the other computing devices receive the sound. When the other computing devices receive the sound, the other computing devices cease processing of the user's speech. In some implementations, the computing device may encode the hotword confidence score in the audible or inaudible sound. For example, if the hotword confidence score is 0.5, then the computing device may generate an audible or inaudible sound that includes a frequency pattern that encodes the score of 0.5.

In some implementations, the computing devices may use different audio metrics to select a computing device to

SONOS EXHIBIT 1001

US 10,593,330 B2

9 10

continue processing the user's speech. For example, the computing devices may use loudness to determine which computing device will continue to process the user's speech. The computing device that detects the loudest speech may continue to process the user's speech. As another example, the computing device that is currently in use or has an active display may notify the other computing devices that it will continue to processes the user's speech upon detecting a hotword.

In some implementations, each computing device that is in the vicinity of the user while the user is speaking receives the audio data and sends the audio data to a server to improve speech recognition. Each computing device can receive the audio data that corresponds to the user's speech. While only one computing device will appear to the user to be processing the user's speech, each computing device can transmit the audio data to a server. The server can then use the audio data that is received from each computing device to improve speech recognition because the server can compare different audio samples that correspond to the same utterance. For example, a user says "Ok computer, remind me to buy milk." Once the user finishes speaking "Ok computer," the nearby computing devices will have likely determined which computing device has the highest hotword confidence score and that computing device will process and respond "remind me to buy milk" as the user speaks those words. The other computing devices will also receive "remind me to buy milk." While the other computing device will not respond to the "remind me to buy milk" utterance, the other computing devices can send audio data corresponding to "remind me to buy milk" to a server. The computing devices responding to "remind me to buy milk" can also send its audio data to the server. The server can process the audio data to improve speech recognition because the server has different audio samples from different computing devices that correspond to the same "remind me to buy milk" utterance.

FIG. **2** is a diagram of an example process **200** for hotword detection. The process **200** may be performed by a computing device such as the computing device **108** from FIG. **1**. The process **200** computes a value that corresponds a likelihood that an utterance includes a hotword and compares the value to other values computed by other computing devices to determine whether or not to perform speech recognition on the portion of the utterance after the hotword.

The computing device receives audio data that corresponds to an utterance (**210**). A user speaks the utterance and a microphone of the computing device receives the audio data of the utterance. The computing device processes the audio data by buffering, filtering, endpointing, and digitizing the audio data. As an example, the user may utter "Ok, computer" and the microphone of the computing device will receive the audio data that corresponds to "Ok, computer." An audio subsystem of the computing device will sample, buffer, filter, and endpoint the audio data for further processing by the computing device.

The computing device determines a first value corresponding to a likelihood that the utterance includes a hotword (**220**). The computing device determines the first value, which may be referred to as a hotword confidence score, by comparing the audio data of the utterance to a group of audio samples that include the hotword or by analyzing the audio characteristics of the audio data of the utterance. The first value may be normalized to a scale from zero to one where one indicates the highest likelihood that the utterance includes a hotword. In some implementations, the computing device identifies a second computing device

and determines that the second computing device is configured to respond to utterances that include the hotword and is configured by the user to be responsive to the hotword. The user may be logged into both the computing device and the second computing device. Both the computing device and the second computing device may be configured to respond to the user's voice. The computing device and the second computing device may be connected to the same local area network. The computing device and the second computing device may both be located within a particular distance of each other, such as ten meters, as determined by GPS or signal strength. For example, the computing devices may communicate by a short range radio. The computing device may detect a strength of a signal being transmitted by the second computing device as five dBm and translate that a corresponding distance such as five meters.

The computing device receives a second value corresponding to a likelihood that the utterance includes the hotword, the second value being determined by a second computing device (**230**). The second computing device receives the utterance through a microphone of the second computing device. The second computing device processes the received audio data that corresponds to the utterance and determines a second value or a second hotword confidence score. The second hotword confidence score reflect the likelihood, as calculated by the second computing device, that the utterance includes a hotword. In some implementations, the computing device transmits the first value to the second computing device using one or more of the following techniques. The computing device may transmit the first value to the second computing device through a server accessible through the Internet, through a server that is located on the local area network, or directly through the local area network or a short range radio. The computing device may transmit the first value only to the second computing device or the computing device may broadcast the first value so that other computing devices may also receive the first value. The computing device may receive the second value from the second computing device using the same or different technique as the computing device transmitted the first value.

In some implementations, the computing device may compute a loudness score for the utterance or a signal to noise ratio for the utterance. The computing device may combine the loudness score, the signal to noise ratio, and the hotword confidence score to determine a new value for comparing to similar values from other computing devices. For example, the computing device may compute a hotword confidence score and a signal to noise ratio. The computing device may then combine those two scores and compare to similarly computed scores from other computing devices. In some implementations, the computing device may compute different scores and transmit each score to other computing devices for comparison. For example, the computing device may compute a loudness score for the utterance and a hotword confidence score. The computing device may then transmit those scores to other computing devices for comparison.

In some implementations, the computing device may transmit a first identifier with the first value. The identifier may be based on one or more of an address of the computing device, a name of the computing device given by the user, or a location of the computing device. For example, an identifier may be "69.123.132.43" or "phone." Similarly, the second computing device may transmit a second identifier with the second value. In some implementations, the computing device may transmit the first identifier to particular

US 10,593,330 B2

11

computing devices that the computing device previously identified as configured to respond to the hotword. For example, the computing device may have previously identified the second computing device as configured to respond to the hotword because, in addition to being able to respond to a hotword, the same user was logged into the second computing device as the computing device.

The computing device compares the first value and the second value (**240**). The computing device then initiates, based on the result of the comparison, speech recognition processing on the audio data (**250**). In some implementations, for example, the computing device initiates speech recognition when the first value is greater than or equal to the second value. If the user spoke "ok computer, call Carol," then the computing device would begin to process "call Carol" by performing speech recognition on "call Carol" because the first value is greater than or equal to second value. In some implementations, the computing device sets an activation state. In instances where the first value is greater than or equal to the second value, then the computing device sets the activation state as active or "awake." In the "awake" state, the computing device displays results from the speech recognition.

In some implementations, the computing device compares the first value and the second value and determines that the first value is less than the second value. The computing device, based on determining that the first value is less than the second value, sets the activation state as inactive or "sleep." In the "sleep" state, the computing device does not appear, to the user, to be active or processing the audio data.

In some implementations, when the computing device determines that the first value is greater than or equal to the second value, the computing device may wait for a particular amount of time before setting the activation state to active. The computing device may wait for the particular amount of time to increase the probability that the computing device will not receive a higher value from another computing device. The particular amount of time may be fixed or may vary depending on the technique that the computing devices transmit and receive values. In some implementations, when the computing device determines that the first value is greater than or equal to the second value, the computing device may continue to transmit the first value for a particular amount of time. By continuing to transmit the first value for a particular amount of time, the computing device increases the probability that the first value is received by the other computing devices. In instances where the computing device determines that the first value is less than the second value, the computing device may stop transmitting the first value.

In some implementations, the computing device may consider additional information in determining whether to execute the command following the hotword. One example of the additional information may be the portion of the utterance that follows the hotword. Typically, the audio data that follows the hotword corresponds to a command for the computing device such as "call Sally," "play Halloween Movie," or "set heat to 70 degrees." The computing device may identify a typical device that handles the type of request or that is capable of handling the request. A request to call a person would be typically handled by a phone based on pre-programmed typical usages or based on usage patterns of a user of the device. If the user typically watches movies on a tablet, then the tablet may handle a request to play a movie. If the thermostat is capable of adjusting the temperature, then the thermostat may handle temperature adjustments.

12

For the computing device to consider the portion of the utterance that follows the hotword, the computing device would have to initiate speech recognition on the audio data once it likely identifies a hotword. The computing device may categorize the command portion of the utterance and compute a frequency of commands in that category. The computing device may transmit the frequency along with the hotword confidence score to other computing devices. Each computing device may use the frequencies and the hotword confidence scores to determine whether to execute the command following the hotword.

For example, if the user utters "OK computer, play Michael Jackson," then if the computing device is a phone that the user use's twenty percent of the time to listen to music, then the computing device may transmit that information along with the hotword confidence score. A computing device such as a tablet that the user uses five percent of the time to listen to music may transmit that information along with the hotword confidence score to other computing devices. The computing devices may use a combination of the hotword confidence score and the percentage of time playing music to determine whether to execute the command.

FIG. **3** shows an example of a computing device **300** and a mobile computing device **350** that can be used to implement the techniques described here. The computing device **300** is intended to represent various forms of digital computers, such as laptops, desktops, workstations, personal digital assistants, servers, blade servers, mainframes, and other appropriate computers. The mobile computing device **350** is intended to represent various forms of mobile devices, such as personal digital assistants, cellular telephones, smart-phones, and other similar computing devices. The components shown here, their connections and relationships, and their functions, are meant to be examples only, and are not meant to be limiting.

The computing device **300** includes a processor **302**, a memory **304**, a storage device **306**, a high-speed interface **308** connecting to the memory **304** and multiple high-speed expansion ports **310**, and a low-speed interface **312** connecting to a low-speed expansion port **314** and the storage device **306**. Each of the processor **302**, the memory **304**, the storage device **306**, the high-speed interface **308**, the high-speed expansion ports **310**, and the low-speed interface **312**, are interconnected using various busses, and may be mounted on a common motherboard or in other manners as appropriate. The processor **302** can process instructions for execution within the computing device **300**, including instructions stored in the memory **304** or on the storage device **306** to display graphical information for a GUI on an external input/output device, such as a display **316** coupled to the high-speed interface **308**. In other implementations, multiple processors and/or multiple buses may be used, as appropriate, along with multiple memories and types of memory. Also, multiple computing devices may be connected, with each device providing portions of the necessary operations (e.g., as a server bank, a group of blade servers, or a multi-processor system).

The memory **304** stores information within the computing device **300**. In some implementations, the memory **304** is a volatile memory unit or units. In some implementations, the memory **304** is a non-volatile memory unit or units. The memory **304** may also be another form of computer-readable medium, such as a magnetic or optical disk.

The storage device **306** is capable of providing mass storage for the computing device **300**. In some implementations, the storage device **306** may be or contain a com-

SONOS EXHIBIT 1001

US 10,593,330 B2

13

14

puter-readable medium, such as a floppy disk device, a hard disk device, an optical disk device, or a tape device, a flash memory or other similar solid state memory device, or an array of devices, including devices in a storage area network or other configurations. Instructions can be stored in an information carrier. The instructions, when executed by one or more processing devices (for example, processor 302), perform one or more methods, such as those described above. The instructions can also be stored by one or more storage devices such as computer- or machine-readable mediums (for example, the memory 304, the storage device 306, or memory on the processor 302).

The high-speed interface 308 manages bandwidth-intensive operations for the computing device 300, while the low-speed interface 312 manages lower bandwidth-intensive operations. Such allocation of functions is an example only. In some implementations, the high-speed interface 308 is coupled to the memory 304, the display 316 (e.g., through a graphics processor or accelerator), and to the high-speed expansion ports 310, which may accept various expansion cards (not shown). In the implementation, the low-speed interface 312 is coupled to the storage device 306 and the low-speed expansion port 314. The low-speed expansion port 314, which may include various communication ports (e.g., USB, Bluetooth, Ethernet, wireless Ethernet) may be coupled to one or more input/output devices, such as a keyboard, a pointing device, a scanner, or a networking device such as a switch or router, e.g., through a network adapter.

The computing device 300 may be implemented in a number of different forms, as shown in the figure. For example, it may be implemented as a standard server 320, or multiple times in a group of such servers. In addition, it may be implemented in a personal computer such as a laptop computer 322. It may also be implemented as part of a rack server system 324. Alternatively, components from the computing device 300 may be combined with other components in a mobile device (not shown), such as a mobile computing device 350. Each of such devices may contain one or more of the computing device 300 and the mobile computing device 350, and an entire system may be made up of multiple computing devices communicating with each other.

The mobile computing device 350 includes a processor 352, a memory 364, an input/output device such as a display 354, a communication interface 366, and a transceiver 368, among other components. The mobile computing device 350 may also be provided with a storage device, such as a micro-drive or other device, to provide additional storage. Each of the processor 352, the memory 364, the display 354, the communication interface 366, and the transceiver 368, are interconnected using various buses, and several of the components may be mounted on a common motherboard or in other manners as appropriate.

The processor 352 can execute instructions within the mobile computing device 350, including instructions stored in the memory 364. The processor 352 may be implemented as a chipset of chips that include separate and multiple analog and digital processors. The processor 352 may provide, for example, for coordination of the other components of the mobile computing device 350, such as control of user interfaces, applications run by the mobile computing device 350, and wireless communication by the mobile computing device 350.

The processor 352 may communicate with a user through a control interface 358 and a display interface 356 coupled to the display 354. The display 354 may be, for example, a TFT (Thin-Film-Transistor Liquid Crystal Display) display or an OLED (Organic Light Emitting Diode) display, or other appropriate display technology. The display interface 356 may comprise appropriate circuitry for driving the display 354 to present graphical and other information to a user. The control interface 358 may receive commands from a user and convert them for submission to the processor 352. In addition, an external interface 362 may provide communication with the processor 352, so as to enable near area communication of the mobile computing device 350 with other devices. The external interface 362 may provide, for example, for wired communication in some implementations, or for wireless communication in other implementations, and multiple interfaces may also be used.

The memory 364 stores information within the mobile computing device 350. The memory 364 can be implemented as one or more of a computer-readable medium or media, a volatile memory unit or units, or a non-volatile memory unit or units. An expansion memory 374 may also be provided and connected to the mobile computing device 350 through an expansion interface 372, which may include, for example, a SIMM (Single In Line Memory Module) card interface. The expansion memory 374 may provide extra storage space for the mobile computing device 350, or may also store applications or other information for the mobile computing device 350. Specifically, the expansion memory 374 may include instructions to carry out or supplement the processes described above, and may include secure information also. Thus, for example, the expansion memory 374 may be provide as a security module for the mobile computing device 350, and may be programmed with instructions that permit secure use of the mobile computing device 350. In addition, secure applications may be provided via the SIMM cards, along with additional information, such as placing identifying information on the SIMM card in a non-hackable manner.

The memory may include, for example, flash memory and/or NVRAM memory (non-volatile random access memory), as discussed below. In some implementations, instructions are stored in an information carrier. that the instructions, when executed by one or more processing devices (for example, processor 352), perform one or more methods, such as those described above. The instructions can also be stored by one or more storage devices, such as one or more computer- or machine-readable mediums (for example, the memory 364, the expansion memory 374, or memory on the processor 352). In some implementations, the instructions can be received in a propagated signal, for example, over the transceiver 368 or the external interface 362.

The mobile computing device 350 may communicate wirelessly through the communication interface 366, which may include digital signal processing circuitry where necessary. The communication interface 366 may provide for communications under various modes or protocols, such as GSM voice calls (Global System for Mobile communications), SMS (Short Message Service), EMS (Enhanced Messaging Service), or MMS messaging (Multimedia Messaging Service), CDMA (code division multiple access), TDMA (time division multiple access), PDC (Personal Digital Cellular), WCDMA (Wideband Code Division Multiple Access), CDMA2000, or GPRS (General Packet Radio Service), among others. Such communication may occur, for example, through the transceiver 368 using a radio-frequency. In addition, short-range communication may occur, such as using a Bluetooth, WiFi, or other such transceiver (not shown). In addition, a GPS (Global Positioning System) receiver module 370 may provide additional navigation- and

**SONOS EXHIBIT 1001**

US 10,593,330 B2

15

location-related wireless data to the mobile computing device **350**, which may be used as appropriate by applications running on the mobile computing device **350**.

The mobile computing device **350** may also communicate audibly using an audio codec **360**, which may receive spoken information from a user and convert it to usable digital information. The audio codec **360** may likewise generate audible sound for a user, such as through a speaker, e.g., in a handset of the mobile computing device **350**. Such sound may include sound from voice telephone calls, may include recorded sound (e.g., voice messages, music files, etc.) and may also include sound generated by applications operating on the mobile computing device **350**.

The mobile computing device **350** may be implemented in a number of different forms, as shown in the figure. For example, it may be implemented as a cellular telephone **380**. It may also be implemented as part of a smart-phone **382**, personal digital assistant, or other similar mobile device.

Various implementations of the systems and techniques described here can be realized in digital electronic circuitry, integrated circuitry, specially designed ASICs (application specific integrated circuits), computer hardware, firmware, software, and/or combinations thereof. These various implementations can include implementation in one or more computer programs that are executable and/or interpretable on a programmable system including at least one programmable processor, which may be special or general purpose, coupled to receive data and instructions from, and to transmit data and instructions to, a storage system, at least one input device, and at least one output device.

These computer programs (also known as programs, software, software applications or code) include machine instructions for a programmable processor, and can be implemented in a high-level procedural and/or object-oriented programming language, and/or in assembly/machine language. As used herein, the terms machine-readable medium and computer-readable medium refer to any computer program product, apparatus and/or device (e.g., magnetic discs, optical disks, memory, Programmable Logic Devices (PLDs) used to provide machine instructions and/or data to a programmable processor, including a machine-readable medium that receives machine instructions as a machine-readable signal. The term machine-readable signal refers to any signal used to provide machine instructions and/or data to a programmable processor.

To provide for interaction with a user, the systems and techniques described here can be implemented on a computer having a display device (e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor) for displaying information to the user and a keyboard and a pointing device (e.g., a mouse or a trackball) by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback (e.g., visual feedback, auditory feedback, or tactile feedback); and input from the user can be received in any form, including acoustic, speech, or tactile input.

The systems and techniques described here can be implemented in a computing system that includes a back end component (e.g., as a data server), or that includes a middleware component (e.g., an application server), or that includes a front end component (e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the systems and techniques described here), or any combination of such back end, middleware, or front end components. The components of the system can be interconnected by any

16

form or medium of digital data communication (e.g., a communication network). Examples of communication networks include a local area network (LAN), a wide area network (WAN), and the Internet.

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other.

Although a few implementations have been described in detail above, other modifications are possible. For example, while a client application is described as accessing the delegate(s), in other implementations the delegate(s) may be employed by other applications implemented by one or more processors, such as an application executing on one or more servers. In addition, the logic flows depicted in the figures do not require the particular order shown, or sequential order, to achieve desirable results. In addition, other actions may be provided, or actions may be eliminated, from the described flows, and other components may be added to, or removed from, the described systems. Accordingly, other implementations are within the scope of the following claims.

What is claimed is:

1. A computer-implemented method comprising:
receiving, by a computing device that is in a low power mode, audio data that includes an utterance of a particular, predefined hotword;
while the computing device remains in the low power mode, and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, transmitting, by the computing device, a message;
while the computing device remains in the low power mode, receiving, by the computing device and from an additional computing device that is in a low power mode, an additional message; and
based on the message and the additional message, determining, by the computing device, to exit the low power mode.

2. The method of claim **1**, comprising:
based on the message and the additional message, performing, by the computing device, automated speech recognition processing on the audio data.

3. The method of claim **1**, wherein:
the computing device is configured to exit the low power mode in response to detecting an utterance of the particular, predefined hotword, and
the additional computing device is configured to exit the low power mode in response to detecting an utterance of the particular, predefined hotword.

4. The method of claim **1**, comprising:
determining, by the computing device, that the audio data includes an utterance of a particular, predefined hotword without performing automated speech recognition processing on the audio data.

5. The method of claim **1**, comprising:
determining, by the computing device, a hotword score that reflects a likelihood that the audio data includes an utterance of the particular, predefined hotword,
wherein the message includes the hotword score.

6. The method of claim **1**, comprising:
determining, by the computing device, a hotword score that reflects a likelihood that the audio data includes an utterance of the particular, predefined hotword; and
determining, by the computing device, that the hotword score satisfies a threshold,

Appx140

SONOS EXHIBIT 1001

US 10,593,330 B2

17

18

wherein transmitting the message is based on determining that the hotword score satisfies the threshold.

**7**. The method of claim **1**, comprising:

comparing, by the computing device, the message to the additional message;

determining to exit the low power mode based on comparing the message to the additional message.

**8**. The method of claim **1**, wherein the first computing device transmits the message for a particular amount of time.

**9**. A system comprising:

one or more computers; and

one or more computers and one or more storage devices storing instructions that are operable, when executed by the one or more computers, to cause the one or more computers to perform operations comprising:

receiving, by a computing device that is in a low power mode, audio data that includes an utterance of a particular, predefined hotword;

while the computing device remains in the low power mode, and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, transmitting, by the computing device, a message;

while the computing device remains in the low power mode, receiving, by the computing device and from an additional computing device that is in a low power mode, an additional message; and

based on the message and the additional message, determining, by the computing device, to exit the low power mode.

**10**. The system of claim **9**, wherein the operations comprise:

based on the message and the additional message, performing, by the computing device, automated speech recognition processing on the audio data.

**11**. The system of claim **9**, wherein:

the computing device is configured to exit the low power mode in response to detecting an utterance of the particular, predefined hotword, and

the additional computing device is configured to exit the low power mode in response to detecting an utterance of the particular, predefined hotword.

**12**. The system of claim **9**, wherein the operations comprise:

determining, by the computing device, that the audio data includes an utterance of a particular, predefined hotword without performing automated speech recognition processing on the audio data.

**13**. The system of claim **9**, wherein the operations comprise:

determining, by the computing device, a hotword score that reflects a likelihood that the audio data includes an utterance of the particular, predefined hotword,

wherein the message includes the hotword score.

**14**. The system of claim **9**, wherein the operations comprise:

determining, by the computing device, a hotword score that reflects a likelihood that the audio data includes an utterance of the particular, predefined hotword; and

determining, by the computing device, that the hotword score satisfies a threshold,

wherein transmitting the message is based on determining that the hotword score satisfies the threshold.

**15**. The system of claim **9**, wherein the operations comprise:

comparing, by the computing device, the message to the additional message;

determining to exit the low power mode based on comparing the message to the additional message.

**16**. The system of claim **9**, wherein the first computing device transmits the message for a particular amount of time.

**17**. A non-transitory computer-readable medium storing software comprising instructions executable by one or more computers which, upon such execution, cause the one or more computers to perform operations comprising:

receiving, by a computing device that is in a low power mode, audio data that includes an utterance of a particular, predefined hotword;

while the computing device remains in the low power mode, and in response to receiving the audio data that includes the utterance of the particular, predefined hotword, transmitting, by the computing device, a message;

while the computing device remains in the low power mode, receiving, by the computing device and from an additional computing device that is in a low power mode, an additional message; and

based on the message and the additional message, determining, by the computing device, to exit the low power mode.

**18**. The medium of claim **17**, wherein the operations comprise:

based on the message and the additional message, performing, by the computing device, automated speech recognition processing on the audio data.

\* \* \* \* \*

**SONOS EXHIBIT 1001**

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing brief complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

The brief has been prepared using a proportionally spaced typeface and includes 8,199 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

Date: November 18, 2024          */s/ Daniel C. Tucker*
                                       Daniel C. Tucker